No. 23-13727

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

DISABILITY RIGHTS FLORIDA, et al.

*Plaintiffs-Appellants*,

v.

FLORIDA SECRETARY OF STATE, et al.

*Defendants-Appellees*,

and

REPUBLICAN NATIONAL COMMITTEE, et al.

*Intervenor-Defendants–Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:23-cv-111 (Winsor, J.)

---

## PLAINTIFFS-APPELLANTS' APPENDIX
## VOLUME II

---

Frederick S. Wermuth
KING, BLACKWELL, ZEHNDER &
WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472

Abha Khanna*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177

Justin Baxenberg*
Alexander F. Atkins*
Renata O'Donnell*
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Telephone: (202) 968-4490

*Admitted Pro Hac Vice*

*Counsel for Plaintiffs-Appellants*

# Index of Appendix

**Docket/Tab #**

<u>Volume I</u>

District Court Docket Sheet ........................................................................A

First Amended Complaint and Exhibit ...............................................101

Hillsborough County Supervisor of Elections'
    Answer to First Amended Complaint ........................................108

Miami-Dade County Supervisor of Elections'
    Answer to First Amended Complaint ........................................109

Fifty-Four County Supervisors of Elections'
    Answer to First Amended Complaint ........................................110

Intervenors' Motion to Dismiss First Amended Complaint ................111

Secretary of State and Supervisors of Elections' Motion to Dismiss ................112

Sarasota County Supervisor of Elections'
    Answer to First Amended Complaint ........................................114

Statement of Interest of the United States and Exhibit .......................118


<u>Volume II</u>

Plaintiffs' Memorandum in Opposition to Defendants' and
    Intervenors' Motions to Dismiss and Exhibit ...........................119

Order Granting Motion to Dismiss .....................................................140

Judgment ............................................................................................143

Certificate of Service

# 119

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

VOTE.ORG; FLORIDA ALLIANCE
FOR RETIRED AMERICANS;
FLORIDA STATE CONFERENCE
OF BRANCHES AND YOUTH
UNITS OF THE NAACP;
DISABILITY RIGHTS FLORIDA,

Case No. 4:23-cv-111-AW-MAF

    *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida; et al.,

    *Defendants*,
        and

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY,

    *Intervenor-Defendants*.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................- 1 -

LEGAL STANDARD..........................................................- 3 -

ARGUMENT ....................................................................- 4 -

I.   The Wet Signature Requirement violates the Materiality Provision..............- 4 -

   A.  The Wet Signature Requirement denies the right to vote. .......................- 5 -

   B.  A wet signature is not material to qualifications to vote..........................- 7 -

   C.  Racial discrimination is not an element of a Materiality Provision claim.... - 10 -

   D.  The Materiality Provision allows challenges to technical requirements
       imposed by state law................................................................- 13 -

II.  Plaintiffs have Article III standing. ............................................- 15 -

   A.  DRF, Florida Alliance, and Florida NAACP have associational standing. .. - 16 -

   B.  Florida NAACP, Vote.org, and DRF have organizational standing. ......- 20 -

III. Plaintiffs are appropriate parties to challenge the Wet Signature Requirement
     under the Materiality Provision and Section 1983. ......................................- 24 -

IV.  The Materiality Provision confers a cause of action enforceable by private
     plaintiffs under Section 1983, and no interlocutory appeal is warranted.....- 28 -

CONCLUSION ..................................................................- 33 -

App.250

## **INTRODUCTION**

The Materiality Provision of the Civil Rights Act prohibits rejecting voter registration applications due to errors or omissions that are immaterial to determining the applicant's qualifications to vote under state law. 52 U.S.C. § 10101(a)(2)(B). Plaintiffs—four organizations dedicated to empowering and encouraging civic participation in Florida—challenge Florida's requirement that certain registration applications be rejected based on how applicants sign their forms. The qualifications to vote under Florida law are straightforward: a person is qualified if they are 18 years old by election day; a U.S. citizen; a legal resident of Florida and the county in which they wish to register; and, if they have been convicted of a felony or adjudicated mentally incapacitated with respect to voting, have had their rights restored. Fla. Stat. § 97.041. The Materiality Provision requires that Florida registers such voters, even if their registration form includes errors or omissions that are not *material* to determining whether the voter meets these specific and exclusive qualifications.

At issue is a provision of Florida law that requires any prospective voter who has not provided an electronic signature to the Department of Highway Safety and Motor Vehicles (DMV) to complete a paper registration application signed with their "original signature." Fla. Stat. § 97.053(5)(a)(8). Florida election officials— including Defendants—interpret this to mean that paper applications must be

rejected unless they include the applicant's handwritten signature in wet-ink (the "Wet Signature Requirement"). As a result, a paper application submitted with any other type of signature—e.g., an electronic or imaged signature—will be rejected and the applicant will not be registered to vote. *See id.* (providing only two options for signing an application: with wet signature or with digital signature transmitted by DMV). Plaintiffs allege that the Wet Signature Requirement violates the Materiality Provision because whether an application bears a wet ink signature is immaterial to determining a prospective voter's qualifications under Florida law.

Defendants and Intervenors moved to dismiss, *see* Sec'y of State & Supervisors' Mot. to Dismiss ("Defs.' Br."), ECF No. 112; Intervenors' Mot. to Dismiss ("Ints.' Br.") ECF No. 111, but their arguments misunderstand the Materiality Provision and the case law applying it.[1] First, they argue that the Wet Signature Requirement does not "deny" the right to vote, but under the Materiality Provision's plain terms, rejecting an application *is* denying the right to vote, even if alternate means of registering or cure opportunities are available. And regardless of other purposes it might serve, a "wet" signature on an application tells election officials nothing about whether the applicant is qualified under Florida law. Rejecting an application on this basis therefore violates the Materiality Provision.

---

[1] As used herein, "Defendants" refers to Defendant Byrd in his official capacity as the Florida Secretary of State and the ten county supervisors of elections who joined his motion to dismiss, ECF No. 112.

App.252

Furthermore, binding precedent establishes that the Materiality Provision is enforceable through private actions, and the statutory text and relevant caselaw support the ability of organizations such as Plaintiffs to challenge violations of civil rights laws, like the Materiality Provision.

Defendants' and Intervenors' standing arguments are also misplaced, particularly at this stage of the proceedings. Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP (Florida NAACP), Florida Alliance for Retired Americans (FLARA), and Disability Rights Florida (DRF) sufficiently allege standing to challenge the Wet Signature Requirement on behalf of their members and constituents who have been or will be harmed by the Requirement, either through denial of applications with non-wet signatures or through deterrence from submitting an application in the first instance. Plaintiffs Vote.org, Florida NAACP, and DRF also sufficiently allege standing on their own behalf, because the Requirement forces each organization to divert resources away from other activities towards educating and assisting voters to comply with the Requirement.

The motions to dismiss must be denied.

## LEGAL STANDARD

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim or a facial attack on subject matter jurisdiction under Rule 12(b)(1), the Court accepts the allegations in the complaint as true and construes them in the light most favorable

- 3 -

to the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). The Court must deny a motion to dismiss so long as the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

## ARGUMENT

The Wet Signature Requirement violates the Materiality Provision of the Civil Rights Act by denying some voters the right to vote based on how they sign their registration applications. Plaintiffs have adequately alleged that the Defendant's enforcement of the Requirement harms their members or constituents by deterring or preventing them from registering to vote and the organizations themselves by requiring diversion of resources toward educating and assisting voters to comply with the Requirement. Federal law therefore allows Plaintiffs to bring this suit under 52 U.S.C. § 10101(a)(2)(B) and 42 U.S.C. § 1983.

### I.     The Wet Signature Requirement violates the Materiality Provision.

The Materiality Provision of the Civil Rights Act provides that "[n]o person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any … registration … requisite to voting" if it is immaterial "in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C.

- 4 -

§ 10101(a)(2)(B). Florida's Wet Signature Requirement requires state election officials acting "under color of law" to deny Floridians their right to vote based on the "omission" of a handwritten, wet-ink signature on a voter registration application, which is a "record or paper" relating to "registration." Because whether a voter provides a signature by pen, e-signature, or otherwise provides no insight into a voter's qualifications to register, *see* Fla. Stat. § 97.041, rejecting applications due to the Wet Signature Requirement violates the Materiality Provision.

### A. The Wet Signature Requirement denies the right to vote.

Plaintiffs adequately allege that the Wet Signature Requirement denies the right to vote under the Materiality Provision. *First*, the Materiality Provision defines "vote" broadly, to include "all action necessary to make a vote effective including, but not limited to, registration[.]" 52 U.S.C. § 10101(a)(3)(A), (e). Rejecting the registration application of an otherwise qualified voter is a denial of the right to vote as defined by the Materiality Provision. *See id.* § 10101(a)(2)(B); *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1286 (N.D. Ga. 2005) (affirming registration requirement violated Materiality Provision).

*Second*, courts repeatedly have confirmed that rejecting registrations based on errors or omissions immaterial to determining an applicant's qualifications to vote violates the Materiality Provision even where a state provides other methods of registration or an opportunity to cure. Order on Mot. to Dismiss at 32 n.17, *Mi*

App.255

*Familia Vota v. Fontes*, No. 2:22-cv-00509 (D. Ariz. Feb. 16, 2023) (Ex. 1) ("cure

provision … does not warrant dismissing [] § 10101 claim"); *La Unión del Pueblo*

*Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022) (holding Materiality

Provision "does not only apply when a voter is absolutely prohibited from voting");

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282

(N.D. Ga. 2021) (rejecting argument at motion to dismiss stage that "opportunity to

cure an error rehabilitates any potential violation" of Materiality Provision). These

holdings are rooted in both law and logic. Under Defendants' position, a poll worker

who turns away qualified voters for half the day has not actually denied anyone the

right to vote because those voters can return later. This is obviously not right. When

a state official rejects an individual's voter registration application, that individual

is effectively denied the right to vote, regardless of other avenues that may be

available for the individual to try again.

Defendants cite *McDonald v. Board of Elections Commissioners of Chicago*,

394 U.S. 802 (1969), and a concurrence in *New Georgia Project v. Raffensperger*,

976 F.3d 1278 (11th Cir. 2020), to contend that the Wet Signature Requirement is

not unduly burdensome. Defs.' Br. at 9-10. But in both cases the plaintiffs alleged

their claims under the Fourteenth Amendment, which—unlike Plaintiffs' claim

under the Materiality Provision—requires an analysis of the burden imposed by a

law under the *Anderson-Burdick* test, weighing the plaintiffs' burden against the

App.256

state's interest in the law. *See McDonald*, 394 U.S. at 806; *New Ga. Project*, 976 F.3d at 1280. Under the Materiality Provision, by contrast, the scope and magnitude of the burden are irrelevant. *See, e.g.*, *Eakin v. Adams Cnty. Bd. of Elections*, No. 1:22-cv-340, 2023 WL 3903112, at *4-5 (W.D. Pa. June 8, 2023) (employing a Materiality Provision analysis that did not involve any balancing); *Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-01734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) (same).

### B. A wet signature is not material to qualifications to vote.

The way an applicant signs a voter registration application does not provide insight into the applicant's qualifications to vote and is accordingly immaterial under the plain terms of the Materiality Provision. Defendants argue that a wet signature is material for two reasons, but both arguments fail.

*First*, Defendants incorrectly argue that, because "[b]oth Florida and the [National Voter Registration Act's] requirements demand that the applicant sign his or her registration application under penalty of perjury," the wet signature requirement is "*per se* material." Defs.' Br. at 12-13 (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)). But this argument is rebutted by Defendants' acceptance of electronic signatures from applicants who register at the DMV or online. Defs.' Br. at 5, 10-11. If federal law required a wet signature, Defendants would be out of compliance with it for the vast majority of voter

registration forms they accept. The reality is that neither the NVRA nor *Browning*

so much as mentions—much less requires—a wet signature. *See* 52 U.S.C.

§ 20508(b)(1); *Browning,* 522 F.3d at 1174.[2]

*Second*, Defendants' assertion that Florida can require wet signatures because

the Materiality Provision "does not prohibit states from exercising their discretion

in prescribing the form used to obtain [] material information," Defs.' Br. at 14, is

unsupported and plain wrong. Requiring applicants to comply with needless

technical requirements to present otherwise material information violates the

Materiality Provision. *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006)

(identifying "two types of non-material omissions," including "failure to follow

needlessly technical instructions, such as the color of ink to use in filling out the

form"). For example, age is obviously material to one's qualifications, but asking

applicants "to list the exact number of months and days" for their age is the

---

[2] Defendants cite a stay order in *Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), to argue that the coexistence of a signature requirement and a wet signature requirement in one statute proves that both are material. Defs.' Br. at 13. This argument fails for the reasons discussed *infra* Section I(D). Moreover, the order merely granted a stay pending appeal of the district court's decision striking down Texas's wet signature requirement under the Materiality Provision, 39 F.4th at 300, and "a motions panel decision is not binding precedent." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988); *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) ("necessarily tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case"). Intervenors' assertion (at 7) that the Fifth Circuit "rejected" Vote.org's Materiality Provision claim is thus significantly overstated.

App.258

quintessential "tactic" "to disqualify potential voters," and it violates the Materiality Provision. *Schwier*, 340 F.3d at 1294 (quotation marks omitted). Similarly, while Defendants purport to use signatures to *confirm* a voter's qualifications, Defs.' Br. at 5-6, the act of signing—rather than the method used—affirms the information provided is true and accurate.

Defendants rely on *Browning* to argue that Florida can employ any method it chooses to obtain material information, but *Browning* explained that the proper inquiry is whether information that is incorrect or absent from the application "is material to determining the eligibility of the applicant." *See* 522 F.3d at 1175. In this case, whether a signature is wet provides no material information at all about a voter's qualifications.

Intervenors' materiality arguments likewise fail because they assess the State's purported interests in requiring a wet signature rather than whether a wet signature is material to a voter's qualifications. Intervenors observe that applicants required to provide a wet signature "have not gone through the process of physically presenting themselves to the State DMV," Ints.' Br. at 16-17, and contend that a handwritten signature deepens the "solemnity of the oath," *id.* at 7-8. But neither physical presentment nor solemnity is a qualification for voting in Florida. Even if the State had valid reasons for preferring a wet signature in certain circumstances, the Materiality Provision prohibits rejection of voter registration applications for

- 9 -

reasons that are irrelevant to determining a voter's qualifications. *Cf. Schwier*, 412 F. Supp. 2d at 1276 (holding preventing "fraud" did not render mandatory disclosure of social security number "material"); *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (S. Ct. Oct. 11, 2022) (mem.) (finding "whatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps [the state] determine" voters' qualifications);[3] *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006) (rejecting argument that information used for matching purposes would help prevent fraud rendered information material).

### C. Racial discrimination is not an element of a Materiality Provision claim.

Intervenors' argument that the complaint should be dismissed because it fails to allege that the Wet Signature Requirement is the result of racial discrimination is also easily disposed of. The plain language of the Materiality Provision states that "no person acting under color of law" may disenfranchise "*any* individual" on technical grounds and makes no mention of race or discriminatory conduct. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). As such, courts have recognized that it

---

[3] Although the U.S. Supreme Court vacated *Migliori* consistent with its practice in cases that become moot before a decision is issued, *see United States v. Munsingwear*, 340 U.S. 36, 39 (1950), there is nothing to suggest the Third Circuit's interpretation has changed. *See Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 n.18 (3d Cir. 2017) (opinion vacated on non-merits grounds "sets forth the view of our Court").

App.260

"isn't limited to race discrimination[.]" *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 634 (W.D. Wis. 2021).

Neighboring provisions of the Civil Rights Act, by contrast, explicitly refer to race. *See* 52 U.S.C. § 10101(a)(1), (e). It is "generally presume[d] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (cleaned up). Because "courts must presume that a legislature says in a statute what it means," this Court cannot insert a racial-discrimination requirement into the Materiality Provision where Congress chose not to. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Intervenors quote language *outside* the Materiality Provision to claim that the "[t]he plain text requires a 'pattern or practice of discrimination' to show a violation of the materiality provision." Ints.' Br. at 9. But the quoted language describes procedures that a court must follow "[i]n any proceeding instituted pursuant to subsection (c)," 52 U.S.C. § 10101(e), and this action is not instituted pursuant to subsection (c). Furthermore, by requiring certain procedures "in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a)," *id.*, the statute recognizes that not all claims under 52 U.S.C. § 10101(a) require a showing of racial discrimination—otherwise, the phrase "on account of race or color" would be unnecessary. *See Lowe v. Sec. &*

*Exch. Comm'n*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

The statutory context also undermines Intervenors' claim that subsection (e) defines "qualified under State law" as used in the Materiality Provision. Subsection (e) defines "the words 'qualified under State law'" only for purposes of subsection (e). *See* 52 U.S.C. § 10101(e) (defining terms "when used in the subsection"). The same paragraph of subsection (e) defines the term "vote," but that definition is expressly incorporated into subsection (a). *See id.* § 10101(a)(3)(A) ("For purposes of this subsection … the term 'vote' shall have the same meaning as in subsection (e) of this section."). Had Congress intended subsection (e)'s definition of "qualified under State law" to apply to the Materiality Provision, it would have incorporated that term in a similar manner; it did not do so.

Intervenors also are wrong that, without a racial discrimination element, the Materiality Provision exceeds congressional power to regulate elections under the Fifteenth Amendment. Ints.' Br. at 11-12. Under the Fifteenth Amendment, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), and the Supreme Court has "repeatedly affirmed that Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Tennessee v. Lane*, 541 U.S.

509, 518 (2004) (quotation marks omitted); *see also Browning*, 522 F.3d at 1173 (recognizing, with respect to Materiality Provision, "Congress in combating specific evils might choose a broader remedy"). Especially because of the history of "state and local government tactics of using … burdensome registration requirements to disenfranchise African-Americans," *Browning*, 522 F.3d at 1173, Congress can prohibit non-discriminatory deprivations of the right to vote due to immaterial omissions.

### D. The Materiality Provision allows challenges to technical requirements imposed by state law.

Intervenors attempt to muddy the plain language of the Materiality Provision again with the circular argument that the "text does not apply to errors or omissions that state law determines are material" and that Plaintiffs' "concession" that a wet signature is required by Florida law "ends the inquiry." Ints.' Br. at 13. This perverts the Materiality Provision, which asks only whether an error or omission in a record—such as a voter registration application—is "material in determining whether such individual is *qualified under State law* to vote in such election," 52 U.S.C. § 10101(a)(2)(B), not whether it is required by state law.

Intervenors' argument would effectively insulate any state law that deals with a voter's execution of registration forms, even if plainly immaterial to determining qualifications to vote. *See Ga. State Conf. NAACP v. Georgia*, No. 1:17-cv-1397, 2017 WL 9435558, at *3 (N.D. Ga. May 4, 2017) ("[E]very legal authority the Court

has located supports the conclusion that voter registration is not itself a substantive qualification to vote, but rather a procedural method which an otherwise qualified voter must follow to exercise his or her right to vote." (quotation marks omitted)). But, as courts have repeatedly found, state laws are not so insulated; whenever a citizen is denied the right to vote because of an immaterial error or omission on a record related to voting, the Materiality Provision applies. *See Browning*, 522 F.3d at 1155 (analyzing Materiality Provision challenge to "Florida statute"); *see also Reed*, 492 F. Supp. 2d at 1264 (addressing Materiality Provision challenge to state statute); *Diaz*, 435 F. Supp. 2d at 1206 (same); *Gonzalez v. Arizona*, No. 06-CV-1268, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007) (same).

The cases Intervenors cite do not hold otherwise. In *Organization for Black Struggle v. Ashcroft*, the court permitted election officials to "reject applications" that did not include "information required by Missouri statute" only because it found such information material to qualifications for voting. 493 F. Supp. 3d 790 (W.D. Mo. 2020). And in *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), the court held that requiring applicants to provide social security numbers *violated* the Materiality Provision, even though Georgia state law required that information. Finally, in *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018), the court's conclusion that voters' failure to fully provide their birth year was immaterial was strengthened by the fact that state law only permitted (rather than required) rejection

- 14 -

on this basis, but the court's analysis did not rely on that fact. *See* 347 F. Supp. 3d at 1309. Instead, the court relied on the fact that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law." *Id.* at 1308-09. Intervenors cite no case establishing that any state law requirement imposed is per se material.

## II.    Plaintiffs have Article III standing.

Plaintiffs have Article III standing because they allege injuries in fact that are fairly traceable to Defendants and redressable by this Court. *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1115-16 (11th Cir. 2022). Standing requirements differ at each stage of the proceedings, and "[a]t the pleading stage 'general factual allegations of injury … may suffice,'" *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561(1992)), if they "plausibly establish" standing, *Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1377 (N.D. Fla. 2021) (quotation marks omitted). Plaintiffs satisfy this standard with allegations that show that DRF, Florida Alliance, and Florida NAACP each have associational standing on behalf of their members because of the substantial risk they will be deterred or prevented from registering to vote due to the Wet Signature Requirement, and that DRF, Florida NAACP, and Vote.org each have organizational standing due to their diversion of resources to address these harms. Moreover, the

App.265

Court need find that only one Plaintiff plausibly alleges associational or organizational standing to deny Defendants' motion to dismiss. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006).

### A. DRF, Florida Alliance, and Florida NAACP have associational standing.

"An organization has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Browning*, 522 F.3d at 1160 (quotation marks omitted). Defendants appear to challenge only the first element of standing, *see* Defs.' Br. at 16-21, but DRF, Florida Alliance, and Florida NAACP satisfy each of the three elements.

*First*, Plaintiffs' members would have standing to sue in their own right. At this stage, "the rule in this Circuit is that organizational plaintiffs need only establish that 'at least one member faces a realistic danger' of suffering an injury." *Schalamar Creek Mobile Homeowner's Ass'n, Inc. v. Adler*, 855 F. App'x 546, 552 (11th Cir. 2021) (quotation marks omitted); *see also Browning*, 522 F.3d at 1163 (finding it "highly unlikely … that not a single member w[ould] have his or her application rejected" given plaintiffs claimed around 20,000 members statewide). Defendants do not cite any Eleventh Circuit case requiring an organizational plaintiff to identify an injured member by name at the pleading stage. *See* Defs.' Br. at 16-17 (citing

App.266

*Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (finding lack of associational standing post-judgment); *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 820 (11th Cir. 2023) (first requirement of associational standing satisfied by, but not contingent on, identification of specific member); *see also Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought[.]").

DRF represents millions of disabled Floridians, some of whom are not yet registered to vote and lack stable housing or easy access to transportation. FAC ¶ 23. Although DRF does not have "members," "ha[ving] constituents rather than members does not deprive [an entity] of Article III standing." *Stincer*, 175 F.3d at 885 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)). Just like the Protection and Advocacy ("P&A") system in *Stincer* discussed in Defendants' brief (at 19), DRF's constituents "possess the means to influence the priorities and activities [DRF] undertakes," 175 F.3d at 886, because the statutes governing DRF require that it (1) include "individuals with disabilities" who are eligible or have received "services through the system" or their families; (2) "establish an advisory council … on which a majority of the members shall be … individuals with disabilities" or their families; and (3) "establish a grievance procedure for clients or prospective clients of the system to ensure that individuals

- 17 -

with disabilities are afforded equal opportunity to access the services of the system."

42 U.S.C. § 15044(a)(1)(B), (a)(5); 29 U.S.C. § 794e(f)(6); *see also* FAC ¶¶ 23-24.

As in *Hunt*, DRF "serves a specialized segment of the State[] … which is the primary

beneficiary of its activities, including the prosecution of this kind of litigation." 432

U.S. at 344; *see also* FAC ¶ 24 (citing 42 U.S.C. § 15043). Accordingly, DRF "may

sue on behalf of its constituents like a more traditional association may sue on behalf

of its members." *Stincer*, 175 F.3d at 886; *see also Yelapi*, 525 F. Supp. 3d at 1377

n.4 ("DRF has associational standing because its members have standing and this

case is germane to DRF's purpose.").

Florida Alliance has tens of thousands of retired members, many of whom are

elderly, struggle with mobility and manual dexterity, and may no longer drive or

have access to a printer. FAC ¶¶ 15-16. Florida NAACP has 12,000 members across

the state. *Id.* ¶ 17. For Plaintiffs' members and constituents who are not registered

with the DMV and have difficulty obtaining, printing, signing, or returning a

registration application, the Wet Signature Requirement may deter or prevent these

individuals from registering to vote. *See id.* ¶¶ 16, 21, 27. It is beyond dispute that

denial of the right to vote satisfies Article III standing. *E.g.*, *Yick Wo v. Hopkins*, 118

U.S. 356, 370 (1886); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

Defendants claim that "Plaintiffs' allegations amount to nothing more than

'hypothetical harm.'" Defs.' Br. at 17 (quoting *Tsao v. Captiva MVP Rest. Partners,*

App.268

*LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021)), but acknowledge that Article III is satisfied if the harm alleged is either "certainly impending" or there is a "substantial risk of such harm," *id.*, which "does not require a plaintiff to show that it is 'literally certain that the harms they identify will come about,'" *Tsao*, 986 F.3d at 1338 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The cases Defendants cite involve generic speculation or failure to even allege substantial risk of injury. *Id.* at 1343-44 (finding plaintiff relied on "conclusory allegations" of identity theft that did "nothing to clarify the risks to the plaintiffs *in this case*"); *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1234-35 (11th Cir. 2019) (finding plaintiff failed to allege "he represent[ed] a heightened security risk that would trigger mandatory screening under the [challenged] policy"). By contrast, Plaintiffs allege a substantial risk that at least one of their members will be deterred or prevented from registering to vote because of the Wet Signature Requirement, FAC ¶¶ 15-17, 21, 23, 27, which is sufficient to satisfy Article III at this stage. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (2014); *Stincer*, 175 F.3d at 884.

*Second*, the ability of Plaintiffs' members and constituents to register to vote is undeniably germane to the organizations' purposes. Federal law authorizes DRF to protect the rights of disabled Floridians, FAC ¶ 23 (citing 29 U.S.C. § 794e), and DRF receives federal funding "to ensure full participation in the electoral process for individuals with disabilities, including registering to vote," *id.* ¶ 24 (quoting 52

App.269

U.S.C. § 21061(a)). Florida Alliance's mission is to "ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work." FAC ¶ 15. And Florida NAACP's mission is to "ensure the political, social, educational, and economic equality of all persons," and it has spent decades heavily engaged in a variety of statewide voter registration efforts. FAC ¶¶ 17-18; *see also Browning*, 522 F.3d at 1160 ("[T]he interests of voters in being able to register are clearly germane to [Florida NAACP's] purposes.").

*Third*, neither Plaintiffs' Materiality Provision claim nor the injunctive relief they request requires the participation of individual members in the lawsuit, and Defendants do not argue otherwise. *See* Defs.' Br. at 16-21; *see also Browning*, 522 F.3d at 1160 ("[W]hen the relief sought is injunctive, individual participation of the organization's members is not normally necessary." (quotation marks omitted)).

As a result, each of these Plaintiffs have satisfied the requirements for associational standing.

## B. Florida NAACP, Vote.org, and DRF have organizational standing.

Because at least one (in fact, three) Plaintiffs sufficiently allege associational standing to proceed with the sole claim in this case, the Court need not consider Defendants' standing arguments further. But, in addition, Florida NAACP, Vote.org and DRF each independently have standing based on direct injuries. In the Eleventh Circuit, "organizations can establish standing to challenge election laws by showing

- 20 -

that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day." *Arcia*, 772 F.3d at 1341. "[B]road allegation[s] of diversion of resources [are] enough at the pleading stage." *Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1115. Florida NAACP, Vote.org, and DRF each allege sufficient facts to establish their right to bring this claim based on direct organizational standing.

Florida NAACP alleges that, "[b]ecause of the Wet Signature Requirement, [it] must divert valuable resources to engage in additional door-to-door canvassing activities to ensure that potential voters who cannot register online and lack easy access to printers are registered." FAC ¶ 22. These activities are "resource-intensive and require significant commitments from Florida NAACP and its members and volunteers—all resources that Florida NAACP could otherwise use to support [its] mission-critical activities," "such as programming and initiatives concerning educational inequities, the school-to-prison pipeline, and mass incarceration." *Id.* ¶¶ 21-22. Vote.org alleges that, "[b]ecause the Wet Signature Requirement prohibits the use of [the e-signature function of its web application], Vote.org must devote resources to alternative voter registration efforts in Florida that otherwise would be used for absentee ballot and GOTV projects in Florida and elsewhere." *Id.* ¶ 13.[4]

---

[4] Vote.org does not allege, as suggested by Defendants, that its investment in the e-signature function of its web application is the source of its standing. Defs.' Br. at

Despite acknowledging—indeed, quoting—Florida NAACP and Vote.org's allegations regarding these activities that are *impaired by* the Wet Signature Requirement, Defs.' Br. at 22-23, Defendants inexplicably claim that Florida NAACP and Vote.org "do[] not allege where [their] resources are being diverted from to comply with the [Wet Signature Requirement]," *id.* at 22. But the cases cited by Defendants demonstrate that, at the pleading stage, Plaintiffs' allegations are sufficient. *See Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1115 ("general[] alleg[ations]" that organization "has diverted resources on an ongoing basis from [civic engagement, voter registration and get out the vote] activities" are "enough at the pleading stage"); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (Georgia NAACP "established an injury sufficient to confer standing" by "divert[ing] resources from its regular activities to educate voters about the [challenged] requirement"); *Browning*, 522 F.3d at 1166 (finding sufficient allegations that organizations diverted "personnel and time" from unspecified "registration drives and election-day education and monitoring"); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (finding

---

21, 23. Vote.org's ability to utilize its print and mail program as part of its alternative voter registration efforts in Florida will depend on the availability and allocation of the "significant resources" it requires. *See* FAC ¶ 14. Contrary to Defendants' assertion (at 22 n.3), while Section 4 of S.B. 7050 exacerbates the difficulty of in-person registration efforts, it is inapplicable to, and thus does not prohibit, Vote.org's print and mail program.

organizational plaintiffs "satisfied … the minimum requirements of Article III" by "claim[ing] injuries analogous to those present in *Common Cause* and *Browning*"); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("no question" that organization's "broadly alleged" impairment of activities "constitute[d] far more than simply a setback to the organization's abstract social interests") (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).[5]

Even putting these two Plaintiffs aside, DRF, at the very least, has organizational standing under the Eleventh Circuit's "implicit[] recogni[tion]" of a protection and advocacy system's standing to redress injuries to itself. *Stincer*, 175 F.3d at 883 (citing *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492 (11th Cir. 1996)); *see* FAC ¶¶ 23 (DRF designated as Florida's P&A system for individuals with disabilities), 25-26 (alleging diversion of resources). Defendants make no contrary arguments, asserting only that "DRF's diversion of resource allegations … fail for the same reasons," Defs.' Br. at 25. Such a conclusory assertion is inadequate for dismissal. *See Rumsfeld*, 547 U.S. at 53 n.2 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

---

[5] Plaintiffs' allegations are also distinguishable from *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), where the organizations "fail[ed] to identify *any* activities that w[ould] be impaired." *Id.* at 1250 (emphasis added). Both *Jacobson* and *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), moreover, assessed organizational standing post-trial, not on motions to dismiss.

App.273

### III. Plaintiffs are appropriate parties to challenge the Wet Signature Requirement under the Materiality Provision and Section 1983.

Defendants argue that Plaintiffs are not the proper parties to challenge the Wet Signature Requirement under the Materiality Provision or Section 1983, but this argument, too, is without merit. The plain terms of the Materiality Provision evidence congressional intent to broadly confer standing on all aggrieved parties, including those suffering associational and organizational injuries. The Materiality Provision's protection of the right to vote is also presumptively enforceable under Section 1983, and neither its statutory text nor relevant caselaw support limiting such enforcement to only individual voters. To the extent prudential considerations apply, Plaintiffs also are qualified to represent third-party voters injured by the Wet Signature Requirement.

*First*, the text of Section 101 of the Civil Rights Act contemplates a cause of action for Plaintiffs' organizational injuries. Subsection (d) expressly recognizes that federal district courts have jurisdiction over actions to enforce the law "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d). Use of the term "aggrieved person" or "party aggrieved" indicates "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998) ("History associates the word 'aggrieved'

- 24 -

with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested."). Congress could have granted jurisdiction to any "individuals seeking to vote," but instead chose a term that permits enforcement by the broadest array of plaintiffs.

*Second*, Plaintiffs also have statutory standing under Section 1983, which provides a remedy against state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Materiality Provision's "focus … is … the protection of each individual's right to vote," *Schwier*, 340 F.3d at 1296-97, and "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). Section 1983's statutory text provides only that liability or relief must flow from the state actors sued to the "party injured." 42 U.S.C. § 1983. It does not foreclose suits by parties with associational and organizational injuries like Plaintiffs to enforce the rights of individual voters.

Defendants claim that the Eleventh Circuit "has long applied [an] elevated standard" that requires Section 1983 plaintiffs to demonstrate that the federal statute "define[s] the content of a specific right conferred upon the plaintiffs by Congress." Defs.' Br. at 29 (quoting *Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325 (11th Cir. 2019) (en banc)). But the *Yarbrough* court was considering whether

- 25 -

regulations can join with a statute to create an enforceable right and did not discuss or apply this standard in the context of organizational plaintiffs. Defendants' attempt to restrict the class of permissible Section 1983 plaintiffs to individual rights-holders conflicts with long-standing precedent from the Supreme Court and other courts around the country. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (holding "litigants are permitted to challenge a statute [under § 1983] not because their own rights of free expression are violated," but to protect the rights of "others not before the court") (cleaned up); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (holding firing range supplier could bring § 1983 claim asserting the Second Amendment rights of its potential customers); *Coggins v. Carpenter*, 468 F. Supp. 270, 282 (E.D. Pa. 1979) (holding plaintiffs need not be "the object of the conduct allegedly in violation of 42 U.S.C. § 1983" to assert a claim).

The Materiality Provision and Section 1983 encompass Plaintiffs' claim, and courts "cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 128 (2014). But even if Plaintiffs could only maintain this suit on behalf of individuals denied the right to vote by the Wet Signature Requirement, Plaintiffs are qualified to do so on multiple grounds. First, DRF is federally authorized to "pursue legal, administrative, and other appropriate remedies" "to ensure full participation

in the electoral process for individuals with disabilities [in Florida], including registering to vote." 42 U.S.C. § 15043(a)(2)(A)(i); 52 U.S.C. § 21061(a). Additionally, DRF, Florida Alliance, and Florida NAACP each have associational standing on behalf of their members who may be prevented from registering to vote due to the Wet Signature Requirement. *Supra* Section II(A). Finally, Plaintiffs satisfy the test for third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (requiring that party seeking third-party standing demonstrate "'close relationship with the person who possesses the right" and "hindrance to the possessor's ability to protect his own interests") (quotation marks omitted).

Each Plaintiff has a "close relationship" with its users, constituents, and members. Defendants concede that a vendor/vendee relationship is exemplary of this dynamic, Defs.' Br. at 26, and "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," *Craig v. Boren*, 429 U.S. 190, 195 (1976). Vote.org is "in like position[]" to a vendor deprived of making its "function,"—the e-signature function of its web application—available to its users, depriving those users of the right to vote, which is a "causal connection between the [plaintiff]'s injury and the violation of the third parties' constitutional rights." Defs.' Br. at 27 (quoting *Mata Chorwadi, Inc. v. City of Boynton Beach*, No. 20-14694, 2023 WL 3186740, at *5 (11th Cir. May 2, 2023)).

And Vote.org's users are hardly "as yet unascertained," Defs.' Br.at 26—it has helped register over 390,000 Florida voters since 2016. FAC ¶ 11. Similarly, Florida NAACP has 12,000 members who, like the tens of thousands of members of Florida Alliance, have chosen to voluntarily formalize their relationship with the organization. Finally, federal law specifically designates DRF to be "a proponent of the right[s]" of the disabled community in Florida, *Powers v. Ohio*, 499 U.S. 400, 413 (1991); 52 U.S.C. § 21061(a).

Plaintiffs' users, constituents, and members also face a "hindrance" in protecting their interests, *Kowalski*, 543 U.S. at 130, given the "small financial stake involved and the economic burdens of litigation," *Powers*, 499 U.S. at 415. And the claim that Plaintiffs' members "are no more inhibited than the indigent prisoners in *Kowalski*," Defs.' Br. at 28, ignores that those prisoners were *already* engaged in litigating their appeals. Plaintiffs' non-registered members and constituents, by contrast, face at least "some hinderance" to protecting their right to register and vote. *Powers*, 499 U.S. at 411; *see* FAC ¶¶ 11, 16-17, 23.

IV.     **The Materiality Provision confers a cause of action enforceable by private plaintiffs under Section 1983, and no interlocutory appeal is warranted.**

Binding precedent—including from the Eleventh Circuit and U.S. Supreme Court—requires rejection of Defendants' argument that the Materiality Provision is not enforceable by a private right of action. "By its terms, § 1983 is available to

- 28 -

enforce every right that Congress validly and unambiguously creates." *Health &*
*Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S. Ct. 1444, 1462 (2023); *see also*
*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700-01 (1978)
(Section 1983 "provide[s] a remedy, to be broadly construed, against all forms of
official violation of federally protected rights"). The Materiality Provision's
unambiguous protection of the right to vote makes it presumptively enforceable
under Section 1983. *See Schwier*, 340 F.3d at 1296-97; *Gonzaga Univ.*, 536 U.S. at
283-84.

To defeat the presumption of Section 1983 enforcement, Defendants must
"demonstrat[e] that Congress did not intend that remedy," which, if not stated
"directly in the statute," must be "inferred from the statute's creation of a
comprehensive enforcement scheme that is incompatible with individual
enforcement under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113,
120 (2005) (quotation marks omitted). "The crucial consideration is whether
Congress intended a statute's remedial scheme to be *the exclusive avenue* through
which a plaintiff may assert [his] claims," which requires "*incompatibility* between
enforcement under § 1983 and the enforcement scheme that Congress has
enacted." *Talevski*, 143 S. Ct. at 1459 (cleaned up). The Supreme Court has found
such "implicit preclusion" in only three cases, each of which "concerned statutes
with self-contained enforcement schemes that included statute-specific rights of

- 29 -

action." *Id.* at 1460-61 (collecting cases). The Materiality Provision contains nothing of the sort.

In an attempt to satisfy their burden to show that "the design of the enforcement scheme in the [Materiality Provision] is inconsistent with enforcement under §1983," *id.* at 1459 (quoting *Abrams*, 544 U. S. at 120), Defendants point to "the limited private remedy contained in subsection (e)." Defs.' Br. at 31-32. But subsection (e) provides no private right of action; instead it refers to proceedings initiated by the Attorney General where, "upon request of the Attorney General," the court finds a "pattern or practice" of vote denial "on account of race or color," allowing affected members of the targeted racial group to "appl[y]" for an "order declaring [the applicant] qualified to vote." 52 U.S.C. § 10101(e). Far from being "comprehensive," this application procedure is entirely contingent upon the Attorney General and a specific set of facts that excludes a broad swath of potential Materiality Provision claims. The narrow application procedure contained in subsection (e) is thus entirely inapposite to—and in no way "incompatible with"— private enforcement under § 1983. *Abrams*, 544 U.S. at 120. "In focusing on what [Section 10101] contains, [Defendants] ignore what it lacks—a private judicial right of action, a private federal administrative remedy, or any carefu[l] congressional

- 30 -

tailor[ing] that § 1983 actions would distort." *Talevski*, 143 S. Ct. at 1461 (cleaned up) (quotation marks omitted).[6]

Ultimately, Defendants "acknowledge" that "binding circuit precedent exists" holding that the Materiality Provision "is amenable to private enforcement via Section 1983." Defs.' Br. at 32, 34. Specifically, the Eleventh Circuit held in *Schwier* that neither the "provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in [the Materiality Provision] *require*[*s*] the conclusion that Congress did not intend such a right to exist." 340 F.3d at 1296. Nonetheless, Defendants "urge" the Court to certify the question of whether the Materiality Provision can be enforced via Section 1983 for interlocutory appeal under 28 U.S.C. § 1292(b) "to repair, or at least clarify, [an alleged] circuit split." Defs.' Br. at 32-33. This request should be denied. *See Baptist Coll. of Fla., Inc. v. Church Mut. Ins. Co.*, No. 5:22cv158-MW/MJF, 2023 WL 4358778, at *1 (N.D. Fla. Mar. 27, 2023) ("an issue of settled law [] prevents this Court from finding that there is a substantial ground for difference of opinion that would permit the certification of an interlocutory appeal").

---

[6] Defendants also argue that the Materiality Provision lacks congressional intent to create a private remedy. Defs.' Br. at 31. This ignores that "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga Univ.*, 536 U.S. at 284.

- 31 -

First and foremost, there is no "substantial ground for difference of opinion" under Section 1292(b). Defendants claim a "one-to-one" circuit split between the Eleventh Circuit in *Schwier* and the Sixth Circuit in *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000), but this is a false equivalency. The Sixth Circuit in *McKay* addressed private enforcement of the Materiality Provision in a single sentence. The Eleventh Circuit subsequently devoted several pages to analyzing the issue—including by examining and rejecting *McKay*. *Schwier,* 340 F.3d at 1294 (tracing *McKay*'s support to two sentences in a 1978 district court decision). And the Eleventh Circuit is not alone; the Third Circuit also recently held that "private plaintiffs have a private right of action to enforce § 10101 under 42 U.S.C. § 1983." *Migliori*, 36 F.4th at 156. The score is therefore not "one-to-one"; it is two thorough, well-reasoned appellate decisions to one sentence.

Nor has there been any intervening change in law that would justify reconsidering *Schwier*. *Cf. Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (granting 1292(b) and then en banc review where binding precedent conflicted with more recent decisions of Alabama and U.S. Supreme Courts). The *Schwier* and *Migliori* opinions are entirely consistent with the Supreme Court's recent decision in *Talevski*. There, the Court declined to find incompatibility between a private right of action under Section 1983 and the "detail[ed]" enforcement mechanisms of the Federal Nursing Home Reform Act, because

- 32 -

appellants did not "demonstrate[] that enforcement via § 1983 would thwart the operation of the [] remedial scheme in any respect." 143 S. Ct. at 1460.  So too here.

Given this weight of authority, Defendants' quibbles with the *Schwier* court's methods of analysis fail to establish any basis for interlocutory appeal under Section 1292(b). *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2020 WL 4756326, at *3 (N.D. Fla. Aug. 17, 2020) ("court[s] must analyze the strength of the arguments … when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute" (quotation marks omitted)).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss.

- 33 -

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

The undersigned, Frederick Wermuth, certifies that this motion contains 8,000

words, excluding the case style and certifications.

Dated: July 10, 2023

Respectfully submitted,

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law

Justin Baxenberg*
Alexander F. Atkins*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
jbaxenberg@elias.law
aatkins@elias.law
rodonnell@elias.law

*Counsel for Plaintiffs Vote.Org,
Florida Alliance for Retired
Americans, Florida State Conference
of Branches and Youth Units of the
NAACP, and Disability Rights Florida*

*\*Admitted Pro Hac Vice*

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
**KING, BLACKWELL, ZEHNDER
  & WERMUTH, P.A.**
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

App.284

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2023, I filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all counsel of record.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No.: 0184111
*Counsel for Plaintiffs*

App.285

# Exhibit 1

1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8

9   Mi Familia Vota, et al.,

    No. CV-22-00509-PHX-SRB

10           Plaintiffs,

    **ORDER**

11  v.

12  Adrian Fontes, in his official capacity as
13  Arizona Secretary of State, et al.,

14           Defendants.

15  **AND CONSOLIDATED CASES**

16

17       The Court now considers Defendants Mark Brnovich and the State of Arizona's
18  (collectively, "Defendants") Consolidated Motion to Dismiss ("Motion") Plaintiffs'
19  Complaints. (Doc. 127, "Mot.") For the following reasons, Defendants' Motion is denied
20  except as to Plaintiffs' freestanding procedural due process claims.

21  **I.    BACKGROUND**

22       This case arises out of two Arizona laws regulating voting registration, H.B. 2243
23  and H.B. 2492 ("the Voting Laws"). The Voting Laws, effective January 1, 2023, enable
24  government officials to require heightened proof of citizenship from Arizona registrants
25  and mandate certain consequences if a registrant does not provide such proof. (*See*
26  *generally* Doc. 169, Poder Latinx Compl.) Plaintiffs, the United States of America
27  ("United States") and a collection of nonpublic entities ("Private Plaintiffs"), allege that

28

the Voting Laws are both statutorily and constitutionally unsound.[1] (*See, e.g.*, *id.* at ¶¶ 86–152.)

## A.    Recent History of Arizona Voting Laws

Arizona has required documentary proof of citizenship ("DPOC") from in-state voters since 2004. (Doc. 1, 22-cv-1124, USA Compl. ¶ 41.) An individual seeking to register to vote in Arizona state elections must provide one of the following forms of "evidence of citizenship":

> 1.  The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.
>
> 2.  A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.
>
> 3.  A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.
>
> 4.  A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.
>
> 5.  Other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986.

---

[1] Plaintiff Mi Familia Vota describes itself as "a national, non-profit civic engagement organization with a mission of uniting Latino, immigrant, and allied communities to promote social and economic justice through increased civic participation by encouraging leadership development, citizenship, and issue organizing." (Doc. 65, Mi Familia Vota Compl. ¶ 16.) It "encourages non-partisan voter registration and voter participation and has challenged voter suppression around the nation." (*Id.*) Similarly, Plaintiff Voto Latino "is a 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle." (*Id.* ¶ 19.) "Voto Latino considers eligible Latinx voters in Arizona to be the core of its constituency." (*Id.*) Apart from the United States, the remaining Plaintiffs allege similar interests in maximizing voter turnout among certain communities, including Native Americans, Asian Americans, and Democratic voters in general. (*See, e.g.*, Doc. 1, 22-cv-1381, AZ AANHPI For Equity Coalition Compl. ("AAANHPI Compl.") ¶¶ 30–31; Doc. 67, Living United for Change in Arizona Am. Compl. ("LUCHA Compl.") ¶¶ 254–60.)

App.288

6. The applicant's Bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F).

In addition to providing applicants a State Form to register for state and federal elections, Arizona also provides a form created by the United States Election Assistance Commission, known as the Federal Form, to register for federal elections only. *See Gonzales v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012). The Federal Form requires applicants to check a box under penalty of perjury indicating that they are citizens of the United States ("Check Box Requirement"). (AAANHPI Compl. ¶ 42.)

Arizona had previously imposed a DPOC requirement on applicants using the Federal Form. In 2004, Arizona passed a law requiring all applicants for voter registration, regardless of whether they used the Federal or State Form, to provide DPOC in order to register. (USA Compl. ¶ 41.) In 2013, the United States Supreme Court held that the National Voter Registration Act ("NVRA") preempted Arizona's requirement as applied to applicants using the Federal Form. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013). The Federal Form contains "only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). Because the NVRA mandates that states "accept and use" the Federal Form—which does not require applicants to provide DPOC—the *Inter Tribal* Court held that Arizona could not "requir[e] a Federal Form applicant to submit information beyond that required by the form itself," including DPOC. 570 U.S. at 12, 20 ("States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be

App.289

1    available."); (AAANHPI Compl. ¶ 42.)[2]

2         Plaintiffs allege that ever since *Inter Tribal Council*, Arizona has attempted to

3    disenfranchise certain voters. In 2018, the Arizona Secretary of State entered into a

4    Consent Decree with Plaintiff League of United Latin American Citizens ("LULAC")

5    after the nonprofit sued the state for allegedly discriminating against registrants who used

6    the State Form without providing DPOC. (*See* Doc. 37, 2:17-cv-04102-DGC, LULAC

7    Consent Decree; AAANHPI Compl. ¶ 46.) Plaintiffs explain that under the LULAC

8    Consent Decree, Arizona must "(1) treat all registrants the same regardless of whether

9    they use the state form or Federal Form, registering all voters for federal elections

10   regardless of provided evidence of citizenship; and (2) check the motor vehicles database

11   for citizenship documentation before limiting voters to federal-only elections." (Mi

12   Familia Vota Compl. ¶¶ 44–45.)

13   **B.      The Voting Laws Passed in 2022**

14       **1.      H.B. 2492**

15       Former Arizona Governor Doug Ducey signed H.B. 2492 into law on March 30,

16   2022. (*See id.* ¶ 3.) H.B. 2492 created additional requirements for individuals using either

17   the Federal or State Form. Specifically, the statute mandates registrants show DPOC and

18   Documentary Proof of Residence ("DPOR") through the following provisions:

19       Requirements for proper registration
         A person is presumed to be properly registered to vote on completion of a
20       registration form . . . that contains at least the name, the residence address
         or the location, proof of location of residence as prescribed by Section 16-
21       123, the date and place of birth and the signature . . . of the registrant . . .
         and a checkmark or other appropriate mark in the "yes" box next to the
22       question regarding citizenship. Any application for registration, including
         an application on a form prescribed by the United States Election
23       Assistance Commission, must contain a checkmark or other appropriate

24   ─────────────────
     [2] The differences between Arizona's state and federal voting registration create different
25   voter rolls depending on when a voter registered. As described by Plaintiffs:
         Arizona has three classes of voters: (1) those who registered pre-2005 and
26       did not have to show documentary proof of citizenship (because Arizona
         did not yet require it), who can vote in all elections; (2) those who
27       registered post-2005 using the [Federal Form] . . . and did not show
         documentary proof of citizenship, who can vote only in federal elections;
28       and (3) those who registered post-2005 and showed adequate proof of
         citizenship, who can vote in all elections.
     (Mi Familia Vota Compl. ¶¶ 2, 43.)

- 4 -

mark in the "yes" box next to the question regarding citizenship as a condition of being properly registered to vote as either a voter who is eligible to vote a full ballot or a voter who is eligible to vote only with a ballot for federal offices. . . .

Proof of location of residence

Except for persons who register pursuant to Section 16-103, a person who registers to vote shall provide an identifying document that establishes proof of location of residence. Any of the identifying documents prescribed in Section 16-579, Subsection A, Paragraph 1 constitutes satisfactory proof of residence.

H.B. 2492 §§ 4(A), 5. The Federal Form does not require an applicant to list her place of birth ("the Birthplace Requirement"). (*See* AAANHPI Compl. ¶ 63; DNC Compl. ¶ 41.)

The documents with which an individual can show DPOR are:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is labeled as "official election material". Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

Ariz. Rev. Stat. § 16-579(A)(1). Unlike preexisting Arizona law, H.B. 2492 contains no exceptions to the DPOR requirement for applicants who do not have numbered street addresses. (LUCHA Compl. ¶¶ 28, 40.)

The statute also mandates different requirements for applicants using the Federal or State Form:

Except for a form produced by the United States Election Assistance Commission, any application for registration shall be accompanied by

- 5 -

App.291

satisfactory evidence of citizenship as prescribed in Section 16-166, Subsection F, and the County Recorder . . . shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship.

H.B. 2492 § 4(C).

Federal only voters; early ballot; eligibility
1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by Section 16-166, Subsection F is not eligible to vote in presidential elections.
2. A person who has not provided satisfactory evidence of citizenship pursuant to Section 16-166, Subsection F and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

*Id.* § 5(A).

The statute places the burden on County Recorders to implement the provisions of H.B. 2492. A County Recorder "shall cancel a registration" when "the County Recorder receives and confirms information that the person registered is not a United States citizen." *Id.* § 8(A)(10). Election officials also have duties to verify registrants' citizenship. "Within ten days after receiving an application for registration [through the Federal Form] that is not accompanied by [DPOC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant." *Id.* § 4(D). The statute prescribes a specific verification process:

. . . [A]t a minimum, [the election official] shall compare the information available on the application for registration with the following, provided the county has access:
1. The Department of Transportation databases of Arizona diver licenses or nonoperating identification licenses.

2. The Social Security Administration databases.

3. The United States Citizenship and Immigration Services Systemic Alien Verification for Entitlements program, if practicable.

4. A National Association for Public Health statistics and information systems electronic verification of vital events system.

5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder . . . has access, including an electronic registration information center database.

*Id.*

The statute provides for three different outcomes from this verification. First, if the election official "matches the applicant with information that verifies the applicant is a United States citizen . . . the applicant shall be properly registered." *Id.* § 4(E). Second, if

- 6 -

the election official "matches the applicant with information that the applicant is not a United States citizen, the County Recorder . . . shall reject the application, notify the applicant that the applicant was rejected because the applicant is not a United States citizen and forward the application to the county attorney and Attorney General for investigation." *Id.* Third, if the election official "is unable to match the applicant with appropriate citizenship information, the [official] shall notify the applicant that [her citizenship could not be verified] and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided." *Id.*

Lastly, the statute provides for prosecution of certain registrants referred for investigation. Election officials must "make available to the Attorney General a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship pursuant to Section 16-166." *Id.* § 7(A). The Attorney General must then use "all available resources to verify the citizenship" of the referred applicants and "at a minimum shall compare the information available on the application for registration" with the same databases listed in § 4(D) of the statute. *Id.* § 7(B). "The Attorney General shall prosecute individuals who are found to not be United States citizens pursuant to Section 16-182." *Id.* § 7(D).

Both parties detail the application and impact of H.B. 2492. Plaintiffs allege that absent such proof of citizenship as described in H.B. 2492, (1) new registrants cannot use the Federal Form to vote in presidential elections or vote by mail in elections for any office unless they provide additional documentation; (2) currently registered voters who registered using the Federal Form without proof of citizenship cannot vote in presidential elections or vote by mail for any office; and (3) approximately 200,000 Arizona voters who never had to provide proof of citizenship upon registration cannot vote in presidential elections, unless they provide additional documentation of citizenship. (*See* Mi Familia Vota Compl. ¶¶ 3, 43, 63.) In Defendants' words, "if you file the Federal Form, you will be registered for congressional elections. And if, in the course of . . .

- 7 -

1   subsequent list maintenance they discover not the absence of evidence of citizenship, but

2   proof that you are not a citizen, you will be deregistered. [I]f you file the State Form . . .

3   [y]ou need to provide documentary proof of citizenship or you won't be registered."

4   (Hr'g Tr. at 30:14–21.)

5      Plaintiffs further describe that "[t]he law provides no details concerning how

6   long-registered voters will be notified that they must provide new documents, or how

7   they will be given an opportunity to do so." (Mi Familia Vota Compl. ¶¶ 3, 65.) Plaintiffs

8   also allege that there is no cutoff date in the statute by which a registration must be

9   cancelled, meaning "nothing prevent[s] the county recorder or other election official from

10   removing a voter from the rolls, or otherwise blocking them from voting by mail or in

11   presidential elections, weeks or even days before an election, when it is too late for the

12   affected voters to correct any error." (Doc. 1, 22-cv-1369, Democratic National

13   Committee Compl. ("DNC Compl.") ¶ 39.)

14       **2.    H.B. 2243**

15      On July 6, 2022, Governor Ducey signed H.B. 2243 into law. (LUCHA Compl.

16   ¶ 18.) According to Plaintiffs, H.B. 2243 reenforces and extends several of the

17   requirements imposed by H.B. 2492. Like H.B. 2492, H.B. 2243 provides for

18   cancellation of registration and investigation of registrants should they fail to meet certain

19   requirements. (AAANHPI Compl. ¶ 84 (citing H.B. 2243 § 2).) H.B. 2243 also adds

20   verification deadlines for registrants and mandates that election officials perform

21   additional verification procedures. Specifically,

> When the County Recorder obtains information pursuant to this Section and
> confirms that the person registered is not a United States citizen . . .
> [b]efore the County Recorder cancels a registration pursuant to this
> paragraph, the County Recorder shall send the person notice by
> forwardable mail that the person's registration will be canceled in thirty
> five days unless the person provides satisfactory evidence of United States
> citizenship pursuant to Section 16-166. The notice shall include a list of
> documents that person may provide and a postage prepaid preaddressed
> returned envelop. If the person registered does not provide satisfactory
> evidence within thirty five days, the County Recorder shall cancel the
> registration and notify the county attorney and Attorney General for
> possible investigation.

H.B. 2243 § 2(A)(10).

Plaintiffs point out that not all registrants suspected of being ineligible to vote in Arizona are subject to a 35-day deadline[3] to provide documentation. (*See* AAANHPI Compl. ¶¶ 16–18, 60.) Certain registrants suspected of lacking Arizona residency are subject to a more lenient response deadline under the statute:

> Each month the Department of Transportation shall furnish to the Secretary of State . . . a list of persons who the Department has been notified have been issued a driver license . . . in another state. [After receiving this list from the Secretary of State,] [t]he County Recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license . . . in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of this state and is not knowingly registered to vote in another state . . . . If the person returns the form within ninety days confirming that the person is a resident of this state, the County Recorder shall maintain the registration in active status. If the person fails to return the form within ninety days, the County Recorder shall place the person's registration in inactive status.

H.B. 2243 § 2(E).

H.B. 2243 also mandates monthly review and potential purging of voter rolls. Specifically,

> To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by Section 16-166 with the Systemic Alien Verification for Entitlements program maintained by the United States Citizenship and Immigration Services to verify the citizenship status of the persons registered.

*Id.* § 2(H). County Recorders must conduct similar checks with the Social Security Administration Database, Verification of Vital Events System, and "relevant city, town, county, state and federal databases to which the County Recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this Section." *Id.* § 2(G), (I)–(J).

Lastly, "[a]fter cancelling a registration pursuant to this Section, the County Recorder shall send a notice by forwardable mail informing the person that the person's

---

[3] Plaintiffs add that Governor Ducey vetoed a previous version of H.B. 2243, expressing his concerns that the previous bill risked "disturb[ing]" the right to vote "without sufficient due process." (*See* AAANHPI Compl. ¶¶ 57–58.) The previous bill gave individuals suspected of lacking United States citizenship 90 days to provide DPOC. (*Id.* ¶ 60.) H.B. 2243, as enacted, reduced that response period to 35 days. (*Id.*)

1    registration has been cancelled, the reason for cancellation, the qualifications of electors

2    pursuant to Section 16-101 and instructions on registering to vote . . . ." *Id.* § 2(K).

### C. Legality of the Voting Laws

3    Plaintiffs claim that the Voting Laws are illegal in multiple respects.

### 1. Preemption Under *Inter Tribal Council*

6    Plaintiffs allege that "[i]n essence, H.B. 2492 creates three distinct voter rolls in

7    Arizona—one for all local, state, and federal elections, one for U.S. House and Senate

8    elections, and one for Presidential elections." (AAANHPI Compl. ¶ 72.) Under *Inter*

9    *Tribal Council*, as interpreted by Plaintiffs, the NVRA preempts Arizona's requirement

10   that Federal Form users provide DPOC in order to vote for President. (*E.g.* Mi Familia

11   Vota Compl. ¶¶ 97–99.) The United States details that during legislative hearings on H.B.

12   2492, legislative counsel warned that the NVRA would preempt the statute's DPOC

13   requirement for Federal Form users. (USA Compl. ¶ 45 (referencing *Inter Tribal Council*,

14   570 U.S. at 20).) House Speaker Pro Tempore Travis Grantham responded that defending

15   H.B. 2492 would be a "fight worth having" in court. (*Id.* ¶ 46; LUCHA Compl. ¶ 209.)

### 2. Arbitrary & Discriminatory Verification of Citizenship

17   Plaintiffs also contend that the citizenship verification requirements in the Voting

18   Laws threaten to illegally disenfranchise thousands of Arizonans.

19   After attempting to verify a registrant's citizenship, County Recorders must

20   "cancel a registration . . . when the [Recorder] receives and confirms information that the

21   person registered is not a United States citizen," but the statute does not define what

22   "confirms information" means in this context. (AAANHPI Compl. ¶ 82.) Plaintiffs add

23   that the databases used to "confirm" citizenship are "outdated and inaccurate," which

24   subjects naturalized citizens who might erroneously appear in those databases to

25   disproportionate scrutiny.[4] (*Id.* ¶¶ 73, 86; Poder Latinx Compl. ¶ 127.) Plaintiffs allege on

---

[4] Plaintiffs posit that the DPOC requirement "disproportionately affect[s] . . . not only
Arizona voters who are naturalized citizens . . . but also those who are racial minorities,
elderly, or recently turned 18 years old, because the law singles out for disparate
treatment 'federal only' voters, who disproportionately have these characteristics." (DNC
Compl. ¶ 40.)

1    information and belief that the Systemic Alien Verification for Entitlements database

2    only contains information on naturalized and derived citizens, not citizens born in the

3    United States. (Poder Latinx Compl. ¶ 53.) Compounding the alleged risk of arbitrary and

4    inaccurate enforcement of the verification requirements, "[certain] of these databases

5    were [not] designed to capture or reflect current citizenship status." (DNC Compl. ¶¶ 36–

6    37.) Plaintiffs relatedly allege that H.B. 2243's "reason to believe" investigation criterion

7    "essentially allows anyone, without evidence, to simply give a list of names of people

8    who are purportedly not citizens to the county recorders, thus triggering a check that can

9    lead to improperly cancelled voter registrations and potential investigation and

10   prosecution of eligible and registered Arizonans." (AAANHPI Compl. ¶ 86.)

11          Further, Plaintiffs assert that the Voting Laws intentionally target protected groups

12   for investigation, registration cancellation, and prosecution. "AANHPIs and other ethnic

13   groups. . . are disproportionately likely to lack the forms of identification required under

14   H.B. 2492 and H.B. 2243 to register to vote and remain on the voter rolls." (*Id.* ¶ 90.)

15   And because AANHPIs and Latinos "comprise a large proportion of naturalized citizens

16   in Arizona and the population of AANHPIs and other ethnic groups in Arizona is rapidly

17   increasing, the birthplace, DPOC, and DPOR requirements imposed by [the Voting

18   Laws] on naturalized citizens has a disproportionate impact" on these protected groups.

19   (*See id.* ¶ 91 (11,000 Arizona residents naturalized each year between 2014 and 2020,

20   with the largest proportion from Mexico, followed by "Asiatic countries"); LUCHA

21   Compl. ¶ 156 (Voting Laws burden "eligible Latino and language minority voters").) To

22   support their claim that this disparate impact is deliberate, Plaintiffs point to the allegedly

23   unsubstantiated statements of Representative Jake Hoffman, H.B. 2492's sponsor, that

24   Arizona's elections are compromised by fraud and count the votes of "non-U.S. citizen

25   voters." (LUCHA Compl. ¶¶ 201–02.) Plaintiffs also allege that H.B. 2243's criterion for

26   enhanced scrutiny of a registrant—"reason to believe" that a registrant is not a United

27   States citizen—invites racial and national origin discrimination. (Poder Latinx Compl.

28   ¶¶ 7, 41; *see* AAANHPI Compl. ¶¶ 85–86, 88.)

- 11 -

### 3.  Discriminatory Affirmation of Citizenship

Plaintiffs also take issue with the Check Box and Birthplace Requirements. (*E.g.* LUCHA Compl. ¶ 273; USA Compl. ¶¶ 57–61.) The United States alleges that by requiring election officials to reject a registration form without the requisite check mark when an applicant has already affirmed citizenship under penalty of perjury and provided DPOC, H.B. 2492 denies "qualified individuals the right to vote" based on an immaterial "technical[ity]." (USA Compl. ¶¶ 57–61.) Private Plaintiffs allege "on information and belief, the birthplace requirement will only be used to identify naturalized citizens for differential, unequal treatment by the state and will act to chill voter registration of AANHPIs, naturalized citizens, and other voters of color in a disproportionate manner." (AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs contend that such added complexities of properly registering to vote risk disenfranchising "language minority" groups in Arizona, including Arizona's naturalized Latino population. (LUCHA Compl. ¶¶ 186–91.)

### 4.  Discriminatory Documentary Proof of Residence

Plaintiffs assert that "because many residences on Indian reservations in Arizona lack a numbered street address or residential address, many enrolled members of tribes are likely to be prevented from voting by the DPOR requirement." (*Id.* ¶ 29.) Indeed, Plaintiff San Carlos Apache Tribe alleges that on the San Carlos Apache Reservation, "many residences are not assigned a physical numbered street address. Instead, members of the Tribe commonly describe where they live using . . . mile markers on Route 70, Bureau of Indian Affairs' Indian Routes, or other landmarks and distances." (*Id.* ¶ 32.) The Tribe's members often lack documents bearing their name and residential address and will be unable to satisfy H.B. 2492's DPOR requirement. (*Id.* ¶ 35.) Plaintiffs add that the "experience for citizens of the San Carlos Apache is also the norm for many other Tribal citizens residing on the reservations of . . . other . . . Tribes in Arizona."[5] (*Id.* ¶ 38.)

---

[5] In addition to specific protected groups that risk disenfranchisement under the Voting Laws, Plaintiffs claim that the DPOR requirement will prevent other Arizonans from voting. For example, students living and eligible to vote in Arizona often carry out of state drivers' licenses and cannot pay to obtain an additional Arizona state identification. (LUCHA Compl. ¶ 241.) These would-be voters will be unable to meet the DPOR requirement. (*Id.*)

- 12 -

The DPOR requirement will consequently "burden a substantial portion of the Native population in Arizona, and this burden will be unique when compared to other eligible Arizona voters."[6] (*Id.* ¶ 139.)

### 5. The Parties' Interests

Plaintiffs claim that Arizona has no legitimate reason for the Birthplace Requirement when individuals must already provide DPOC to vote in state elections, and such unnecessary emphasis on national origin evidences the discriminatory intent behind the Birthplace Requirement. (*See* AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs argue that there is "no evidence of widespread voter fraud or non-U.S. citizen voting in Arizona." (LUCHA Compl. ¶¶ 198–99.) Arizona cannot, according to Plaintiffs, identify even a rational state interest served by "the DPOC requirement, Birthplace Requirement, Checkmark Requirement, or the mandated use of outdated and incorrect citizenship data to reject voter registration applications and purge eligible voters from the rolls." (*Id.* ¶ 197; *see* USA Compl. ¶¶ 49, 53–54.) Plaintiffs forecast that "the restrictions imposed by HB 2492 and HB 2243 will not enhance electoral security. Instead, they will make voter registration rolls less reliable, and will undermine the public's confidence in Arizona's elections." (LUCHA Compl. ¶ 204.)

All Plaintiffs have asserted interests against the enforcement of the Voting Laws. Specifically, several Private Plaintiffs allege that implementation of the Voting Laws will harm both the entities and their respective constituents. (*See, e.g.*, AAANHPI Compl. ¶¶ 101–12.) These Plaintiffs claim that the Voting Laws have forced and will force them to divert organizational resources to "train [their] staff and volunteers on the new regulations and educate potential voters, who often have limited English proficiency, on the additional documentation required to register to vote." (*Id.* ¶¶ 101–02.) Without the alleged barriers to voting imposed by the Voting Laws, "Plaintiff[s] would have the ability to use [their] limited resources in reaching out to more voters through . . . voter

---

[6] Plaintiffs also claim that H.B. 2492's disproportionate impact on Native Americans is intentional, in that the Arizona Legislature aims to repress the "increased political mobilization by Native voters" seen in the 2020 presidential election. (LUCHA Compl. ¶¶ 149–50.)

registration, mobilization, and participation efforts." (*Id.* ¶ 102.) Further, certain Private Plaintiffs assert that the Voting Laws will diminish the impact of their work, as some of their constituents will be removed from voter rolls and deterred from voting or registering. (*Id.* ¶¶ 101–05, 112.)

As for Defendants, they assert that the Voting Laws advance Arizona's interest in "reducing administrative burdens," "securing its elections," and "maintaining voter confidence." (Mot. at 16.)

### D. Procedural History

On March 31, 2022, Mi Familia Vota Plaintiffs[7] filed their Complaint in this Court. (Doc. 1, 03/31/2022 Mi Familia Vota Compl.) The United States and additional Private Plaintiffs subsequently filed lawsuits attacking the legality of the Voting Laws. These lawsuits have been consolidated into the instant case. (*E.g.* Doc. 164, 11/10/2022 Order re: Consolidation.) All Plaintiffs make at least one of the following claims: the Voting Laws (1) place an undue burden on the right to vote, violating the First and Fourteenth Amendments of the United States Constitution; (2) enable arbitrary and disparate treatment of voters, violating the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"); (3) enable national origin discrimination in violation of the Fourteenth Amendment; (4) discriminate based on race, violating the Fourteenth and Fifteenth Amendments; (5) deprive procedural due process (6) violate § 10101 of the Civil Rights Act of 1964; (7) violate Sections 5, 6, and 8 of the NVRA; and (8) violate the Voting Rights Act.

On September 16, 2022, Defendants[8] filed the Motion, to which Plaintiffs filed their Oppositions on October 17, 2022. (Mot.; Doc. 150, Mi Familia Opp'n; Doc. 151, Democratic National Committee Opp'n ("DNC Opp'n"); Doc. 152, United States Opp'n; Doc. 153, Living United for Change in Arizona Opp'n ("LUCHA Opp'n"); Doc. 154,

---

[7] The Court references organizational Plaintiffs that have filed collectively under the name of one organization. "LUCHA Plaintiffs," for example, includes all additional Plaintiffs that are named on the briefing with LUCHA.

[8] Plaintiffs also sued the Arizona Secretary of State and all Arizona County Recorders in their official capacities. (*E.g.*, Mi Familia Vota Compl. ¶¶ 22, 24–39.) These Defendants did not join the Motion. (*See* Mot.)

1    Poder Latinx Opp'n; Doc. 89, 22-cv-1381, AAANHPI Opp'n.) Defendants filed their

2    Consolidated Reply on November 23, 2022. (Doc. 180, Reply.) The Court held oral

3    argument on the Motion on December 15, 2022. (Doc. 187, Min. Entry.)

4    **II.    LEGAL STANDARDS & ANALYSIS**

5         Defendants argue that Plaintiffs lack standing to sue and bring unripe claims.

6    (Mot. at 9–13.) Defendants alternatively argue that Plaintiffs have failed to state claims

7    that the Voting Laws are unlawful. (*Id.* at 14–30.) The Court addresses each argument in

8    turn.

9         **A.    Rule 12(b)(1)**

10        Rule 12(b)(1) allows parties to move to dismiss for lack of subject matter

11   jurisdiction. As courts of limited jurisdiction, federal courts may only hear cases as

12   permitted by Congress and the U.S. Constitution. *See Kokkonen v. Guardian Life Ins.*

13   *Co.*, 511 U.S. 375, 377 (1994). Federal jurisdiction is therefore presumed absent until the

14   claimant demonstrates otherwise. *Id.* "A Rule 12(b)(1) jurisdictional attack may be facial

15   or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial

16   attack "assert[s] that the allegations contained in a complaint are insufficient on their face

17   to invoke federal jurisdiction." *Id.* The court accepts the plaintiff's allegations as true and

18   draws all reasonable inferences in the plaintiff's favor. *Leite v. Crane Co.*, 749 F.3d 1117,

19   1121 (9th Cir. 2014). From there, the court "determines whether the allegations are

20   sufficient as a legal matter to invoke the court's jurisdiction." *Id.* A factual attack

21   challenges the underlying factual allegations by introducing evidence beyond the

22   pleadings. *Id.* In either instance, the party asserting jurisdiction bears the burden of proof.

23   *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

24        **1.    Standing**

25        Under Article III of the United States Constitution, a plaintiff does not have

26   standing unless it can show (1) an "injury in fact" that is concrete and particularized and

27   actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the

28   challenged action of the defendant; and (3) that it is likely, as opposed to merely

- 15 -

Case 2:22-cv-00109-SRB   Document 44-2   Filed 06/23/23   Page 57 of 98
Case 2:22-cv-00109-SRB   Document 80-9   Filed 02/06/23   Page 17 of 36
USCA11 Case: 23-13727      Document: 44-2      Date Filed: 01/26/2024      Page: 57 of 98

speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Id.* at 561. In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. When addressing behavior that is alleged to increase the risk of future injury, the future injury must be "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). Plaintiffs must establish standing "for each claim for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

"[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Organizations cannot "manufacture the injury by incurring litigation costs," but they can show standing when they "would have suffered some other injury had they not diverted resources to counteracting the problem." *Id.* (internal quotations omitted). And even if the diversion-of-resources injury is "broadly alleged," such allegations are still "sufficient to establish organizational standing at the pleading stage." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (citation omitted). Moreover, "[o]nly one plaintiff needs to have standing when only injunctive relief is sought." *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)) (finding standing where Arizona Democratic Party and additional private plaintiffs requested injunctive and declaratory relief against Arizona election law), *aff'd sub nom. DNC v. Hobbs*, 9 F.4th 1218, 1219 (9th Cir. 2021) (Mem.); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the

1   suit to proceed."); *c.f. We Are America/Somos America, Coal. of Arizona v. Maricopa*
2   *Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) (district court is not
3   "strictly prohibit[ed]" from considering multiple plaintiffs' standing, despite "general
4   rule" on appeal that only one plaintiff need have standing).

5        Plaintiffs have standing to sue.[9] Defendants concede that the United States has
6   standing to bring its claims. (*See* Hr'g Tr. at 6:22–7:3.) Private Plaintiffs have also
7   established organizational standing. LUCHA Plaintiffs plausibly allege that the Voting
8   Laws will force LUCHA, which has previously conducted voter registration and
9   education activities and plans to continue these activities in the future, to "divert money,
10  personnel, time, and resources away from other activities" as a result of the requirements
11  imposed by the Voting Laws. (LUCHA Compl. ¶¶ 214–16, 223–24.) LUCHA also serves
12  naturalized citizens, and as explained below Plaintiffs have plausibly alleged that this
13  group will be disproportionately disenfranchised under the Voting Laws. (*Id.* ¶¶ 211–13;
14  *infra* II(B)(1)(a), (2)(a).) LUCHA anticipates not only that some its "assisted voters" will
15  be prevented from voting by the Voting Laws' DPOC and DPOR requirements, but also
16  that many of the individuals it seeks to mobilize will be "intimidated and discouraged
17  from registering to vote, even though they are eligible, because of the unconstitutional
18  limits imposed on the exercise of their franchise by H.B. 2492 and H.B. 2243." (LUCHA
19  Compl. ¶¶ 218–19.) LUCHA has standing to sue. *See Reagan*, 329 F. Supp. 3d at 841
20  (finding standing where "the new law injures the [organizational plaintiff] by compelling
21  [it] to devote resources to getting to the polls those of its supporters who would otherwise
22  be discouraged by the new law from bothering to vote." (citation omitted)). The Court
23  need not assess whether additional Plaintiffs have standing.

24                          **2.      Ripeness**

25        Defendants also argue that Plaintiffs' claims are constitutionally and prudentially
26  unripe. (Mot. at 12–14.) A claim is constitutionally ripe when a plaintiff's injury is

---

[9] Defendants argue that Plaintiffs' claims are not redressable through the instant suit, as
Plaintiffs have not named any County Recorders as Defendants. (Mot. at 2, 11–12.) All
Arizona County Recorders are now named as Defendants in this action.

App.303

"definite and concrete, not hypothetical or abstract." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (citation omitted). When evaluating the existence of a definite injury, courts consider whether "plaintiffs have articulated a concrete plan to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (internal quotation marks and citation omitted). Under the last prong, "the government's active enforcement of a statute [may] render . . . the plaintiff's fear [of injury] . . . reasonable." *Id.* at 1140. To minimize any chilling effect from an unwarranted First Amendment restriction, the Ninth Circuit has "applied the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).

Plaintiffs' claims are constitutionally ripe. Though Plaintiffs do not *per se* plan to violate the Voting Laws, certain Plaintiffs plausibly allege that their members risk violating the Voting Laws as an incident of inadequate access to DPOR or DPOC.[10] (LUCHA Compl. ¶¶ 274–85.) Further, as detailed in the surrounding analysis, Plaintiffs plausibly allege that enforcement of the Voting Laws will "imminently" harm their organizational missions. *C.f. Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) (citation omitted) (even preenforcement claim may be ripe where plaintiffs "confront a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement"); (*see* Poder Latinx Opp'n at 4.) And contrary to Defendants' claims, the Court has no reason believe that the Voting Laws will not be enforced. (*See* Mot. at 12–13 ("Plaintiffs have not alleged any 'genuine threat of imminent enforcement'").) Plaintiffs' injuries are at least reasonably anticipated, not just hypothetical or "theoretically possible." *See Bowen*, 752 F.3d at 839–40.

Plaintiff's claims are also prudentially ripe. A claim is prudentially ripe when "the

---

[10] AAANHPI raises that the ripeness inquiry is limited to its prudential component when a plaintiff is not "the target of enforcement." (AAANHPI Opp'n at 4 (citing *San Luis & Delta-Mendoza Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011)).) This only underscores the Court's conclusion that Plaintiffs' claims are ripe.

1    fitness of the issues for judicial decision and the hardship to the parties of withholding

2    court consideration" both weigh toward hearing the case. *See Ass'n of Irritated Residents*

3    *v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136,

4    149 (1967)). This case primarily hinges on legal issues—preemption under the NVRA,

5    the ability of Congress to regulate presidential elections, the relative burden of Arizona's

6    citizenship verification requirements vis-à-vis other requirements previously evaluated by

7    the Supreme Court—and discovery will provide any factual development necessary to

8    fully evaluate the merits of the case. *See id.* (challenge prudentially ripe where issue was

9    "purely [a] legal question"); (Poder Latinx Opp'n at 4–6). Moreover, delaying review

10   until after certain Plaintiffs have already been unlawfully removed from Arizona's voting

11   rolls and prevented from voting would make any review "too late to redress the injuries

12   suffered by [Plaintiffs'] members." *Ass'n of Irritated Residents*, 10 F.4th at 944. The

13   Court concludes that Plaintiffs' claims are ripe for review.

14       **B.    Rule 12(b)(6)**

15       A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) a

16   lack of cognizable legal theory or (2) insufficient facts to support a cognizable legal

17   claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In

18   determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the

19   complaint are presumed true, and the pleadings are construed in the light most favorable

20   to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076,

21   1080 (9th Cir. 2012). At this early stage of the litigation, the standard does not mandate

22   that "plaintiff's explanation . . . be true or even probable." *Starr v. Baca*, 652 F.3d 1202,

23   1216–17 (9th Cir. 2011). However, "for a complaint to survive a motion to dismiss, the

24   nonconclusory 'factual content,' and reasonable inferences from that content, must be

25   plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*,

26   572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

27   In other words, the complaint must contain enough factual content "to raise a reasonable

28   expectation that discovery will reveal evidence" of the claim. *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 556 (2007).

Defendants argue that Plaintiffs have failed to plausibly allege that the Voting Laws are unlawful under either constitutional or statutory frameworks. (Mot. at 14–30.)

### 1.    *Anderson-Burdick* Claims

Under the *Anderson-Burdick* framework, courts evaluate the validity of an election law by balancing the burden the law places on the fundamental right to vote against the state interests served by the law. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Specifically, courts must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; "determine the legitimacy and strength of each of those interests"; and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

"[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). A restriction is "not severe" when it is "generally applicable, even-handed, politically neutral, and . . . protect[s] the reliability and integrity of the election process." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). This balance means that voting regulations are rarely subjected to strict scrutiny. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).

Plaintiffs assert that the Voting Laws place an undue burden on the right to vote in several ways. Defendants counter that Plaintiffs have failed to state claims under the

- 20 -

*Anderson-Burdick* doctrine because "the burdens involved [in complying with the Voting Laws] are not significant" and are "justified by the State's compelling interests." (Mot. at 14.) The Court disagrees with Defendants.

### a. Burden on Identifiable Segment of Voters

Plaintiffs make several plausible claims that the Voting Laws "place a particular burden on an identifiable segment of voters [which is] more likely to raise constitutional concerns." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021) (Mem) ("*Hobbs III*") (citing *Anderson*, 460 U.S. at 792). For example, the San Carlos Apache Tribe alleges that a significant number of its 11,000 members in Arizona "are likely to be unable to obtain [DPOR], as required by H.B. 2492, either because their residence lacks a numbered street address entirely, or because they are not officially listed as a resident of the home where they stay." (LUCHA Compl. ¶¶ 284, 312; LUCHA Opp'n at 2–4.) The alleged effect of the DPOR requirement on Tribal members "will be unique when compared to other eligible Arizona voters . . . giving [Tribal members] less opportunity than other eligible Arizona voters to participate in the political process and elect representatives of their choice." (LUCHA Compl. ¶¶ 137, 139; *see also* AAANHPI Compl. ¶¶ 117–18 (Voting Laws' DPOC requirement and verification particularly burden "AANHPIs, naturalized citizens, and other voters of color."); Mi Familia Vota Compl. ¶ 79.) Plaintiffs additionally allege that the Voting Laws undermine public confidence in Arizona's elections and draw upon legislative history to claim that the Voting Laws were intended to discriminate against certain protected groups. (*E.g.*, LUCHA Compl. ¶ 326; AAANHPI Compl. ¶¶ 53–54.) Relatedly, Plaintiffs allege that Arizona has no legitimate interest in the mandates underlying the Voting Laws. (AAANHPI Compl. ¶¶ 116–17; LUCHA Compl. ¶¶ 195–97, 325; DNC Compl. ¶ 46.) Plaintiffs have stated a claim that the Voting Laws impose a burden on the right to vote without a corresponding justification.

### b. Arbitrary State and Federal Form Distinction

Plaintiffs also plausibly allege, both within the *Anderson-Burdick* framework and

App.307

under the traditional Equal Protection framework,[11] that H.B. 2492 arbitrarily treats registrants differently depending on whether they used the Federal or State Form. (LUCHA Opp'n at 7–8; LUCHA Compl. ¶¶ 309, 313; *e.g.*, Mi Familia Vota Compl. ¶¶ 89–90.) In other words, Plaintiffs have stated a claim that the Voting Laws are not "generally applicable." *See Rubin*, 308 F.3d at 1014.

LUCHA Plaintiffs detail that the Voting Laws violate the LULAC Consent Decree and arbitrarily prevent State Form users who did not provide DPOC from voting in any election, while Federal Form users who did not provide DPOC may still vote in congressional elections. (LUCHA Opp'n. at 8.) Federal and State Form users are not suspect classes, so the State need only show that there is a rational basis for discriminating against State Form users. *See McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 808–09 (1969) ("The [race- and wealth-neutral] distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal."); *Weber v. Shelley*, 347 F.3d 1101, 1107 n.2 (9th Cir. 2003). It is undisputed that a State Form applicant who did not provide DPOC will be barred from voting at all, whereas a Federal Form registrant will be allowed to vote in certain federal elections.  (LUCHA Opp'n at 7.) Both Federal and State Form users have affirmed citizenship under penalty of perjury. (*Id.* at 8.) Defendants counter that requiring DPOC and DPOR from State Form users increases "confiden[ce]" that registrants "are indeed U.S. citizens and reside in the districts in

---

[11] Poder Latinx Plaintiffs similarly claim that the Voting Laws subject registrants to "arbitrary and disparate treatment," but they rely on the Equal Protection standard articulated in *Bush v. Gore*, 531 U.S. 98, 104–09 (2000) to assert this claim. (Poder Latinx Compl. ¶¶ 120–29.) The Motion does not directly address this claim. (*See* Mot.; Poder Latinx Opp'n at 9.) Instead, Defendants generally assert that any Equal Protection challenges to the Voting Laws pled outside of the *Anderson-Burdick* framework are improperly presented to the Court. (Mot. at 17.) However, the authority Defendants cite for this assertion does not foreclose constitutional claims pled outside of the *Anderson-Burdick* framework. (*See id.* at 17–18 (citing *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (observing that the Supreme Court "has addressed [First Amendment, Due Process, and Equal Protection claims] collectively using a single analytic framework" but noting that plaintiff did not suggest separate analyses for his claims beyond *Anderson-Burdick*)).)

App.308

1    which they intend to cast a vote." (See Mot. at 18–19.) But Defendants do not offer any

2    basis for preventing State Form applicants from voting at all without DPOC. (*See id.*)

3        Plaintiffs seem to disagree regarding whether this discrimination claim is analyzed

4    under the *Anderson-Burdick* framework. (*Compare* MFV Opp'n at 5–6 (analyzing

5    disparate treatment of Federal and State Form users under *Anderson-Burdick*) *with*

6    LUCHA Opp'n at 7 (separately analyzing disparate treatment claim).) The Court

7    concludes that Plaintiffs have stated a claim that the Voting Laws arbitrarily discriminate

8    based on use of Federal or State Forms under either framework.[12]

9                    **c.    Fact-Sensitive Inquiry**

10       The procedural posture of this case also weighs against granting the Motion.

11   Plaintiffs correctly note that because *Anderson-Burdick* claims are particularly fact-

12   sensitive, dismissal under Rule 12(b)(6) is disfavored. (LUCHA Opp'n at 4; MFV Opp'n

13   at 2–3); *see, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 447, 450 (9th Cir. 2018) (reversing

14   "premature" grant of dismissal, as court could not determine "without any factual record .

15   . . [whether the state's] justifications outweigh the constitutional burdens"); *Mecinas*, 30

16   F.4th at 905 ("[T]he magnitude of the asserted injury [under *Anderson-Burdick*]. . .

17   present[s] factual questions that cannot be resolved on a motion to dismiss."). Defendants

18   also cite *Crawford v. Marion County* to argue that requiring voter identification to vote is

19   not an undue burden as a matter of law. (*See* Mot. at 15–16 (citing 553 U.S. 181, 185,

20   199 (2008)).) Plaintiffs counter not only that the law upheld in *Crawford* provided for

21   alternative ways to vote without the requisite identification, but also that *Crawford*

22   addressed *Anderson-Burdick* claims on summary judgment. (LUCHA Opp'n at 4 n.6; *see*

23   *also* AAANHPI Opp'n at 8); 553 U.S. at 185, 187, 201. Defendants have not brought any

24   identical state laws upheld under *Anderson-Burdick* to the Court's attention, nor is the

25   Court aware of any. The Court will not dismiss Plaintiffs' *Anderson-Burdick* claims.

26                    **2.    Additional Constitutional Claims**

27   ─────────────────────
     [12] Applying a traditional Equal Protection analysis, Plaintiffs must plausibly allege that
28   there is no rational basis for Arizona's distinction between Federal and State Form users
     voting in federal elections. (*See* LUCHA Compl. ¶¶ 86, 328.) Plaintiffs have met their
     burden to do so. (*See* LUCHA Opp'n at 8.)

App.309

### a.     National Origin & Race Discrimination

Several Plaintiffs claim that the Voting Laws discriminate based on national origin and race, both allegedly violating the Equal Protection Clause. (*See, e.g.*, LUCHA Compl. ¶¶ 329–35; AAANHPI Compl. ¶¶ 143–50.) There are two "strands of equal protection doctrine: suspect classifications and fundamental rights. The first strand bars a state from codifying a preference for one class over another, but it prescribes heightened scrutiny only where the classification is drawn from . . . race, gender, alienage, [or] national origin. The second strand bars a state from burdening a fundamental right for some citizens but not for others. Absent some such burden, however, legislative distinctions merit no special scrutiny." *Short v. Brown*, 893 F.3d 671, 678–79 (9th Cir. 2018) (internal citations omitted). The Court addresses each alleged constitutional violation in turn.

First, Plaintiffs allege the Voting Laws facially discriminate based on national origin. (LUCHA Compl. ¶¶ 100–01, 110–16.) LUCHA details that by requiring applicants to list their place of birth and "subject[ing] voters to additional burdensome procedures to verify their eligibility to vote, as well as mandatory criminal investigation, only if they were born outside the United States," the Voting Laws unconstitutionally discriminate against naturalized citizens. (LUCHA Opp'n at 6.) Plaintiffs have plausibly alleged a scenario where a naturalized citizen who lawfully obtained state identification in Arizona before obtaining citizenship would be flagged as a noncitizen under the verification provisions of the Voting Laws. (LUCHA Compl. ¶¶ 100–33.) Considering Plaintiffs' detailed allegations regarding the unreliable "data-matching process" mandated by the Voting Laws, the Birthplace Requirement—particularly combined with the Check Box Requirement—and H.B. 2243's "reason to believe" criterion for investigating citizenship status, the Court finds that Plaintiffs have stated a claim that the Voting Laws are facially discriminatory based on national origin. (*See id.* ¶¶ 113, 116; AAANHPI Compl. ¶ 87.) Alternatively, even under *Anderson-Burdick*, total deprivation of the opportunity to vote is a severe burden and burdening voters based on foreign

1    national origin separately demands strict scrutiny. *Short*, 893 F.3d at 678–79 (applying

2    *Anderson-Burdick*). Plaintiffs have stated a claim that naturalized citizens will incur such

3    a burden solely by virtue of their birthplace.

4          Defendants attempt to counter Plaintiffs' claims of national origin discrimination

5    by arguing that Plaintiffs have not adequately alleged discriminatory intent. (Mot. at 20–

6    22.) As above explained, Plaintiffs have stated a claim that the Voting Laws are facially

7    unconstitutional, which does not require a finding of discriminatory intent. (*See* LUCHA

8    Opp'n at 6–7); *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) ("When the

9    government expressly classifies persons on the bases of race or national origin . . . its

10   action is 'immediately suspect'. . . . A plaintiff in such a lawsuit need not make an

11   extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict

12   scrutiny.") (alterations in original) (citation omitted)); *Walker v. Gomez*, 370 F.3d 969,

13   974 (9th Cir. 2004) (plaintiff need not prove discriminatory intent or impact when policy

14   is suspect on its face) (citing *Loving v. Virginia*, 388 U.S. 1, 8–9 (1967)).

15         In any event, the Court alternatively finds that Plaintiffs have adequately alleged

16   discriminatory intent such that they have stated a claim that the Voting Laws were

17   "motivated by" a discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous.*

18   *Dev. Corp.*, 429 U.S. 252, 265–66, 269 (1977); (AAANHPI Opp'n at 13–15). "The

19   central inquiry in any disparate treatment claim under the Equal Protection Clause is

20   whether an invidious discriminatory purpose was a motivating factor in some government

21   action." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022) (cleaned up). "'[A]ny

22   indication of discriminatory motive may suffice' to allow a disparate treatment claim to

23   survive summary judgment." *Id.* (emphasis and alteration in original) (quoting *Arce v.*

24   *Douglas*, 793 F.3d 968, 978 (9th Cir. 2015)).

25         The Supreme Court articulated the following, non-exhaustive factors that a
         court should consider in assessing whether a defendant acted with
26       discriminatory purpose: (1) the impact of the official action and whether it
         bears more heavily on one race than another; (2) the historical background
         of the decision; (3) the specific sequence of events leading to the
27       challenged action; (4) the defendant's departures from normal procedures
         or substantive conclusions; and (5) the relevant legislative or administrative
28       history.

*Arce*, 973 F.3d at 977.

Plaintiffs point to the reduction in response time to provide DPOC between the previous version of H.B. 2243 (90 days) and H.B. 2243 as enacted (35 days) as evidence of the legislature's intention to target naturalized citizens. (*See* AAANHPI Compl. ¶¶ 17–18, 60.) Plaintiffs also raise the comments made by H.B. 2942's sponsor regarding immigrant voters, as well as the bill's passage over advice of legislative counsel that the statute would be preempted by the NVRA, as evidence of discriminatory intent in legislation. (Poder Latinx Compl. ¶ 48 (detailing statements from bill sponsors that intention of the Voting Laws was to overrule LULAC Consent Decree and ensure noncitizens are not voting in Arizona elections).) Plaintiffs have stated a claim that the Voting Laws intentionally subject naturalized citizens to increased burdens, up to and including complete disenfranchisement, violating the Equal Protection Clause.[13]

Second, Plaintiffs allege that the Voting Laws discriminate based on race, violating both the Equal Protection Clause and the Fifteenth Amendment.[14] (*See* AAANHPI Compl. ¶¶ 143–50; Poder Latinx Compl. ¶¶ 107–18.) The Fifteenth Amendment establishes that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend XV. A plaintiff must allege "actual interference in the voting or registration processes" on account of race to state a claim for Fifteenth Amendment violation. *See Skorepa v. City of Chula* Vista, 723 F. Supp. 1384, 1393 (S.D. Cal. 1989) (citation omitted).

---

[13] Amicus curiae Immigration Reform Law Institute raises that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." (Doc. 131-1, IRLI Amicus Br. at 15 (quoting *Arlington Heights*, 429 U.S. at 266).) The fact-sensitive nature of invidious discrimination claims further weighs against granting the Motion.

[14] Poder Latinx Plaintiffs correctly note that the Motion does not address their claim that the Voting Laws violate the Fifteenth Amendment under *Louisiana v. United States*, 380 U.S. 145 (1965). (Poder Latinx Opp'n at 10.) Defendants argue in Reply that the unconstitutional action in *Louisiana* is distinguishable from the Voting Laws, in that *Louisiana* struck down a voting requirement administered "without any controls on official discretion, placing arbitrary power in the hands of election officials." (Reply at 17 n.9.) But Plaintiffs have plausibly alleged that, *inter alia*, H.B. 2243's "reason to believe" investigation criterion similarly gives election officials "arbitrary power" to purge registered voters. *See Louisiana*, 380 U.S. at 153; (Poder Latinx Compl. ¶ 111.)

App.312

Plaintiffs' claims survive the Motion. LUCHA Plaintiffs describe Arizona's extended history of denying the franchise to Native Americans and plausibly connect this history to H.B. 2492's DPOR requirement. (*See* LUCHA Compl. ¶¶ 164–69, 176–77.) AAANHPI asserts that by imposing the DPOR, DPOC, and Birthplace Requirements, "and removing voters from the rolls if such information is not provided or is questioned, Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 intentionally discriminate against AAANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments." (AAANHPI Compl. ¶ 148.) AAANHPI makes similar allegations regarding H.B. 2243. (*Id.* ¶ 150.) Poder Latinx asserts that H.B. 2243 is "in essence, a redeployment of [Jim Crow-era] unconstitutional registration practices involving the unfettered discretion of officials to revoke voting rights and arbitrarily allocate the right to vote, with particular harm falling on naturalized voters and, in particular, Latinx voters throughout Arizona." (Poder Latinx Compl. ¶ 116.) The Court finds that Plaintiffs have stated a claim that the Voting Laws are racially discriminatory in violation of the Fourteenth and Fifteenth Amendments.

### b.  Procedural Due Process

Multiple Private Plaintiffs claim that the Voting Laws deny procedural due process. (*See, e.g.*, AAANHPI Compl. ¶¶ 135–41; Poder Latinx Compl. ¶¶ 133–44; Poder Latinx Opp'n at 7–9.) Defendants counter that any "freestanding" procedural due process claims are "squarely foreclosed by Ninth Circuit precedent." (Mot. at 16–17 (citing *Hobbs III*, 18 F.4th at 1195).) Defendants are correct. *See Hobbs III*, 18 F.4th at 1195 (holding that the *Anderson-Burdick* framework is "better suited to the context of election laws than is the more general *Eldridge* test"); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020) (observing that district court likely erred in accepting "plaintiffs' novel procedural due process argument" when *Anderson-Burdick* should supersede any other framework). To the extent Plaintiffs assert procedural due process claims distinct from their *Anderson-Burdick* claims, the Court grants the Motion as to these "freestanding" claims. However, certain Plaintiffs' procedural due process

claims survive the Motion, as they are included in allegations that the Voting Laws impose an undue burden under *Anderson-Burdick*. (*See, e.g.*, MFV Compl. ¶¶ 3, 62–69, 79 (alleging that H.B. 2492 severely burdens the right to vote by, *inter alia*, threatening voters with registration cancellation and criminal investigation without adequate notice and time to respond); AAANHPI Compl. ¶ 136; AAANHPI Opp'n at 10 (explaining that its procedural due process claim is alleged within the *Anderson-Burdick* framework).)

### 3.    National Voter Registration Act

Plaintiffs allege that the Voting Laws violate multiple sections of the NVRA. The NVRA sets parameters for the federal election process and bars states "from requiring a Federal Form applicant to submit information beyond that required by the form itself." *Inter-Tribal Council*, 570 U.S. at 20 (striking down under the NVRA Arizona's requirement that Federal Form applicants submit DPOC).

As a general argument for dismissal of all Plaintiffs' NVRA claims, Defendants assert that because the Voting Laws only regulate presidential elections rather than all federal elections, the NVRA does not apply. (*See* Mot. at 3, 23.) Citing Article I Section 4 of the United States Constitution, Defendants argue that the NVRA "can [only] apply constitutionally to 'Elections for Senators and Representatives.'" (*Id.* at 23.) But Plaintiffs point out that there is no "carve-out" in H.B. 2243 for Federal Form users—on its face, H.B. 2243 allows election officials to purge individuals lawfully registered to vote using the Federal Form. (*See* AAANHPI Opp'n at 6.) And further, contrary to Defendants' suggestions, Plaintiffs have at least plausibly alleged that the NVRA applies to presidential elections.[15] *C.f. Mattioda v. Bridenstine*, No. 20-cv-03662-SVK, 2021 WL 75665, at *18 (N.D. Cal. Jan. 8, 2021) (assuming without deciding that a claim exists, where case is on motion to dismiss and Ninth Circuit has not spoken to the issue); *see also Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) ("The broad power given to Congress over congressional elections has been extended to presidential

---

[15] The United States details the history surrounding the Elections Clause to explain why Presidential elections may have been omitted but why the NVRA still applies to presidential elections. (USA Opp'n at 8.)

1    elections"); (USA Opp'n at 5 ("An unbroken line of precedent confirms Congress's

2    power to regulate all federal elections, including those for president."); AAANHPI Opp'n

3    at 6 (citing *Oregon v. Mitchell*, 400 U.S. 112, 124 & n.6 (1970) ("It cannot be seriously

4    contended that Congress has less power over the conduct of presidential elections than it

5    has over congressional elections.")), n.6 (detailing codified finding accompanying the

6    NVRA regarding "discriminatory and unfair registration [harming] racial minorities.").)

7                                **a.    Section 5**

8         Section 5 of the NVRA mandates that voter registration applications included with

9    driver's license applications "may only require the minimum amount of information

10   necessary to enable State election officials to assess eligibility of the applicant . . . ."  52

11   U.S.C. § 20504(c)(2)(B). This "minimum" means an "an attestation that the applicant

12   meets each such requirement [of citizenship]," with "signature of the applicant, under

13   penalty of perjury." *Id.* § 20504(c)(2)(C)(i)–(iii). The DNC alleges that by requiring

14   Federal Form users to submit DPOC in order to vote in presidential elections, H.B. 2492

15   violates Section 5 of the NVRA. (*See* DNC Compl. ¶¶ 80–83.) The DNC argues that

16   Defendants failed to address this specific claim in the Motion. (DNC Opp'n at 8.) The

17   Court finds no indication otherwise. (*See* Mot.) Plaintiffs have stated a claim that the

18   Voting Laws are preempted by Section 5 of the NVRA.

19                                **b.    Section 6**

20        Plaintiffs allege that H.B. 2492's DPOC requirement violates the mandate of

21   Section 6 of the NVRA that states "accept and use" the Federal Form to register

22   individuals for all federal elections. *See* 52 U.S.C. § 20505(a); (*e.g.*, DNC Compl. ¶¶ 70–

23   72; DNC Opp'n at 5.)

24        Plaintiffs have plausibly alleged that the Voting Laws are preempted by Section 6.

25   (*See* AAANHPI Compl. ¶¶ 160, 168.) Plaintiffs argue that under *Inter Tribal Council*,

26   "[f]ederal-only voters must be permitted to vote in *all* federal elections, including

27   presidential elections, so long as those voters submit a complete and valid Federal Form."

28   (USA Opp'n at 6) (emphasis in original). Like the law found preempted in *Inter Tribal*

- 29 -

1   *Council*, Plaintiffs allege that the Voting Laws require Federal Form users to provide

2   "every additional piece of information the State requires on its state-specific form. If that

3   is so, the Federal Form ceases to perform any meaningful function, and would be a feeble

4   means of 'increas[ing] the number of eligible citizens who register to vote in elections for

5   Federal office.'" *Inter Tribal Council*, 570 U.S. at 13 (alteration in original) (citing

6   § 1973gg(b)). Plaintiffs have stated a claim that the Voting Laws are preempted by

7   Section 6 of the NVRA.

8                                    **c.      Section 8**

9          Section 8 of the NVRA, in relevant part, requires that any state program to

10  "protect the integrity of the electoral process" by maintaining an accurate registration roll

11  for federal elections "be uniform, nondiscriminatory, and in compliance with the Voting

12  Rights Act of 1965" ("Uniformity Provision"). 52 U.S.C. § 20507(b)(1). It also mandates

13  that States "complete, not later than 90 days prior to the date of a primary or general

14  election for Federal office, any program the purpose of which is to systematically remove

15  the names of ineligible voters from the official lists of eligible voters" ("Purge

16  Provision"). *Id.* § 20507(c)(2)(A).

17         The DNC alleges that H.B. 2492 violates the Uniformity Provision by excluding

18  Federal Form users who did not provide DPOC from voting by mail or in Presidential

19  elections. (*See* DNC Compl. ¶¶ 73–78.) LUCHA Plaintiffs make the same allegation

20  regarding H.B. 2492's DPOR requirement. (LUCHA Compl. ¶¶ 356, 358; *see also* DNC

21  Opp'n at 9.) Taking the allegations in the Complaints as true, the Court finds that

22  Plaintiffs have stated a claim that the Voting Laws violate the Uniformity Provision. (*See*

23  DNC Opp'n at 9–10.) And though Defendants counter that the Voting Laws have no

24  mandate that registrants shall continue to be purged from the rolls through the 90-period

25  preceding an election, the Voting Laws do not qualify when election officials can and

26  cannot purge registrants from the rolls. (*See* H.B. 2492 § 8; H.B. 2243 § 2; AAANHPI

27  Compl. ¶¶ 171–72.) At this stage of litigation, the statutes' broad directive to purge

28  registrants, without any limit as to when this purge should cease, suffices to state a claim

App.316

1  for violation of the Purge Provision. (*See* DNC Opp'n at 10.)

2         **4.    Section 10101**

3         The Materiality Provision of Section 10101 ("Materiality Provision") forbids

4  states from denying "the right of any individual to vote in any election because of an

5  error or omission on any record or paper relating to any application, registration, or other

6  act requisite to voting, if such error or omission is not material in determining whether

7  such individual is qualified under State law to vote in such election." 52 U.S.C.

8  § 10101(a)(2)(B). The United States explains that "[t]he Materiality Provision

9  specifically covers registration." (USA Opp'n at 4 (citing §§ 10101(a)(3)(A), (e)).) In

10 Arizona, such qualifications are age of majority, citizenship, residency, ability to write

11 one's name or make one's mark, and lack of criminal convictions or adjudications

12 rendering the voter incapacitated. Ariz. Rev. Stat. § 16-101.

13        The United States argues that multiple provisions of H.B. 2492 mandate voter

14 purges due to immaterial omissions or errors by registrants. The Birthplace Requirement,

15 the United States asserts, is immaterial to a voter's eligibility, as naturalized citizens are

16 born outside of the United States and still carry the citizenship necessary to vote in

17 Arizona. (USA Opp'n at 18–19.) Conversely, individuals born in the United States might

18 not be American citizens, whether through foreign diplomatic parentage or expatriation.

19 (*Id.* at 19.) Failure to comply with the Check Box Requirement would similarly

20 disqualify applicants who have previously provided DPOC and met every other

21 requirement for verification of citizenship. (*Id.* at 19; USA Compl. ¶ 59.)

22        Defendants counter that there is no private right of action under § 10101 and that,

23 in any event, the information solicited under the Voting Laws is "material to ascertaining

24 eligibility to vote and thus cannot run afoul of Section 10101." (Mot. at 3, 25, 28.)

25 Specifically, Defendants assert that a cause of action under § 1983 "is not available if

26 Congress 'did not intend that remedy' for the statutory right in question." (*Id.* at 25

27 (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)).) Defendants

28 also argue that the Materiality Provision does not "dictate the substance of state law," as

- 31 -

1    Congress's concerns in the Provision "c[a]me not from discriminatory laws," but "'from

2    the discriminatory application and administration of apparently nondiscriminatory laws.'"

3    (*See id.* at 26 (citing H.R. Rep. No. 88914 (Nov. 20, 1963), 1964 U.S.C. § 2391, 2491).)

4          As this stage of litigation, the Court disagrees with Defendants. Before the passage

5    of the Voting Laws, the state of Arizona used other methods to verify a registrant's

6    citizenship, suggesting that the Voting Laws' "confirmation" measures are not necessary.

7    (*See* USA Opp'n at 19; USA Compl. ¶ 49.) And the United States points out that the

8    Materiality Provision forbids "election officials from denying the right to vote based on

9    errors and omissions not material to voter qualifications," "target[ing] *all* state conduct

10   that denies the right to vote based on immaterial errors or omissions." (USA Opp'n at 14)

11   (emphasis in original). No party disputes that citizenship itself is material to a voter's

12   qualifications, but the United States persuasively argues that materiality may mean more

13   than relevance in this context. (*Id.* at 17, 17 n.6.) The United States has plausibly alleged

14   that H.B. 2492 requires duplicative information from registrants that is "unnecessary and

15   therefore not material to determining an individual's qualifications to vote" under

16   Arizona law.[16] *See La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542

17   (W.D. Tex. 2022). The United States has stated a claim that H.B. 2492 violates the

18   Materiality Provision.[17] (*See* USA Opp'n at 11–20.)

19         The Court also finds that Private Plaintiffs have stated a claim that the Voting

20   Laws violate § 10101. Similar to the application of the NVRA to presidential elections,

21   the Court need not decide whether there is a private right of action under § 10101 on a

22   motion to dismiss. While the Ninth Circuit has not spoken to this issue, Plaintiffs have

23   cited persuasive authority from within this Circuit indicating that there is such a private

24

---

[16] The Court agrees with the United States that the text of the Materiality Provision does
25   not indicate the Provision only concerns "ad hoc executive actions that exceed state law."
(USA Opp'n at 13–14; *see* Mot. at 26.) Nor do the cases Defendants cite for this
26   argument support their reading of the Materiality Provision.
[17] Defendants also argue that because Arizona voters may cure any error in their
27   registrations before H.B. 2492 would mandate cancelling their registrations, H.B. 2492
does not run afoul of § 10101. (Mot. at 27.) Defendants cite no authority for this
28   assertion. The Court agrees with Plaintiffs that the cure provision of H.B. 2492 does not
warrant dismissing the § 10101 claim. (*See* USA Opp'n at 15–16.)

App.318

right of action, rendering their claims at least plausible. (*See* AAANHPI Opp'n at 16 n.14 (citing *Davis v. Commonwealth Election Comm'n*, No.: 1–14–CV–00002, 2014 WL 2111065, at *10 (D. N. Mar. I. May 20, 2014)).) While the United States addresses Private Plaintiffs' allegations regarding H.B. 2492, Poder Latinx additionally alleges that H.B. 2243 violates § 10101(a)(2)(A), which prohibits election officials from "apply[ing] any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote[.]" (Poder Latinx Compl. ¶¶ 100–06.) Poder Latinx has plausibly alleged that County Recorders are "instructed" to apply a different "standard, practice, or procedure" to verify the eligibility of voters suspected of being noncitizens. (*Id.* ¶ 102.) Only suspected noncitizens, investigated under broad, potentially discriminatory criteria, will be subjected to allegedly unreliable database checks and risk erroneous cancellation of their registrations. (*Id.* ¶ 103.)

### 5.     Voting Rights Act

Section 2 of the Voting Rights Act ("Section 2") prohibits states from enacting voting rules that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). In evaluating an alleged Section 2 violation, courts must consider "the totality of circumstances" in each case and whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members" of a protected class "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). "The essence of a § 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities of minority and non-minority voters to elect their preferred representatives." *Brnovich v. DNC*, 141 S. Ct. 2321, 2333 (2021) (cleaned up). "[T]he judiciary provides the only meaningful review of legislation that may violate the Voting Rights Act." *Feldman v. Arizona Sec. of State's Office*, 843 F.3d 366, 369 (9th Cir.

App.319

2016).

When assessing a claim of discriminatory results under Section 2, courts consider the extent of any historical discrimination burdening the right to vote, the degree of racially polarized voting, and the severity with which discrimination restricts the class from voting. *See Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986). LUCHA Plaintiffs allege that the Voting Laws disparately burden Native American, Latino, and language-minority voters by placing "barriers to registration [causing] impacted individuals to be wholly barred from voting." (LUCHA Compl. ¶¶ 367–69.) For example, as above detailed, LUCHA Plaintiffs assert that a disproportionate number of San Carlos Apache Tribal members will be unable to provide DPOR not because obtaining adequate proof is a "mere inconvenience," but because many Tribal members do not live in a residence with one address recognized by the State. (*Id.* ¶¶ 28–40); *c.f. Brnovich*, 141 S. Ct. at 2338 ("Mere inconvenience cannot be enough to demonstrate a violation of [Section] 2.") Arizona also has a history of disenfranchising Native American citizens. (*Id.* ¶¶ 164–69, 176–77.) LUCHA Plaintiffs additionally allege that naturalized citizens, a disproportionate number of whom are members of protected racial classes, will be subject to unwarranted disenfranchisement and criminal prosecution due to the Birthplace Requirement and the State's use of faulty databases to verify citizenship. (*Id.* ¶¶ 367–70.)

Defendants respond that LUCHA's Section 2 claim does not plausibly detail any "meaningful disparate racial impacts" and "depends enormously on speculative racial disparities that may not occur as anticipated, or indeed may not occur at all." (Mot. at 4, 29 (internal quotation marks and citation omitted).) But Defendants' attacks on the Section 2 claim depend on evaluating the merits of the claim, which the Court will not do at this stage of litigation. And Plaintiffs need not plead any "specific set of factors" to state a claim of Section 2 violation. *Sixth Dist. Of African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1277 (N.D. Ga. 2021) (citing *Brnovich*, 141 S. Ct. at 2336, 2340). Plaintiffs have met their burden to plausibly allege that Arizona's voting process is not "equally open to participation" from, *inter alia*, Native American voters who will not

App.320

be able to obtain DPOR. LUCHA Plaintiffs have stated a claim that the Voting Laws violate Section 2.

**III.    CONCLUSION**

The Court concludes that Plaintiffs have standing to bring this action. Further, the Court finds that Plaintiffs have stated plausible claims for relief, apart from any alleged "freestanding" procedural due process violation.

**IT IS ORDERED** denying Defendants State of Arizona and the Arizona Attorney General's Motion to Dismiss except as to Plaintiffs' freestanding procedural due process claims (Doc. 127).

Dated this 16th day of February, 2023.

Susan R. Bolton
United States District Judge

App.321

**140**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

VOTE.ORG, et al.,

      Plaintiffs,

v.                                       Case No. 4:23-cv-111-AW-MAF

CORD BYRD, in his official capacity as
SECRETARY OF STATE OF
FLORIDA, et al.,

      Defendants,

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY,

      Intervenor-Defendants.

_____/

## ORDER GRANTING MOTIONS TO DISMISS

Before they can vote, Floridians must first register. And when they register, they must include a signature on their registration form. Under current Florida law, that signature must be either an "original signature" or a "digital signature transmitted by the Department of Highway Safety and Motor Vehicles." Fla. Stat. § 97.053(5)(a)(8). The question in this case is whether Florida's law complies with a federal law that keeps states from using immaterial errors or omissions to deny the right to vote.

Plaintiffs—several advocacy organizations focused on voting rights—sued to enjoin the law's enforcement. ECF No. 1. Defendants are the Florida Secretary of

1

State and each of Florida's sixty-seven supervisors of election. ECF No. 101. Two political organizations intervened as additional Defendants. ECF No. 85.

There are two pending motions to dismiss: one from the Intervenors (ECF No. 111) and one from the Secretary and ten Supervisors (the "Moving Defendants") (ECF No. 112). (The other fifty-seven Supervisors have answered the First Amended Complaint. ECF Nos. 108, 109, 110, 114.) The United States submitted a "Statement of Interest," arguing that the court should deny the motions to dismiss. ECF No. 118.

Having carefully considered the parties' arguments, I now grant the motions.

## I.

Before turning to the merits, I must address the issue of this court's jurisdiction, which the Constitution limits to "Cases" and "Controversies," U.S. Const. art. III, § 2. One "essential and unchanging part of the case-or-controversy requirement" is standing. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up).

App.324

To establish standing, a plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 560-61). Ultimately, a plaintiff must prove these three elements, but at the pleading stage, a plaintiff need only allege facts that would support them. *See Lujan*, 504 U.S. at 561; *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (noting the need to "sufficiently allege[] a basis" for each element). And at this stage, the court accepts as true the complaint's factual allegations. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).

Here, Plaintiffs are organizations, which means they have two avenues to show standing: through their members (associational standing) or through an injury to themselves that is traceable to and redressable by Defendants (organizational standing). *Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). Plaintiffs assert standing through both avenues; the Moving Defendants dispute standing altogether.[1]

---

[1] The Intervenors do not challenge Plaintiffs' standing. But regardless of the parties' views on standing, the court has an independent obligation to address it. *See Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1400-01 (11th Cir. 2000).

App.325

Plaintiffs have alleged enough to show that at least one of them has standing. Specifically, Plaintiffs have alleged sufficient facts that, taken as true, show the NAACP has organizational standing under a diversion-of-resources theory. This makes it unnecessary to address the parties' arguments as to the other Plaintiffs' standing or as to the NAACP's associational standing. *See Georgia Ass'n of Latino Elected Officials, Inc.*, 36 F.4th at 1113.

Under a diversion-of-resources theory, "an organization has standing 'if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *Id.* at 1114 (quoting *Jacobson*, 974 F.3d at 1250). Here, Plaintiffs allege that the challenged provision "forces Florida NAACP to divert valuable resources to helping registrants who cannot use Florida's other methods of registration to print, sign, and physically return their voter registration applications." ECF No. 101 ¶ 21. They further allege that "Florida NAACP also must divert valuable resources to engage in additional door-to-door canvassing activities to ensure that potential voters who cannot register online and lack easy access to printers are registered." *Id.* ¶ 22.

The Moving Defendants complain that Plaintiffs have not detailed where these resources will be diverted *from*. ECF No. 112 at 23-24 (citing *Georgia Ass'n*).[2]

---

[2] All page citations are to the blue, CM/ECF generated numbers.

App.326

But Plaintiffs allege several specific Florida NAACP projects and programs, they allege that Florida NAACP has limited resources, and they allege that the work Florida NAACP does to address the harms at issue takes away from other projects. ECF No. 101 ¶¶ 18-21; *accord id.* ¶ 20 ("The resources and effort expended in one area necessarily detract from the resources and effort available for Florida NAACP to direct to others."). At the pleading stage, where Plaintiffs only have to allege facts plausibly showing standing, and where the court must draw all reasonable inferences in Plaintiffs' favor, Plaintiffs have alleged enough. *Cf. Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933-34 (11th Cir. 2020) (en banc) (noting that *Ashcroft v. Iqbal*, 556 U.S. 662 (2007), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2009), "have put a finer point on" the standard requiring plaintiffs to set forth facts satisfying standing).

Indeed, the situation here is not appreciably different from that in *Georgia Association of Latino Elected Officials*, where the court found a "broad allegation of diversion of resources [to be] enough at the pleading stage." 36 F.4th at 1115 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) ("Instead of 'abstract social interests,' the plaintiffs have averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by [the challenged law's] enforcement. Even though the injuries are anticipated rather than

App.327

completed events, they satisfy the immediacy and likelihood requirements . . . and for those reasons, the Secretary's argument that the organizational injuries are not concrete or particularized fails."); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (holding the NAACP established organizational standing when the statute at issue would affect NAACP's voter registration efforts by "divert[ing] volunteers and resources from getting voters to the polls to helping them obtain acceptable photo identification" (cleaned up)).

## II.

The Moving Defendants separately argue that Plaintiffs lack "prudential standing," ECF No. 112 at 25, pointing to "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). They further argue that Plaintiffs "do not have standing to challenge the Materiality Provision under Section 1983." ECF No. 112 at 28. These "standing" issues both boil down to whether organizations like Plaintiffs have a statutory right to enforce the Materiality Provision, which provides rights to *voters*.[3]

_____

[3] The Moving Defendants also argue that private parties cannot sue to enforce the Materiality Provision under § 1983. ECF No. 112 at 31. There is a Circuit split on that issue. *Compare McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000), *with Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). But as the Moving Defendants

App.328

The Moving Defendants offer a persuasive argument on these points, and they have support from a recent Fifth Circuit decision. In *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), the court stayed a district court's order that preliminarily enjoined Texas's "wet signature" requirement. *Id.* at 309. It concluded that the organizational plaintiff lacked third-party standing. *Id.* at 304. And it found strength in defendants' argument that § 1983 gave the organizational plaintiffs no right to sue on behalf of voters. *Id.* at 305 ("Without an arguable cause of action, Vote.org lacks statutory standing and the defendants appear poised for merits success on this basis too.").

In response, Plaintiffs first say the plain text of the Civil Rights Act "contemplates a cause of action for Plaintiffs' organizational injuries." ECF No. 119 at 26. But the only text they cite is the provision establishing district courts' jurisdiction over "proceedings instituted pursuant to this section" and directing courts to exercise that jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d); *see also* ECF No. 119 at 26. It is difficult to read this anti-exhaustion text as Congress's establishing a statutory claim for any plaintiff

---

acknowledge, there is binding Eleventh Circuit precedent holding that the Materiality Provision "may be enforced by a private right of action under § 1983." *Schwier*, 340 F.3d at 1297.

with Article III standing—no matter how tangentially affected by a Materiality Provision violation.

This is true even though the statute uses the phrase "party aggrieved." Plaintiffs cite *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205 (1972), in which the Supreme Court found a different statute's words "showed 'a congressional intention to define standing as broadly as is permitted by Article III." *Id.* at 209. But that statute—which addressed housing discrimination—defined "person aggrieved" broadly as "(a)ny person who claims to have been injured by a discriminatory housing practice." *Id.* at 208 (quoting statute). So it reached white tenants who "had lost the social benefits of living in an integrated community" because of discrimination against their neighbors. *Id.* Similarly, the statute in *Federal Election Commission v. Akins*, 524 U.S. 11 (1998), which Plaintiffs also cite, "specifically provided . . . that '[a]ny person who believes a violation of this Act . . . has occurred'" could file an administrative complaint and then (if that complaint were dismissed) a district court action. *Id.* at 19 (quoting statute).

Plaintiffs' cases thus provide little support for their position that *anyone* can sue under the Materiality Provision so long as they claim injury from denial of someone else's right to vote. *Cf. Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) ("Read literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article

8

III. No party makes that argument, however, and the unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that [the statute] should not get such an expansive reading." (cleaned up)); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265-66 (1992) (concluding that statutory language providing that "[a]ny person injured in his business or property by reason of a violation of [the federal statute] may sue therefor" did not mean that any plaintiff injured "by reason of" the violation could sue).

In sum, the Moving Defendants argue with some force that the court should dismiss on prudential grounds. But I ultimately need not decide whether the Moving Defendants are correct on that point because I agree with them on the merits, which present more straightforward issues. Unlike Article III standing, Defendants' prudential arguments do not implicate the court's subject-matter jurisdiction, so it is not necessary to further address them. *See United States v. Blake*, 868 F.3d 960, 970 (11th Cir. 2017) ("Because prudential standing is flexible and not jurisdictional in nature, and deciding that issue will not affect the result in this case, we can bypass it and reach the less difficult issue . . . ." (cleaned up)); *see also Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018) ("Under *Lexmark*, the question is whether Plaintiffs have a valid cause of action, and the absence of a valid cause of action does not implicate subject-matter jurisdiction." (cleaned up)); *Kowalski*, 543 U.S. at 129 (noting distinction between Article III jurisdiction and

9

"the alternative threshold question [of] whether [plaintiffs] have standing to raise the rights of others").

## III.

Turning to the merits, the Moving Defendants and the Intervenors argue that Plaintiffs fail to state a claim. To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim" that—when ignoring legal conclusions but taking all factual allegations as true—show the pleader is entitled to relief. *Iqbal*, 556 U.S. at 663.

Under Florida law, citizens wishing to vote must first register. *See Browning*, 522 F.3d at 1156. And to register, they must complete a voter registration application, providing certain information:

> A voter registration application is complete if it contains the following information necessary to establish the applicant's eligibility pursuant to § 97.041, including . . . The original signature or a digital signature transmitted by the Department of Highway Safety and Motor Vehicles of the applicant swearing or affirming under the penalty for false swearing pursuant to § 104.011 that the information contained in the registration application is true and subscribing to the oath required by § 3, Art. VI of the State Constitution and § 97.051.

Fla. Stat. § 97.053(5)(a)8.

App.332

So under Florida law, a voter registration requires *either* an original signature or a digital signature that the Department of Highway Safety transmitted.[4] Either way, the signature is the applicant's "swearing or affirming" that the information provided is correct. It is also the applicant's "subscribing to the oath" the Florida Constitution requires. *Cf.* Fla. Const. art. VI, § 3 ("Each eligible citizen upon registering shall subscribe the following: 'I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, and that I am qualified to register as an elector under the Constitution and laws of the State of Florida.'").

Plaintiffs do not contend that the Department of Highway Safety avenue is unlawful, and they say they do not challenge the requirement for a signature generally. Their only contention is that for voters lacking a "signature transmitted by the Department," the requirement for an "original" signature is too much. In Plaintiffs' view, federal law requires states to accept photocopies, facsimiles, electronic checkmarks, or something other than an original signature.[5]

---

[4] The parties agree that Florida requires a "wet" signature—one made by the signor himself. Plaintiffs note that Florida officials "interpret this to mean that paper applications must be rejected unless they include the applicant's handwritten signature in wet-ink." ECF No. 119 at 3-4. Plaintiffs do not dispute this interpretation or offer a plausible contrary interpretation.

[5] Plaintiffs never detail what types of *unoriginal* signatures should suffice, but they complain that applications "with any other type of signature—e.g., an electronic

App.333

The federal law at issue, often called the Materiality Provision, provides that voters should not lose the right to vote "because of an error or omission" on a registration application "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Congress originally enacted the Materiality Provision as part of the Civil Rights Act of 1964. *Browning*, 522 F.3d at 1173.[6] Some of Congress's earlier enactments turned out to be "unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans." *Id.* (citing *Condon v. Reno*, 913 F. Supp. 946, 949-50 (D.S.C. 1995). The Materiality Provision—enacted in the same era in which Congress addressed literacy tests—"was necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon*, 913 F. Supp. at 950.

That Congress enacted the Materiality Provision to tackle racial discrimination does not, though, mean the provision applies only to racially discriminatory practices. *See Browning*, 522 F.3d at 1173 ("[W]e recognize that

---

or imaged signature—will be rejected." ECF No. 119 at 4; *cf. id.* at 7 ("[W]hether a voter provides a signature by pen, e-signature, or otherwise provides no insight into a voter's qualifications to register . . . .").

[6] The provision, previously codified as 42 U.S.C. § 1971(a)(2)(B), now appears at 52 U.S.C. § 10101(a)(2)(B).

App.334

Congress in combating specific evils might choose a broader remedy. The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent." (citations omitted)). The Intervenors—but not the Secretary—argue that Plaintiffs must show racial discrimination to succeed. ECF No. 111 at 9-11. They contend their argument flows from the text, but the Materiality Provision's text says nothing about race or racial discrimination. It says simply that no person acting under color of state law may deprive someone of the right to vote based on an immaterial error or omission. That text covers a state actor motivated by racial discrimination. It also covers a state actor *not* motivated by racial discrimination. It is therefore unsurprising that the Eleventh Circuit has found a Materiality Provision violation without mentioning racial discrimination. *See Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (affirming district court decision holding that under Materiality Provision, "Georgia cannot mandate disclosure of SSNs because such information is not 'material' to a voter registration system"); *see also Browning*, 522 F.3d at 1174 (addressing Materiality Provision issue on the merits without addressing whether there was showing of racial discrimination); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 (S.D. Fla. 2006) (same).[7]

---

[7] It is true, as the Intervenors note, ECF No. 111 at 14, that because *Browning* found the challenged state-law features material, a racial-discrimination prerequisite

App.335

The Intervenors—but again not the Secretary—also argue that Congress enacted the Materiality Provision pursuant to its Fifteenth Amendment powers and that, therefore, the provision's application must be limited to racially discriminatory practices. ECF No. 111 at 11. They present this as a constitutional avoidance argument: rather than explicitly argue that Congress lacked authority to enact a Materiality Provision applying beyond race-based discrimination, they argue the interpretive principle that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). But that rule cannot justify a "construction [that] is plainly contrary to the intent of Congress." *Id.* And limiting the Materiality Provision's reach as the Intervenors suggest would require rewriting the provision—not just interpreting it. Moreover, the Intervenors have not shown that interpreting the Materiality Provision as written "would raise serious constitutional problems."

The real question is whether Plaintiffs have alleged facts plausibly showing that the wet-signature requirement is immaterial. They have not.

---

would not have changed the outcome. Still, one would not expect the Eleventh Circuit to ignore the omission of a threshold statutory showing. Regardless, in *Schwier*, the outcome *would have* been different.

Plaintiffs contend "a 'wet' signature on an application tells election officials nothing about whether the applicant is qualified under Florida law." ECF No. 119 at 4. They contend it "bears no relation to the statutory qualifications," the applicant's age, citizenship, and residence. ECF No. 101 ¶ 51 (citing Fla. Stat. § 97.041(1)(a)). But they do not argue the same for any signature requirement. *Cf. Callanen*, 39 F.4th at 307 (noting a logical inconsistency when plaintiff argued against one—but not the other—statutory requirement when the two "fall or stand together"). Instead, they contend "the act of signing—rather than the method used—affirms the information provided is true and accurate." ECF No. 119 at 11.

Plaintiffs' entire premise is that a copied, faxed, or otherwise non-original signature is equal in stature to an original, wet signature. But we know this not to be so. "Physically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Callanen*, 39 F.4th at 308; *cf. Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978) ("[I]ndividual notarization requirement impresses upon the signers of the petitions the seriousness of the act of signing a petition . . . ."). Indeed, because original signatures carry different weight than other "signatures," society is replete with examples of original-signature

15

requirements. The Intervenors cite several, *see* ECF No. 111 at 2-3, but everyone has encountered some, and no one here disputes the ubiquity of these requirements.

It is true that times are changing and that electronic signatures are acceptable in situations they once were not. *See* ECF No. 118 at 21 (noting modern technology and legislation such as the Global and National Commerce Act and Uniform Electronic Transaction Act). But the acceptance of electronic signatures in certain circumstances does not render the wet signature requirement immaterial in this circumstance. *See Browning*, 522 F.3d at 1175. ("[The law] does not establish a least-restrictive-alternative test for voter registration applications . . . .").

I acknowledge that another district court has allowed this same claim to survive a motion to dismiss. In *Vote.org v. Georgia State Election Board*, -- F. Supp. 3d ----, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023), the court concluded that "[e]ven if Defendants can later prove that requiring applicants to sign in pen and ink is vital to protecting the security of the application or that the signature shows that that the applicant has carefully considered his or her decision," the court would not consider those arguments at the motion-to-dismiss stage. *Id.* at *8. But the question is whether Plaintiffs' allegations here plausibly show that the wet-signature requirement is immaterial, and I conclude they do not.[8] *Cf. Diaz*, 435 F. Supp. 2d at 1211-15

---

[8] Defendants also argue the Materiality Provision does not displace state law. ECF No. 111 at 12-15, ECF No. 112 at 12-14. In other words, they argue, because

App.338

(dismissing under Rule 12(b)(6) a claim that Florida's requiring applicants to check a box confirming they were eligible—even though they also had to sign an oath confirming eligibility—violated the Materiality Provision).[9]

---

state law requires an original signature, that signature is per se material. This argument finds some support in case law. *See Callanen*, 39 F.4th at 307; *cf. Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) ("[D]isclosing one's SSN cannot be material in determining whether that person is qualified to vote under Georgia law, if Georgia [by state statute] is not permitted to require this disclosure."). At any rate—because I find the wet signature requirement is material—I need not reach a decision as to the state law issue. And I need not reach a decision as to Defendants' opportunity-to-cure arguments, ECF No. 111 at 19-20, ECF No. 112 at 10, for the same reason.

[9] The district court summarized the plaintiffs' Materiality Provision claim this way:

> By signing the oath on the bottom of the Florida application, the applicant affirms that he is "qualified to register as an elector under the Constitution and laws of the State of Florida," which qualifications are enumerated both on the top of the form and in the text of the check-boxes. Since those qualifications include 1) being a citizen; 2) not being a convicted felon whose rights have not been restored; and 3) not being currently adjudicated mentally incapacitated with respect to voting, so the Plaintiffs argue, rejecting applications for failure to check the check-boxes explicitly affirming those qualifications individually is to require information that is redundant and therefore immaterial, in violation of the VRA. Plaintiffs do not challenge the presence of the check-boxes under this provision, which may serve a signaling function, but rather the policy, now mandated by Florida statute, that requires applications to be rejected for failure to check the appropriate boxes.

*Diaz*, 435 F. Supp. 2d at 1211-12 (footnote omitted). It concluded that "[e]ven if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission under the VRA." *Id.* at 1213.

App.339

## CONCLUSION

The motions (ECF Nos. 111, 112) are GRANTED, and the claims against the movants are dismissed for failure to state a claim.

Many other Defendants have filed answers and did not join the motion, but the claims for relief are all the same. Within fourteen days, Plaintiff must file a response showing why—considering the ruling above—the court should not dismiss claims against all Defendants and enter final judgment. Any Defendant may file a response within fourteen days thereafter.

SO ORDERED on October 30, 2023.

s/ *Allen Winsor*
United States District Judge

App.340

143

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**VOTE.ORG, et al.,**

      **Plaintiffs,**

**v.**                                  **Case No. 4:23-cv-111-AW-MAF**

**CORD BYRD, in his official capacity as**
**SECRETARY OF STATE OF**
**FLORIDA, et al.,**

      **Defendants,**

**REPUBLICAN NATIONAL**
**COMMITTEE and REPUBLICAN**
**PARTY OF PASCO COUNTY,**

      **Intervenor-Defendants.**

_____/

## **JUDGMENT**

      Plaintiffs' claims are dismissed on the merits for failure to state a claim.


                                JESSICA J. LYUBLANOVITS
                                CLERK OF COURT


November 8, 2023                 s/ KELLI MALU_____
Date                          Deputy Clerk: Kelli Malu

## CERTIFICATE OF SERVICE

This Appendix has been filed by CM/ECF and served via CM/ECF on all

counsel of record.

Dated: January 26, 2024

/s/ *Frederick S. Wermuth*