No. 23-13727

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DISABILITY RIGHTS FLORIDA, et al.,

Plaintiffs-Appellants

v.

SECRETARY, STATE OF FLORIDA, et al.,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING
PLAINTIFFS-APPELLANTS

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

*Disability Rights Fla. v. Secretary, State of Fla.*, No. 23-13727

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the United States as amicus curiae certifies that, in addition to those identified in the certificates filed by plaintiffs-appellants and defendants-appellees, the following persons may have an interest in the outcome of this case:

Bokat-Lindell, Noah B., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

Calderon, Tovah R., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for the United States.

The United States certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
Attorney

Date:  January 30, 2024

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

INTEREST OF THE UNITED STATES ................................................................ 1

STATEMENT OF THE ISSUES ........................................................................... 1

STATEMENT OF THE CASE ............................................................................... 2

    A.    Statutory Background ........................................................................ 2

    B.    Factual Background .......................................................................... 3

SUMMARY OF ARGUMENT .............................................................................. 5

ARGUMENT

    I.    Private plaintiffs may enforce the Materiality Provision. ...................... 6

    II.    The Materiality Provision prohibits acts beyond racial
    discrimination. .................................................................................... 7

    III.    This Court should decline defendants' attempts to restrict the
    Materiality Provision. ......................................................................... 12

        A.    Laws that reject registration applications deny the
            "right to vote" under the Materiality Provision, even if
            applicants can try again. ........................................................... 13

        B.    States cannot define away the Materiality Provision's
            protections. .............................................................................. 16

        C.    The NVRA's signature requirement does not render a
            wet-signature mandate material. ............................................... 19

**TABLE OF CONTENTS (continued):**                              **PAGE**

D.    Fraud-prevention or solemnity concerns cannot justify
Florida's Wet-Signature Requirement. .................................... 21

CONCLUSION ................................................................................. 30

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                                                                                **PAGE**

*Allen v. Milligan*, 599 U.S. 1 (2023)..........................................................................10

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)............................17

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ..............................................8, 20

*City of Boerne v. Flores*, 521 U.S. 507 (1997).........................................................10

*Cowen v. Georgia Sec'y of State*, 960 F.3d 1339 (11th Cir. 2020) ........................27

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ........................24

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019).............27

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) ................................9

*Florida State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ............................................................. *passim*

*Ford v. Tennessee Senate*, No. 06-cv-2031,
    2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ...........................................26

*Gill v. Scholz*, 962 F.3d 360 (7th Cir. 2020)...........................................................27

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ...................... 15-16

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023)...............6

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013).................21

*Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022)................................................10

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018).................................26

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ........................................10

**CASES (continued):**                                     **PAGE**

*Mi Familia Vota v. Fontes*, No. CV-22-00509,
2023 WL 8183070 (D. Ariz. Feb. 16, 2023) .................................................14

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir.),
cert. granted, judgment vacated sub nom.
*Ritter v. Migliori*, 143 S. Ct. 297 (2022) ................................................ *passim*

*Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003) .....................................12

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................................12

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
781 F.3d 1245 (11th Cir. 2015) ......................................................................29

*La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844,
2023 WL 8263348 (W.D. Tex. Nov. 29, 2023),
stay pending appeal granted sub nom. United States v. Paxton,
No. 23-50885 (5th Cir. Dec. 15, 2023)..................................................... 14-15

*Quarles v. United States*, 139 S. Ct. 1872 (2019)............................................... 15-16

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) .........................................5-7, 22

*Sears v. Warden GDCP*, 73 F.4th 1269 (11th Cir. 2023)...........................................7

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ...........................................................10

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................................16

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ...............................................10

*Stringer v. Hughs*, Nos. 5:20-cv-46, 5:16-cv-257,
2020 WL 6875182 (W.D. Tex. Aug. 28, 2020) ...................................... 19-20

*Tanzin v. Tanvir*, 592 U.S. 43 (2020) .......................................................................13

*United States v. Duldulao*, 87 F.4th 1239 (11th Cir. 2023).......................................6

- iv -

**CASES (continued):**                                                    **PAGE**

*United States v. Pate*, 84 F.4th 1196 (11th Cir. 2023)..............................................23

\**Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)...................................... *passim*

**CONSTITUTIONS:**

Fla. Const. Art. VI, § 3.................................................................................................3

U.S. Const. Amend. XV.............................................................................................10

**STATUTES:**

Civil Rights Act of 1957, Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638...............2

Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 ......................2

Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 78 Stat. 241-242 ..................3

Enforcement Act, Act of May 31, 1870, Ch. 114, § 1, 16 Stat. 140 ........................2

National Voter Registration Act
    52 U.S.C. 20501(b)........................................................................................20
    52 U.S.C. 20505(a)(1) ................................................................................ 1-2
    \*52 U.S.C. 20508(b)(1) ........................................................................ 1, 2, 19
    52 U.S.C. 20508(b)(2) .....................................................................................1
    52 U.S.C. 20508(b)(2)(B)..............................................................................19
    52 U.S.C. 20508(b)(2)(C)..............................................................................19
    52 U.S.C. 20508(b)(3) .............................................................................1, 20
    52 U.S.C. 20510(a) ...........................................................................................1

Voting Rights Act of 1965
    52 U.S.C. 10301(b).......................................................................................25

52 U.S.C. 10101
    52 U.S.C. 10101............................................................................................ 1-2
    52 U.S.C. 10101(a)(1) .....................................................................................8
    \*52 U.S.C. 10101(a)(2)(B)................................................................... *passim*
    52 U.S.C. 10101(a)(3)(A)........................................................................ 3, 9, 13

**STATUTES (continued):**                          **PAGE**

    52 U.S.C. 10101(c) ...........................................................................1, 7
    52 U.S.C. 10101(e) ................................................. 3, 7-9, 13

Fla. Stat. § 97.041 (2023).......................................................................3

Fla. Stat. § 97.041(1) (2023)...............................................................16

Fla. Stat. § 97.051 (2023).......................................................................3

Fla. Stat. § 97.052(2)(q) (2023) .......................................................3, 28

Fla. Stat. § 97.0525(1) (2023) ................................................................4

Fla. Stat. § 97.0525(4)(b) (2023) ...........................................................4

Fla. Stat. § 97.053(5)(2) (2023) .............................................................4

Fla. Stat. § 97.053(5)(a)(8) (2023).........................................................4

Fla. Stat. § 98.045(1)(a) (2023) .............................................................4

Fla. Stat. § 668.50(7)(d) (2023) ...........................................................28

**RULE:**

Fed. R. App. P. 29(a) ..............................................................................1

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) ......................... 3, 11-12

**MISCELLANEOUS:**

*Black's Law Dictionary* (4th ed. 1966)................................................23

Comm'n on C.R., Voting:  1961 Commission on Civil Rights Report,
    Book 1 (1961), https://perma.cc/GW6M-V3GP ................................. 11, 18

**MISCELLANEOUS (continued):**                                    **PAGE**

Election Assistance Comm'n, *Voter Registration Application*,
    https://perma.cc/Y2F2-H59N ...............................................................19

*Literacy Tests and Voter Requirements in Federal and State Elections:*
    *Hearings Before the Subcomm. On Const. Rights of the Comm. on*
    *the Judiciary*, 87th Cong., 2d Sess. (1962)........................................11

*Miscellaneous Proposals Regarding the Civil Rights of Persons*
    *Within the Jurisdiction of the United States: Hearings Before*
    *Subcomm. No. 5 of the H. Comm. on the Judiciary*,
    88th Cong., 1st Sess. (1963)...............................................................11

*New Century Dictionary of the English Language*
    (H.G. Emery et al. eds., 1963).............................................................17

*Random House Dictionary of the English Language* (1966) ..................17

*Webster's Third New International Dictionary* (1966) ...........................23

**INTEREST OF THE UNITED STATES**

This case involves the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. 10101(a)(2)(B), and the National Voter Registration Act (NVRA), 52 U.S.C. 20508(b)(1)-(3).  The United States enforces both statutes.  52 U.S.C. 10101(c); 52 U.S.C. 20510(a).  Accordingly, the United States has a significant interest in the statutes' proper interpretation.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

**STATEMENT OF THE ISSUES**

1.  Whether private parties have a right of action to enforce the Materiality Provision.

2.  Whether the Materiality Provision's scope extends beyond acts of racial discrimination.

3.  Whether a law that rejects voter registration forms lacking wet-ink signatures denies the "right to vote" as defined in 52 U.S.C. 10101.

4.  Whether the Materiality Provision prohibits procedural paperwork requirements that are not material to determining voter qualifications, regardless of whether state law dictates that applicants follow such procedures.

5.  Whether the NVRA's mandate that States "accept and use" a federal voter registration form that requires "the signature of the applicant," 52 U.S.C.

20505(a)(1), 20508(b)(1), renders a *wet*-signature requirement material to determining voter qualifications.

6. Whether theoretical fraud-prevention interests render a procedural requirement automatically material to determining voter qualifications, without evidence that officials use the requirement for such purposes.[1]

## STATEMENT OF THE CASE

### A.    Statutory Background

What is now 52 U.S.C. 10101 traces its lineage to the Enforcement Act of 1870. There, Congress provided that any person otherwise qualified to vote "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State . . . to the contrary notwithstanding." Act of May 31, 1870, Ch. 114, § 1, 16 Stat. 140 (as amended, 52 U.S.C. 10101(a)(1)). The Civil Rights Act of 1957 added four subsections to Section 10101 and granted the Attorney General power to enforce it through civil suits. Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638 (52 U.S.C. 10101(b)-(d) and (f)). Further amendment in 1960 authorized the Attorney General to bring pattern-or-practice claims for racial discrimination in voting. Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52 U.S.C. 10101(e)).

---

[1] The United States takes no position on any other issue in this case.

Section 101 of the Civil Rights Act of 1964 again amended the statute to "provide specific protections to the right to vote."  H.R. Rep. No. 914, 88th Cong., 1st Sess. 19 (1963) (1963 House Report); *see* Pub. L. No. 88-352, § 101, 78 Stat. 241-242.  Among the amendments is the Materiality Provision, which today states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B).  The statute defines "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted."  52 U.S.C. 10101(a)(3)(A) and (e).

## B.    Factual Background

1.  Those registering to vote in Florida must swear an oath declaring, among other things, that they meet the State's eligibility requirements and that the information on their registration application is true.  Fla. Const. Art. VI, § 3; Fla. Stat. § 97.051 (2023); *see* Fla. Stat. § 97.041 (2023) (listing eligibility requirements).  Voter registration forms must contain a signature swearing to these oaths.  Fla. Stat. § 97.052(2)(q) (2023).

Since 2005, Florida law has required that applicants swear these oaths via either an "original signature or a digital signature transmitted by the Department of

- 3 -

Highway Safety and Motor Vehicles [DMV]."  Fla. Stat. § 97.053(5)(a)(8) (2023).

Florida officials have interpreted the original-signature requirement as mandating a

"wet"-ink signature.  *See* Doc. 101, at 24-25 (the Wet-Signature Requirement).[2]  In

addition to registering at the DMV, those with Florida driver's licenses or

identification numbers can submit online voter registration requests.  *See* Fla. Stat.

§ 97.0525(1) and (4)(b) (2023).  If their information matches the DMV's, "the

online voter registration system shall transmit . . . the applicant's registration

application, along with the digital signature of the applicant on file with the

[DMV], to the supervisor of elections" for processing.  *Id.* § 97.0525(4)(b).  People

who do not register at the DMV or online must comply with the Wet-Signature

Requirement, and failure to do so renders an application ineligible for registration.

*See id.* §§ 97.053(2), 98.045(1)(a).

   b.  Plaintiffs, a set of membership and non-membership organizations, sued

Florida Secretary of State Cord Byrd and Florida's county supervisors of elections.

Doc. 101, at 9-17.  In their operative complaint, plaintiffs allege that Florida's

Wet-Signature Requirement violates the Materiality Provision.  *Id.* at 25-28.

Defendants, including two intervenors, filed motions to dismiss plaintiffs'

amended complaint (Docs. 111, 112), which the district court granted (Doc. 140).

---

[2]  "Doc. _, at _" refers to the docket and page number of documents filed in
the district court, *Vote.org v. Byrd*, No. 4:23-cv-111 (N.D. Fla.).

## SUMMARY OF ARGUMENT

This Court should reject defendants' and the district court's extratextual arguments for narrowing the scope of the Materiality Provision.

As this Court has already held, private plaintiffs may enforce the Materiality Provision via Section 1983. *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). Recent decisions only confirm that *Schwier*'s holding was correct.

The Materiality Provision also applies beyond racially discriminatory state practices. In contrast to other subsections of Section 10101, the Provision's text says nothing about race and contains no racial-discrimination element. And this Court need not artificially narrow the statute's scope to avoid phantom constitutional concerns.

This Court should reject intervenors' remaining arguments for limiting the Materiality Provision's application. First, state-law requirements can violate the Provision if failure to meet them results in denial of a voter's registration, even if the State allows the voter to try again. Second, procedural requirements are not material to determining voter qualifications simply because they are mandatory. Third, the NVRA's requirement that mail-in voter registration forms contain signatures does not render a *wet*-signature mandate material to determining voter qualifications. Finally, at the motion-to-dismiss stage, theoretical fraud-prevention rationales cannot render a statute's requirements material where, as here, plaintiffs

allege that officials do not use the challenged statute for any fraud-prevention purposes.

## ARGUMENT

**I.      Private plaintiffs may enforce the Materiality Provision.**

As defendants "acknowledge[d]" (Doc. 112, at 32), this Court has held that private plaintiffs may sue under Section 1983 to enforce the Materiality Provision. *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).  Because this holding never has been "overruled or undermined to the point of abrogation," *United States v. Duldulao*, 87 F.4th 1239, 1253 (11th Cir. 2023) (citation omitted), *Schwier* controls.

Indeed, more recent case law only confirms that *Schwier* was correctly decided.  The Supreme Court, applying the same test as in *Schwier*, recently reiterated that personal federal rights are enforceable under Section 1983 unless the rights-creating statute expressly displaces Section 1983 or includes "a private judicial right of action, a private federal administrative remedy, or any carefu[l] congressional tailor[ing] that § 1983 actions would distort."  *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183-184, 190 (2023) (alterations in original; internal citations and quotation marks omitted).  The Materiality Provision includes none of these things.  It merely creates an additional, *public* right of action for the Attorney General and authorizes the Attorney General to

bring an additional type of claim.  52 U.S.C. 10101(c) and (e).  These provisions *supplement*, rather than supplant, the private Section 1983 remedy.  *See Schwier*, 340 F.3d at 1296.  Following this same reasoning, both the Third and Fifth Circuits have recently joined this Court in holding that private plaintiffs may enforce the Materiality Provision via Section 1983.  *See Vote.Org v. Callanen*, 89 F.4th 459, 473-478 (5th Cir. 2023); *Migliori v. Cohen*, 36 F.4th 153, 159-162 (3d Cir.), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022) (mem.).[3]

## II.    The Materiality Provision prohibits acts beyond racial discrimination.

1.  Defendants argue (Doc. 111, at 9-11) that the Materiality Provision applies only to racially discriminatory laws.  But, as the district court correctly recognized (Doc. 140, at 12-13), this Court has always interpreted the Materiality Provision based on "[t]he text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination," *Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).  As the Third and Fifth Circuits have recently agreed, the barest look at the statutory language belies defendants' restrictive reading.  *See Vote.Org*, 89 F.4th at 485-486; *Migliori*,

---

[3]  Though vacated as moot, *Migliori*'s substantive analysis remains persuasive.  *See Sears v. Warden GDCP*, 73 F.4th 1269, 1291 n.14 (11th Cir. 2023).

36 F.4th at 162 n.56.  The Provision protects "the right of *any individual* to vote," prohibiting state actors from "deny[ing]" *any* person's right "because of an" immaterial "error or omission."  52 U.S.C. 10101(a)(2)(B) (emphasis added).  The Provision does not mention race, much less suggest that racial discrimination is required to trigger its application.

Statutory context buttresses this plain-text reading.  A neighboring provision, 52 U.S.C. 10101(a)(1), *does* mention race, mandating that otherwise-qualified voters "shall be entitled and allowed to vote . . . without distinction of race, color, or previous condition of servitude."  And 52 U.S.C. 10101(e) limits pattern-or-practice claims to circumstances in which people are "deprived on account of race or color of any right or privilege secured by subsection (a)."  Moreover, most of the mandates in the Provision's statute of enactment—the 1964 Civil Rights Act—are phrased in terms of protected-class discrimination, but "Congress did not place that limitation in the Materiality Provision."  *Vote.Org*, 89 F.4th at 486.  "[W]hen Congress uses different language in similar sections, it intends different meanings."  *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (citation omitted); *see Vote.Org*, 89 F.4th at 486 n.10.

Additionally, Section 10101(a)(1) already covers the waterfront of direct racial discrimination in voting and had done so for 94 years before Congress added the Materiality Provision.  As a ban on racial discrimination in voting "is already

- 8 -

explicitly achieved by *another* portion of" the same statute, restricting the Provision to discriminatory laws would "render[]" it "superfluous." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307 (2003).

To read a racial discrimination requirement into the Provision, defendants rely (Doc. 111, at 9-10) on the definition of "qualified under State law" applicable to pattern-or-practice claims under 52 U.S.C. 10101(e). Because this definition references race-based pattern-or-practice findings, defendants claim (Doc. 111, at 9-10) that *every* Section 10101 suit must prove a pattern or practice of racial discrimination. This convoluted assertion, however, ignores that subsection (e)'s definition of "qualified under State law" is only relevant "[w]hen used *in the subsection*" in which it appears. 52 U.S.C. 10101(e) (emphasis added). Unlike subsection (e)'s definition of "vote," which Congress expressly incorporated into subsection (a) when it added the Materiality Provision to the statute, *see* 52 U.S.C. 10101(a)(3)(A), the statutory definition of "qualified under State law" remains limited to subsection (e). Congress's choice makes perfect sense, as it had tailored its definition of "qualified under State law" to match subsection (e)'s outline of the proceedings for pattern-or-practice claims. 52 U.S.C. 10101(e).

2. Defendants have asserted (Doc. 111, at 11) that applying the Materiality Provision beyond racial discrimination would pose constitutional difficulties. But the district court correctly held (Doc. 140, at 14) that constitutional avoidance finds

no purchase where, as here, the proposed limiting construction is not a "plausible construction of the text." *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 581 (2022). Regardless, no avoidance is necessary because the Provision validly enforces the Fifteenth Amendment. *See* U.S. Const. Amend. XV; *Vote.org*, 89 F.4th at 486-487.

The "congruence and proportionality" standard applicable to Fourteenth Amendment legislation, *see City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), does not apply to the Fifteenth Amendment (*contra* Doc. 111, at 11). Rather, Fifteenth Amendment legislation remains subject to the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). *See Allen v. Milligan*, 599 U.S. 1, 41 (2023) (upholding Section 2 of VRA as "appropriate" legislation based on cases applying *McCulloch* standard); *Shelby Cnty. v. Holder*, 570 U.S. 529, 556 (2013) (invalidating VRA's coverage formula after finding Congress's justification "irrational"). Under this deferential test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). These means may extend beyond bans on intentional discrimination. *See Allen*, 599 U.S. at 41.

However, the Materiality Provision easily passes muster under both the *McCulloch* and *City of Boerne* tests. *See Vote.Org*, 89 F.4th at 486 n.11. Evidence

- 10 -

before Congress indicated that "[a]mong the devices most commonly employed" to prevent Black voters from registering was "applying more rigid standards of accuracy to Negroes than white[] [registrants], thereby rejecting Negro applications for minor errors or omissions."  H.R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess. 5 (1963) (additional views of Rep. McCulloch et al.).  "Testimony show[ed] that . . . registrars will overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting a Negro application for the same or more trivial reasons."  *Ibid.*  Congress also had before it a 1961 Commission on Civil Rights report documenting widespread denials of Black applicants' registration forms for immaterial errors—such as failing to correctly compute age in years, months, and days—as well as a list of voting rights cases brought by the Department of Justice for similar discriminatory practices.[4]  "Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants."  *Browning*, 522 F.3d at 1173.

---

[4] *See* Comm'n on C.R., Voting:  1961 Commission on Civil Rights Report, Book 1, at 54-57, 59, 66, 86 (1961) (1961 Commission Report), https://perma.cc/GW6M-V3GP; *Miscellaneous Proposals Regarding the Civil Rights of Persons Within the Jurisdiction of the United States:  Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 88th Cong., 1st Sess. 951, 1099, 1380 (1963) (referencing practices in 1961 Commission Report); *Literacy Tests and Voter Requirements in Federal and State Elections:  Hearings Before the Subcomm. On Const. Rights of the Comm. on the Judiciary*, 87th Cong., 2d Sess. 515-522 (1962) (Department's list of cases).

- 11 -

Congress properly determined that this crisis necessitated a general prohibition on denying the right to vote for immaterial errors or omissions. Particularly since Congress's "previous legislative attempts" to solve this "difficult and intractable problem" through prohibitions on racial discrimination "had failed." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 737 (2003) (citation and alteration omitted) (discussing gender discrimination); *see* 1963 House Report 19; *Browning*, 522 F.3d at 1173 (noting that "[s]tatutes enacted in 1870, 1871, 1957, and 1960" were "unsuccessful").  Indeed, the Supreme Court unanimously upheld Congress's nationwide ban on literacy tests for similar reasons—even though such tests were not per se unconstitutional and the ban contained no race-discrimination requirement.  *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (opinion of Black, J.); *see Vote.Org*, 89 F.4th at 486-487 (discussing *Mitchell* and "apply[ing] that reasoning" to Materiality Provision).

## III.    This Court should decline defendants' attempts to restrict the Materiality Provision.

This Court should reject four additional arguments that defendants have made about the Materiality Provision's application, the last of which the district court credited.  First, the Provision does not excuse denying the right to register simply because rejected applicants can try to register again.  Second, States cannot evade the Materiality Provision's reach just by mandating that voters meet whatever procedural requirements the State prefers to register or vote.  Third, the

- 12 -

NVRA's requirement of a signature on mail-in voter registrations does not justify a State's additional, *wet*-signature requirement. And fourth, contrary to the district court's ruling, hypothetical fraud-prevention interests cannot render material a procedural requirement that allegedly serves no such interest.

**A.    Laws that reject registration applications deny the "right to vote" under the Materiality Provision, even if applicants can try again.**

Defendants have asserted (Doc. 111, at 19-20; Doc. 112, at 9-11) that Florida's Wet-Signature Requirement does not implicate the "right to vote" because applicants receive notice of any rejected registration and an opportunity to cure the error. This argument ignores both the statute's definition of "vote" and the practical implications of such a ruling on denied applicants.

The Materiality Provision does not rely on a colloquial conception of the "right to vote," or on courts' definition of the phrase for constitutional purposes. Rather, the statute itself defines "the word 'vote'" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting." 52 U.S.C. 10101(a)(3)(A) and (e). Since Section 10101 defines "vote" to include the entire voting process, including registration, "that addition to the plain meaning controls." *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020). The Provision thus prohibits state actors from "deny[ing] the right of any individual to [*register*] in any election" because of a paperwork error "relating to any application, registration, or other act" that "is not material in

- 13 -

determining whether" the applicant "is qualified under State law to [register]."  52 U.S.C. 10101(a)(2)(B).

Because the Wet-Signature Requirement requires registrars to reject registration applications for failure to include a wet signature, it violates the Provision's statutorily-defined right to vote.  It does not matter that the State provides an opportunity to cure.  "Denial of the statutory right to vote under Section 101[01] is complete when a particular application . . . is rejected; an opportunity to cure the rejection [or] submit another application . . . does not negate the denial of the statutory right to vote."  *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844, 2023 WL 8263348, at *22 (W.D. Tex. Nov. 29, 2023) (citing cases), *stay pending appeal granted sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023); *accord Mi Familia Vota v. Fontes*, No. CV-22-00509, 2023 WL 8183070, at *18 n.17 (D. Ariz. Feb. 16, 2023).  And even with a cure process, the fact remains that no applicant can register or vote unless they ultimately can provide an application with a wet signature.  *See La Union del Pueblo Entero*, 2023 WL 8263348, at *22.  The Fifth Circuit recently recognized this dilemma:  While leaving the issue open, it expressed serious "doubt about the efficacy of an *ability* to cure" as a defense to a Materiality Provision claim, because "the *need* to cure an immaterial requirement creates a hurdle for—even if it is not itself a final denial of—the right to vote."  *Vote.Org*, 89 F.4th at 487.

- 14 -

Nor does the theoretical option of registering online using one's digital DMV signature absolve state officials who use immaterial errors to prevent people from registering on paper. *Contra* Doc. 112, at 10-11. Particularly since some voters may not be able to register another way (Doc. 101, at 15), or would miss a registration deadline if their initial registration is rejected. Since Florida decided to offer paper registration, it is obliged to follow federal law—including the Materiality Provision—in offering that option. *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966); *La Union del Pueblo Entero*, 2023 WL 8263348, at *22.

If the ability to cure an error by submitting another, corrected registration form could negate the Materiality Provision, then no barrier before the close of voter registration would violate the Provision, because theoretically voters could complete another registration form. Even the precise practices that Congress passed the Provision to eliminate—such as registrars' refusals to register Black voters for incorrectly calculating their age in months and days or putting information in the wrong spot on their forms—would not trigger the statute's protections. *See* p. 11 & note 4, *supra*. "That result not only would defy common sense, but also would defeat Congress' stated objective" of entirely eliminating such errors as barriers to voters' ability to register and vote. *Quarles v. United*

- 15 -

*States*, 139 S. Ct. 1872, 1879 (2019).  "We should not lightly conclude that Congress enacted a self-defeating statute."  *Ibid.*

**B.    States cannot define away the Materiality Provision's protections.**

Defendants also argue (Doc. 111, at 12-15) that because compliance with the Wet-Signature Requirement is necessary to register, it must be material.  That reading turns the Materiality Provision on its head.  It would let States control the content of a federal statute, simply by adding procedural requirements to their state codes.  Instead, the Provision sets a federal standard for reviewing States' voting-related paperwork mandates, measuring them against only a small number of state voter qualifications.

The Materiality Provision distinguishes between the few prerequisites that one must meet to be "qualified" to vote and the many additional procedural requirements that merely enforce, measure, or confirm those underlying qualifications.  52 U.S.C. 10101(a)(2)(B).  The category of qualifications is limited to certain substantive characteristics, like age and citizenship, that are "germane to one's ability to participate intelligently in the electoral process."  *Harper*, 383 U.S. at 668; *see* Fla. Stat. § 97.041(1) (2023).  All other regulations—including those around "registration" and "counting of votes," *Smiley v. Holm*, 285 U.S. 355, 366 (1932)—fall outside that category.  While such procedural requirements might help officials enforce the States' qualifications, they do not themselves *become* voter

qualifications simply because state law mandates them. *See, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (distinguishing between setting qualifications and "obtaining the information necessary to enforce" those "qualifications"). Contemporaneous definitions of "qualified" confirm this understanding. *See, e.g.*, 2 *New Century Dictionary of the English Language* 1443 (H.G. Emery et al. eds., 1963) ("Furnished with qualities; also, possessed of qualities or accomplishments which fit one for some function or office."); *Random House Dictionary of the English Language* 1174 (1966) (second definition) ("[H]aving the qualities, accomplishments, etc., required by law or custom for getting, having, or exercising a right.").

Materiality thus turns on whether an error or omission actually affects "whether such individual is qualified under State law to vote," 52 U.S.C. 10101(a)(2)(B), not merely on whether it violates a state-law requirement. The Fifth Circuit recently agreed, "reject[ing]" the idea "that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'" *Vote.Org*, 89 F.4th at 487.

Defendants' contrary interpretation would nullify the Materiality Provision. If any procedural requirement a legislature imposes becomes a voter qualification, then errors or omissions in meeting *any* aspect of state election law automatically

would be material to determining voter qualifications.  No denial of the right to vote could violate the Provision.  Though the Provision applies solely to errors or omissions "on any record or paper," intervenors' interpretation would allow States to deny the right to vote for the minutest errors on the clearest examples of such papers—such as voter "registration[s]" and mail ballot "application[s]"—because any error necessarily would violate state procedural rules around filling out the forms.  52 U.S.C. 10101(a)(2)(B).

Indeed, under defendants' interpretation, the Materiality Provision would not have covered the very mechanisms of vote denial that Congress passed the Provision to override.  For instance, while the Louisiana Constitution allowed anyone age 21 or over to vote at the time, it also required registrants to list their age not only in years but also in days and months.  *See* 1961 Commission Report 56.  Congress sought to prohibit registrars from refusing to register voters merely for incorrectly calculating the days and months of their age.  *See Browning*, 522 F.3d at 1173.  Yet if every requirement that States set to register or vote were deemed a "qualification," then errors in calculating even the days of one's age would be material to determining voter qualifications, and so would fall outside the Provision's reach.

- 18 -

### C. The NVRA's signature requirement does not render a wet-signature mandate material.

Defendants next assert (Doc. 112, at 11-13) that the NVRA's signature requirement for mail-in registration applications automatically renders Florida's *Wet*-Signature Requirement material to determining voter qualifications. It does not. The NVRA requires only "the signature of the applicant." 52 U.S.C. 20508(b)(1) and (b)(2)(C). The statute does not "define[] or limit[] the type of signature that is required." *Stringer v. Hughs*, Nos. 5:20-cv-46, 5:16-cv-257, 2020 WL 6875182, at *24 (W.D. Tex. Aug. 28, 2020) (rejecting argument that NVRA requires "a physical ink or wet signature written on paper by hand"). Nor does the Federal Form itself require a wet signature. *See* Election Assistance Comm'n, *Voter Registration Application* 2, https://perma.cc/Y2F2-H59N (last viewed Dec. 26, 2023) (requiring only "[s]ignature" or "mark").

All textual indicators point against reading a wet-signature requirement into the NVRA's general signature mandate. The NVRA characterizes the signature as merely "identifying information," and requires "*only* such identifying information . . . as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. 20508(b)(1) (emphases added). And while the applicant must sign under penalty of perjury "an attestation that the applicant meets each [eligibility] requirement," 52 U.S.C. 20508(b)(2)(B), the statute again

- 19 -

does not specify that the signature must be wet.  Moreover, the NVRA admonishes that mail-in voter registration forms "may not include any requirement for notarization or other formal authentication."  52 U.S.C. 20508(b)(3).

Congress imposed these limitations to implement the NVRA's "carefully balanced objectives," *Bellitto*, 935 F.3d at 1201, ensuring that attempts to protect election integrity do not unduly discourage voter registration and participation, *see* 52 U.S.C. 20501(b) (laying out NVRA's purposes).  "Interpreting the 'signature' requirement to allow only physical, manual, or wet ink signatures written by hand on paper would be inconsistent with the plain language of the NVRA and the entire statutory scheme." *Stringer*, 2020 WL 6875182, at *25.

Defendants' arguments to the contrary find no purchase.  Defendants first rely (Doc. 112, at 12-13) on *Browning*, 522 F.3d 1153, in which this Court held that requiring a state driver's license number, state-issued identification number, or the last four digits of a social security number on voter registration forms did not violate the Materiality Provision, *id.* at 1175.  However, the Court reached this decision because the Help America Vote Act required the *exact same* information, "notwithstanding any other provision of law."  *Id.* at 1155-1156, 1174 (citation omitted).  The NVRA neither contains a similarly specific requirement for a wet signature nor employs a similar "notwithstanding" clause.

- 20 -

Defendants also suggest (Doc. 112, at 14-15) that the NVRA permits States to require original signatures on applications if the requirement's purpose is to verify registrants' eligibility to vote.  But that would require this Court to read a "purpose" requirement into the NVRA where none exists.  *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1334 (11th Cir. 2013) ("[W]e are 'not allowed to add or subtract words from a statute.'" (citation omitted)).

### D.    Fraud-prevention or solemnity concerns cannot justify Florida's Wet-Signature Requirement.

Finally, both defendants (Doc. 111, at 15-19) and the district court (Doc. 140, at 15-17) have relied on various theoretical anti-fraud or solemnity rationales to justify the Wet-Signature Requirement.  These rationales lack merit.  The Materiality Provision's text provides for no burden-interest balancing or affirmative defenses.  Procedural requirements pass muster under the Provision only if they are "material in determining whether" voters are "qualified"— whatever other freestanding rationales States may provide.  52 U.S.C. 10101(a)(2)(B).  Measures like voter-ID or signature requirements can meet this test, if they determine would-be registrants' or voters' qualifications indirectly by verifying their identities or ensuring that they report their qualifications truthfully.  But the measures must be *needed* for this purpose—duplicative or irrelevant requirements, by definition, are not material.  Defendants' post hoc invocation of

fraud or solemnity cannot render a wet-signature requirement material where, as here, the form of signature allegedly makes no difference to the State.

1. The Materiality Provision prevents States from "requiring unnecessary information for voter registration" and then using errors or omissions in providing that information as "an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294. For a state law or official's action to violate the Provision, it must (1) deny the right of "any individual" to vote in an election, as defined by the statute, (2) for an "error or omission" (3) on a "record or paper" (4) "relating to any application, registration, or other act requisite to voting" that (5) is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. 10101(a)(2)(B). The principal inquiry is whether the state-law error—here, providing a digital, stamped, or facsimile signature rather than a wet ink signature—is material to determining whether a voter is qualified.

To answer this question, a court first must identify the State's voter qualifications, as determined at the stage of the voting process at which the error or omission occurs, such as eligibility requirements to register or to vote by absentee ballot. *See Schwier*, 340 F.3d at 1297; *accord Migliori*, 36 F.4th at 156. Second, the court must determine which of these qualifications the challenged rule or action purportedly enforces, and how. Third, the court must "ask[] whether, accepting the

- 22 -

error *as true and correct*, the information contained in the error is material to determining the eligibility of the applicant." *Browning*, 522 F.3d at 1175.

This Court has not yet decided what "degree[] of importance" the word "material" signifies. *Browning*, 522 F.3d at 1173. However, that question is easily resolved by "afford[ing] the law's terms their ordinary meaning at the time Congress adopted them." *United States v. Pate*, 84 F.4th 1196, 1201 (11th Cir. 2023) (en banc) (citation omitted). Both contemporaneous legal and popular dictionaries defined "material" as "of real importance or great consequence: substantial," or—as applied to law—"requiring serious consideration by reason of having a certain or probable bearing on" an "unsettled matter." *E.g.*, *Webster's Third New International Dictionary* 1392 (1966); *see Black's Law Dictionary* 1128 (4th ed. 1966) ("Important; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form."). "The popular and legal dictionaries' concurrence is powerful evidence of" the word's "ordinary meaning[]." *Pate*, 84 F.4th at 1201.

The "evidence from statutory context" supports this ordinary meaning. *Pate*, 84 F.4th at 1202. State actors cannot deny one's right to vote if an error or omission is "material" only in the abstract. Rather, it must be material "*in determining whether* such individual is qualified." 52 U.S.C. 10101(a)(2)(B) (emphasis added). The statutory text thus focuses the inquiry on whether the

erroneous or missing information tends to make a difference to officials when they actually determine a voter's qualifications. *Cf. Browning*, 522 F.3d at 1175. The district court's abstract consideration of an original signature's "weight" (Doc. 140, at 15) deviates from this framework.

2. The Fifth Circuit recently adopted a similar definition of "material." *Vote.Org*, 89 F.4th at 478. Yet instead of following the statutory text where it leads, that court then applied a convoluted analytical framework to uphold Texas's wet-signature requirement. *See id.* at 487-489. This framework relied heavily on the panel majority's view that courts owe "considerable deference" to States' election measures and must give "weight" to their abstract "justification" for those measures. *Id.* at 480, 485. The district court in this case followed a similar path. *See* Doc. 140, at 15-17. The Fifth Circuit's approach makes two principal errors that this Court should refrain from repeating.

First, the Fifth Circuit's standard is profoundly atextual. The panel plucked its statements about deference from constitutional right-to-vote cases, including *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). *See Vote.Org*, 89 F.4th at 480-481, 485. As the dissent noted, however, this right-to-vote doctrine "involves a different analytical framework than what we use for [statutory] claims." *Id.* at 492 (Higginson, J., dissenting) (citation omitted). Unlike the open-ended language of the First and Fourteenth Amendments, the

Materiality Provision's text imposes a highly specific mandate that "expressly limits states' purported 'considerable discretion.'" *Ibid.* Just as the statute "does not establish a least-restrictive-alternative test for voter registration applications in the plain text of the statute," *Browning*, 522 F.3d at 1175, its text neither inquires into the strength of the government's interest nor adopts means-ends scrutiny, *see, e.g.*, *Migliori*, 36 F.4th at 163. Yet the Fifth Circuit borrowed these concepts from constitutional law and grafted them onto the Materiality Provision. *See Vote.Org*, 89 F.4th at 485.[5]

Second, the Fifth Circuit granted such extreme deference to the State's interest that it ignored the record evidence. "[A]s the district court" in *Vote.Org* "carefully found, factually, [Texas's] wet-signature requirement is *undisputedly* pointless." 89 F.4th at 492 (Higginson, J., dissenting) (discussing evidence). Yet, based only on its determination that "what Texas [was] arguing" on appeal was "a reasonable understanding of the legislative judgment," the majority "accept[ed]" that "physically signing [a registration] form with the warnings in front of the

---

[5] The panel majority likewise borrowed the "tenuousness" factor from the Supreme Court's jurisprudence on Section 2 of the Voting Rights Act, as well as the "totality of the circumstances" test of which that factor is a part. *Vote.Org*, 89 F.4th at 482-485. However, the Materiality Provision also lacks the textual bases for these factors: Section 2's express totality-of-circumstances standard and its requirement to show that "the political processes" in a jurisdiction "are not equally open to participation by a class of citizens." 52 U.S.C. 10301(b); *see Vote.Org*, 89 F.4th at 492 (Higginson, J., dissenting) (citation omitted).

applicant . . . has some prospect of getting the attention of many applicants and dissuading false statements that an electronic signature, without these warnings, does not." *Id.* at 488-489 (majority opinion). Based on this fact-free justification—and despite the undisputed evidence that Texas's wet-signature rule did nothing to serve that purpose—the court upheld the rule as "meaningfully, even if quite imperfectly, correspond[ing] to" the State's interest in voter integrity. *Id.* at 489.

Such extraordinary deference to States' abstract interests substitutes States' post hoc legal justifications for the Materiality Provision's statutory text and the evidence presented to district courts. Materiality can at times be a legal, *per se* determination, such as when another federal law either requires or prohibits collection of the challenged information, or when a State provides no explanation of how a requirement relates to determining voter qualifications. *E.g.*, *Browning*, 522 F.3d at 1174 & n.22. Otherwise, however, materiality is a fact-dependent determination that depends upon the *evidence*—or, at the motion-to-dismiss stage, the *allegations*—of whether the state requirement at issue is material to officials' determination of voters' qualifications. *See, e.g.*, *Migliori*, 36 F.4th at 163-164; *id.* at 165 (Matey, J., concurring in the judgment); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-1309 (N.D. Ga. 2018); *Ford v. Tennessee Senate*, No. 06-cv-2031, 2006 WL 8435145, at *10-11 (W.D. Tenn. Feb. 1, 2006); *cf. Vote.Org*, 89 F.4th at

480 (declaring it "fairly obvious" that omissions related to the law at issue in *Migliori* were immaterial, based on Third Circuit's fact-based analysis).

Deferring to States' interests in lieu of the facts is entirely at cross-purposes with the statutory text. *See* pp. 22-24, *supra*. And it would allow States to justify with hypothetical interests a law that in fact does not serve those interests— something that even constitutional voting rights doctrine, which is highly fact-dependent, does not permit. *See, e.g.*, *Cowen v. Georgia Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322-1323 (11th Cir. 2019); *accord Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020). Such deference also would essentially allow States to define the scope of federal law, frustrating Congress's intent. *But see* Part II.B, *supra*.

3. The district court erred in holding (Doc. 140, at 14-17) that the Wet-Signature Requirement is categorically material. It relied solely on the untested assumption that original signatures carry a "solemn weight" that other signatures do not. Doc. 140, at 15 (citation omitted). This reasoning brushes aside the complaint's allegations and conflates the Wet-Signature Requirement with a more generalized signature mandate.

Signature mandates may be "material in determining whether [an] individual is qualified" to vote, 52 U.S.C. 10101(a)(2)(B), because they help ensure that voters consider the State's eligibility requirements and attest that they meet them.

- 27 -

However, plaintiffs do not challenge Florida's preexisting requirement that registration forms include the "[s]ignature of [the] applicant."  Fla. Stat. § 97.052(2)(q) (2023).  Plaintiffs challenge only the additional mandate that registrants include a *wet* signature on their registration forms.  Doc. 101, at 8, 22. The court provided no factual basis for believing that facsimile, stamped, or electronic signatures are worse than wet signatures at confirming that voters have considered and attested to the eligibility requirements.  Doc. 140, at 15.[6]

The complaint alleges that Florida accepts digitized signatures on registration forms completed at DMV offices or via online registration requests, as well as on vital documents like insurance policies and commercial contracts.  *See* Doc. 101, at 23; Doc. 101-1, at 2-3 (discussing other Florida statutes that allow electronic or facsimile signature); Fla. Stat. § 668.50(7)(d) (2023) ("If a provision of law requires a signature, an electronic signature satisfies such provision.").  This fatally undercuts defendants' claim that provision of a wet signature materially aids in verifying applicants' identity or solemnizing the registration submission process. *See Migliori*, 36 F.4th at 163.  The Wet-Signature Requirement cannot be deemed

---

[6]  The court's reference to the prevalence of "original-signature requirements" in "society" (Doc. 140, at 15-16) is beside the point.  Other entities that require wet signatures in other contexts are not bound by the Materiality Provision, and so have never been forced to justify such requirements as materially more effective in ensuring eligibility than general signature requirements.

material because of the "different weight" an original signature carries (Doc. 140, at 15), when Florida nonetheless accepts digital signatures (some perhaps years-old) from those who register at the DMV or apply for registration online. *See* Doc. 101, at 22.

To be sure, Florida could present evidence at summary judgment or trial demonstrating that its wet-signature requirement is material to ensuring that voters are qualified. But at the motion-to-dismiss stage, where courts must accept the plaintiffs' factual allegations, plaintiffs have plausibly alleged that Florida's requirement of a wet signature, rather than another form of signature, for some registrants is not material to determining a registrant's eligibility to register and vote. *See Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains because it contains 6465 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  January 30, 2024