No. 23-13727

# In the United States Court of Appeals for the Eleventh Circuit

DISABILITY RIGHTS FLORIDA, ET AL.,

*Plaintiffs-Appellants,*

v.

SECRETARY, STATE OF FLORIDA, ET AL.,

*Defendants-Appellees.*

and

REPUBLICAN NATIONAL COMMITTEE, ET AL.

*Intervenor-Defendants-Appellees*

## BRIEF OF APPELLEES SECRETARY OF STATE CORD BYRD & TEN SUPERVISORS OF ELECTIONS

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA,
CASE NO. 4:23-CV-00111-AW-MAF (WINSOR, J.)

Andy Bardos
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
850-577-9090

*Counsel for Appellees Supervisors Chris
Anderson, James Satcher, Melissa
Blazier, Brian Corley, Tommy Doyle,
Joyce Griffin, Alan Hays, Leslie
Rossway Swan, Leah Valenti, and
Wesley Wilcox*

Nicholas J.P. Meros
EXECUTIVE OFFICE OF THE GOVERNOR
400 S. Monroe Street
Tallahassee, FL 32399
(850) 717-9310

Joseph Van de Bogart
Ashley Davis
Genevieve McNalis
FLORIDA DEPARTMENT OF STATE
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

*Counsel for Appellee Secretary Byrd*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1 to 26.3, counsel for Appellees certify that, in addition those persons identified by Plaintiffs-Appellants and the United States as amicus curiae, the following persons may have an interest in the outcome of this appeal:

1. Fitzpatrick, Martin A., Magistrate Judge

2. Gilzean, Glenton, Defendant

3. Harle, Denise, Counsel for Intervenor Defendants

4. McNalis, Genevieve, Counsel for Defendant, Secretary Byrd

5. Satcher, James, Defendant

6. Ward, Nina, Defendant

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ *Andy Bardos*
*Counsel for Appellee Supervisors*

## STATEMENT REGARDING ORAL ARGUMENT

Secretary Byrd and the Supervisors do not request oral argument. The issues are clearly presented in the briefing and in the straightforward appellate record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT................................................................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................................. ii

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ............................................................... 2

INTRODUCTION......................................................................................... 3

STATEMENT OF THE CASE .................................................................... 4

    I.    Florida's Voter Registration Laws ...................................................... 4

        A.    Florida's long-standing signature requirement............................. 4

        B.    Florida makes it easy to register to vote..................................... 6

    II.    Procedural History ........................................................................ 8

STANDARD OF REVIEW............................................................................ 9

SUMMARY OF THE ARGUMENT .......................................................... 10

ARGUMENT ............................................................................................... 12

    I.    The Amended Complaint Does Not State A Claim That The Original Signature Requirement Violates The Materiality Provision. .......................... 12

        A.    The district court correctly found that handwritten signatures are inherently material. ........................................................................ 13

        B.    The Materiality Provision does not deny Florida a choice of the means by which it obtains admittedly material information on voter registration applications. .............................................................. 17

        C.    The original signature requirement does not deny an individual the right to vote. ................................................................................. 20

        D.    The original signature requirement is *per se* material to determining whether an individual is qualified to vote. .................................... 23

II.    Plaintiffs Do Not Have Standing To Challenge The Original Signature Requirement. ................................................................................. 25

   A.    Plaintiffs do not establish associational or organizational standing. ......... 26

      1.    *Plaintiffs do not have associational standing because they do not identify a single member that would have standing to sue in his own right.* .................................... 27

      2.    *Plaintiffs do not have organizational standing because they do not allege where they are diverting their resources from, to what they are diverting those resources, and how the diversion differs from their usual course of conduct.* .......................... 35

   B.    Plaintiffs do not establish prudential standing to challenge the Materiality Provision on behalf of third parties. ........................... 44

III.   Section 1983 Does Not Confer A Private Right Of Action To Enforce The Materiality Provision. .................................................................. 49

CONCLUSION ........................................................................................ 50

CERTIFICATE OF COMPLIANCE .............................................................. 52

CERTIFICATE OF SERVICE ...................................................................... 52

# TABLE OF AUTHORITIES

## <u>Cases</u>

*American Dental Association v. Cigna Corporation,*

    605 F.3d 1283 (11th Cir. 2010) ........................................................ 9

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ........................................................................ 9

*Brnovich v. Democratic National Committee,*

    141 S. Ct. 2321 (2021) .................................................................. 22

*City of Los Angeles v. Lyons,*

    461 U.S. 95 (1983) ........................................................................ 32

*City of Rancho Palos Verdes v. Abrams,*

    544 U.S. 113 (2005) ..........................................................26, 48, 49

*City of South Miami v. Governor of Florida,*

    65 F.4th 631 (11th Cir. 2023) ...................................... 27, 32, 41, 42

*Clapper v. Amnesty International USA,*

    568 U.S. 398 (2013) ................................................... 31, 32, 41, 42

* *Common Cause/Georgia v. Billups,*

    554 F.3d 1340 (11th Cir. 2009) ...............................................37, 38

*Corbett v. Transportation Security Administration,*

    930 F.3d 1225 (11th Cir. 2019) ...................................................... 32

*Craig v. Boren,*

    429 U.S. 190 (1976) ...................................................................... 47

\* *Crawford v. Marion County Election Board,*

    553 U.S. 181 (2008) ..............................................................18, 21

*Davis v. Federal Election Commission,*

    554 U.S. 724 (2008) ...................................................................... 25

\* *Diaz v. Cobb,*

    435 F. Supp. 2d 1206 (S.D. Fla. 2006) ........................................ 18

*Dobbs v. Jackson Women's Health Organization,*

    142 S. Ct. 2228 (2022) .................................................................. 45

*Doe v. Stincer,*

    175 F.3d 879 (11th Cir. 1999) ...............................................34, 35

*Elend v. Basham,*

    471 F.3d 1199 (11th Cir. 2006) .................................................... 32

*Equal Rights Center v. Post Properties, Inc.,*

    633 F.3d 1136 (D.C. Cir. 2011) .................................................... 42

\* *Florida State Conference of NAACP v. Browning,*

    522 F.3d 1153 (11th Cir. 2008) 5, 16, 18, 19, 20, 23, 24, 25, 26, 27, 29, 31, 38, 39, 43

*Georgia Association of Latino Elected Officials v. Gwinnett County Board of Registration and Elections (GALEO),*

    36 F.4th 1100 (11th Cir. 2022) ...........................26, 36, 37, 38, 43

*Georgia Latino Alliance for Human Rights v. Governor of Georgia,*

   691 F.3d 1250 (11th Cir. 2012) ..........................................................39, 40, 41

*Georgia Republican Party v. Securities and Exchange Commission,*

   888 F.3d 1198 (11th Cir. 2018) ...................................28, 29, 30, 31, 40, 43

*Gonzaga University v. Doe,*

   536 U.S. 273 (2002) ................................................................................ 49

*Griswold v. Connecticut,*

   381 U.S. 479 (1965) ................................................................................ 47

*Hang On, Inc. v. City of Arlington,*

   65 F.3d 1248 (5th Cir. 1995) .................................................................. 45

*Havens Realty Corporation v. Coleman,*

   455 U.S. 363 (1982) ...........................................................................41, 43

*Holmes v. Securities Investor Protection Corporation,*

   503 U.S. 258 (1992) ................................................................................ 46

*Howlette v. City of Richmond,*

   485 F. Supp. 17 (E.D. Va. 1978).........................................................15, 19

*Hunt v. Washington State Apple Advertising Commission,*

   432 U.S. 333 (1977) ...........................................................................33, 34

*J W ex rel. Williams v. Birmingham Board of Education,*

   904 F.3d 1248 (11th Cir. 2018) .............................................................. 32

\* *Jacobson v. Florida Secretar of State*,

    974 F.3d 1236 (11th Cir. 2020) ........................................................25, 27, 28, 30, 36

*June Medical Services L. L. C. v. Russo*,

    140 S. Ct. 2103 (2020) ................................................................................ 45

\* *Kowalski v. Tesmer*,

    543 U.S. 125 (2004) ....................................................44, 45, 46, 47, 48

*Lemons v. Bradbury*,

    538 F.3d 1098 (9th Cir. 2008) ................................................................15, 21

*Lewis v. Casey*,

    518 U.S. 343 (1996) ................................................................................ 25

\* *Lexmark International, Inc. v. Static Control Components, Inc.*,

    572 U.S. 118 (2014) ........................................................26, 44, 46

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992) ........................................................28, 30, 35

*Mack v. USAA Casualty Insurance Company*,

    994 F.3d 1353 (11th Cir. 2021) ................................................................ 26

*Maryland Shall Issue, Inc. v. Hogan*,

    971 F.3d 199 (4th Cir. 2020) ................................................................ 45

*Mata Chorwadi, Inc. v. City of Boynton Beach*,

    566 F.4th 1259 (11th Cir. 2023) ................................................................ 47

*Mays v. LaRose*,

    951 F.3d 775 (6th Cir. 2020) ........................................................... 21

*NAACP v. City of Kyle*,

    626 F.3d 233 (5th Cir. 2010) ........................................................... 40

*National Taxpayers Union, Inc. v. United States*,

    68 F.3d 1428 (D.C. Cir. 1995) ...............................................37, 40, 43

*Organization for Black Struggle v. Ashcroft*,

    No. 2:20-CV-04184-BCW, 2021 WL 1318011 (W.D. Mo. Mar. 9, 2021) .............. 24

*PDVSA US Litigation Trust v. LukOil Pan Americas, LLC*,

    65 F.4th 556 (11th Cir. 2023) ........................................................... 12

*Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth of Pennsylvania*,

    97 F.4th 120 (3d Cir. 2024) ........................................................... 20

*Powers v. Ohio*,

    499 U.S. 400 (1991) ...............................................................44, 45, 47

*Randall v. Scott*,

    610 F.3d 701 (11th Cir. 2010) ........................................................... 9

* *Ritter v. Migliori*,

    142 S. Ct. 1824 (2022) ...............................................................18, 21, 22

*Schalamar Creek Mobile Homeowner's Association, Inc. v. Adler*,

    855 F. App'x 546 (11th Cir. 2021) ........................................................... 28

\* *Schwier v. Cox,*

    340 F.3d 1284 (11th Cir. 2003) ..................................................17, 45, 50

*Shelby Advocates for Valid Elections v. Hargett,*

    947 F.3d 977 (6th Cir. 2020) ....................................................... 42

*Sierra Club v. Morton,*

    405 U.S. 727 (1972) .................................................................. 43

*Sierra Club v. Tennessee Valley Authority,*

    430 F.3d 1337 (11th Cir. 2005) .................................................. 27

*Singleton v. Wulff,*

    428 U.S. 106 (1976) .................................................................. 48

*South River Watershed Alliance, Inc. v. Dekalb County,*

    69 F.4th 809 (11th Cir. 2023) .................................................... 29

*Storer v. Brown,*

    415 U.S. 724 (1974) .................................................................... 3

\* *Summers v. Earth Island Institute,*

    555 U.S. 488 (2009) ............................................... 28, 29, 30, 35

*Thompson v. DeWine,*

    976 F.3d 610 (6th Cir. 2020) ..................................................... 18

*Town of Chester v. Laroe Estates, Inc.,*

    581 U.S. 433 (2017) .................................................................. 26

*Tsao v. Captiva MVP Restaurant Partners, LLC,*

    986 F.3d 1332 (11th Cir. 2021) ................................................................31, 32

*Turquitt v. Jefferson County,*

    137 F.3d 1285 (11th Cir. 1998) ..................................................................... 50

\* *Vote.Org v. Callanen,*

    39 F.4th 297 (5th Cir. 2022) ......................................... 14, 15, 21, 24, 25, 45, 47, 48

\* *Vote.Org v. Callanen,*

    89 F.4th 459 (5th Cir. 2023) ........................................................ 15, 18, 24, 39

*Waldman v. Conway,*

    871 F.3d 1283 (11th Cir. 2017) ..................................................................... 12

*Whitmore v. Arkansas,*

    495 U.S. 149 (1990) ..................................................................................... 31

*Wilding v. DNC Services Corporation,*

    941 F.3d 1116 (11th Cir. 2019) ..................................................................... 26

*Yelapi v. DeSantis,*

    525 F. Supp. 3d 1371 (N.D. Fla. 2021) .......................................................... 35

*Young Apartments, Inc. v. Town of Jupiter,*

    529 F.3d 1027 (11th Cir. 2008) ..................................................................... 46

## Constitutional Provisions

Art. VI, § 3, Fla. Const. (1968)...............................................................4, 6, 17

Art. XIV, § 1, Fla. Const. (1868) ............................................................ 4

U.S. Const. Art. III, § 2 ........................................................................ 25

**<u>Statutes</u>**

28 U.S.C. § 1291 ................................................................................... 1

29 U.S.C. § 794e .................................................................................. 33

42 U.S.C. § 1971(a)(2)(B) ................................................................. 8, 24

42 U.S.C. § 1983 ................................................ 2, 11, 26, 48, 49, 50

42 U.S.C. § 15043 ............................................................................... 33

* 52 U.S.C. § 10101(a)(2)(B) ........................... 8, 12, 20, 21, 23, 44

52 U.S.C. § 10101(c) ........................................................................... 49

52 U.S.C. § 10101(e) ........................................................................... 49

52 U.S.C. § 20505(a)(2) ................................................................. 18, 23

52 U.S.C. § 20508(b)(1) ...................................................................... 23

52 U.S.C. § 20508(b)(2) ...................................................................... 23

52 U.S.C. § 20508(b)(3) ...................................................................... 23

Fla. Stat. § 97.041(1)(a) (2023) .......................................................... 13

Fla. Stat. § 97.041(1)(a)1.–5. (2023) .................................................. 6

Fla. Stat. § 97.051 (2023) ..................................................................... 6

Fla. Stat. § 97.052 (2023) ................................................................... 19

Fla. Stat. § 97.052(1)(b) (2023) .......................................................... 22

Fla. Stat. § 97.052(2)(q) (2023) ................................................................ 17

Fla. Stat. § 97.052(6) (2023) ...................................................................... 7

Fla. Stat. § 97.0525 (2023) ........................................................................ 31

Fla. Stat. § 97.0525(4)(a) (2023) ................................................................ 7

Fla. Stat. § 97.0525(4)(b) (2023) ............................................................ 6, 7

Fla. Stat. § 97.0525(4)(c) (2023) ................................................................ 7

* Fla. Stat. § 97.053(5)(a)8. (2023) ...............................................5, 6, 8, 16

Fla. Stat. § 97.057(2)(b)1.c. (2023) .......................................................... 31

Fla. Stat. § 97.073(1) (2023) ................................................................. 7, 22

Fla. Stat. § 98.045(1)(g) (2023) .................................................................. 7

Fla. Stat. § 98.053(5)(a)8. (2023) ............................................................. 10

Fla. Stat. § 101.048(2)(b)1. (2023) ........................................................... 19

Fla. Stat. § 101.62(4)(c)4. (2023) ............................................................. 20

Fla. Stat. § 101.68(2)(c)1. (2023) ............................................................. 19

Fla. Stat. § 322.08(2) (2023) ..................................................................... 16

Fla. Stat. § 322.142 (2023) .......................................................................... 7

Fla. Stat. § 322.142(1) (2023) ................................................................... 16

Fla. Stat. § 322.142(4) (2023) ................................................................... 16

## Laws of Florida

Ch. 2005-277, Laws of Fla .......................................................................... 5

Ch. 2005-278, Laws of Fla.......................................................................... 5

Ch. 2015-36, Laws of Fla. .......................................................................... 6

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................. 9

**Regulations**

Fla. Admin. Code R. 1S-2.040 .................................................................. 6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................... 5

Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 RUTGERS L. REV. (2005)

............................................................................................................. 15

Lon L. Fuller, *Consideration and Form*, 41 COLUMBIA L. REV. 799 (1941) ...................... 15

Michael J. Hays, *The E-Sign Act of 2000: The Triumph of Function Over Form in American Contract Law*, 76 NOTRE DAME L. REV. (2001) .......................................... 16

## STATEMENT OF JURISDICTION

The district court dismissed the Amended Complaint on October 30, 2023. DE 140. Appellant filed a timely notice of appeal on November 8, 2023. DE 144.

The district court, however, lacked subject matter jurisdiction – and this Court, too, lacks jurisdiction – because Plaintiffs failed to establish Article III standing. But assuming Plaintiffs have standing, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that Plaintiffs failed to state a claim under the Materiality Provision.

2.      Whether Plaintiffs have Article III standing.

3.      Whether Plaintiffs have prudential standing to assert the rights of third parties.

4.      Whether Plaintiffs have a private right of action to enforce the Materiality Provision under 42 U.S.C. § 1983.

## INTRODUCTION

Florida requires persons registering to vote to swear to or affirm the accuracy of the information they provide to the State in voter registration applications. Florida made the uncontroversial decision to require that oath or affirmation to be evidenced by an original – i.e., *handwritten* – signature, unless the State already has the applicant's digital signature on file.

Plaintiffs disagree with the Florida Legislature's policy choice. They claim the federal Civil Rights Act of 1964 prohibits States from requiring applicants to sign their applications by hand. According to Plaintiffs, the form of an applicant's signature is immaterial because it does not determine whether the applicant is qualified to vote. But Plaintiffs do not object to Florida requiring a signature of some kind on voter registration applications – only the requirement of an *original* signature. In doing so, Plaintiffs acknowledge that signatures are inherently more reliable than other verification methods, and therefore material. They just want the power to choose the form of the signature for themselves.

But federal law leaves it to the States – not each individual applicant – to decide how to obtain admittedly material information. Any other system would frustrate the State's orderly administration of its elections. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) (explaining that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes"). Florida has selected its methods, which do not

3

include Plaintiffs' preferred options. The district court recognized that one of Florida's methods – the original signature requirement – is inherently more reliable than alternative methods and thus material to determining whether applicants are qualified to vote. Federal law does not require States to allow applicants to sign their applications in any manner the applicant chooses, such as a digital, stamped, or facsimile signature. In addition, under this Court's binding precedent, original signatures are *per se* material and do not deny the right to vote.

The district court got it right. The Secretary and Supervisors ask this Court to affirm.

## STATEMENT OF THE CASE

### I.    Florida's Voter Registration Laws

A.    <u>Florida's long-standing signature requirement.</u>

Since at least 1868, the Florida Constitution has required citizens registering to vote to "subscrib[e]" an oath to defend the United States and Florida Constitutions. *See* Art. XIV, § 1, Fla. Const. (1868). The Florida Constitution of 1968 requires applicants to "subscribe" an oath "swear[ing] (or affirm[ing])" that they "will protect and defend the Constitution of the United States and the Constitution of the State of Florida," and that they are "qualified to register as an elector under the Constitution and laws of the State of Florida." Art. VI, § 3, Fla. Const. (1968).

The meaning of the constitutional text is clear. The word "subscribe" means "[t]o *write* (one's name) underneath; to *put* (one's signature) on a document," or "[t]o

*sign* one's name to a letter or other document," or "to give consent by signing *with one's own hand.*" *Subscribe*, Black's Law Dictionary (11th ed. 2019)[1] (emphasis added). "[W]rit[ing]," "put[ting]," or "sign[ing]" one's *own* name has significant effect. It is "an acknowledgment of" the signatory, rather than someone else, "being its writer or creator," such that the signatory "give[s] consent to," "bind[s] [him/her]self to the terms of," and "attest[s]" to the document. *Id.*

In 1993, Congress passed the National Voter Registration Act ("NVRA"), which required States to collect an applicant's signature on the voter registration form. Although Florida already had a signature requirement, the NVRA federally codified the signature requirement. Under this Court's precedent, the federal signature requirement makes Florida's original signature requirement per se material. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008).

In 2005, the Florida Legislature amended the Florida Voter Registration Act to clarify that prospective voters must provide an "original" signature on their registration applications. Ch. 2005-277, § 5, Laws of Fla. It also amended section 97.053(5)(a)8. to authorize applicants to register with the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") using an electronic, or "digital," signature. Ch. 2005-278,

---

[1] That definition has not substantively changed since Florida first required voters to "subscribe" to an oath to register to vote. *See* https://webstersdictionary1828.com/ Dictionary/subscribe (articulating the 1828 definition of "subscribe" as "**1.** To sign *with one's own hand*; to give consent to something written, or to bind one's self *by writing one's name* beneath") (emphasis added).

§ 6, Laws of Fla. And in 2015, the Legislature created the Department of State's secure, online registration portal. Ch. 2015-36, § 1, Laws of Fla.

B. <u>Florida makes it easy to register to vote.</u>

A person can register to vote in Florida if he or she is at least 18 years of age, a U.S. citizen, a legal Florida resident, a legal resident of the county in which he or she wants to register, and "[r]egisters *pursuant to the Florida Election Code.*" § 97.041(1)(a)1.–5., Fla. Stat. (emphasis added).

Completing the voter registration application is simple. The document itself is prescribed by rule, *see* Fla. Admin. Code R. 1S-2.040, and only requires a few affirmations about voting eligibility, the applicant's date of birth, name and address, and a driver's license number, Florida identification number, or the last four digits of the applicant's social security number. Following this information, the applicant must then subscribe to an oath as required by the Florida Constitution, Art. VI, § 3, Fla. Const. (1968); § 97.051, Fla. Stat., by providing an original signature or a digital signature from the DHSMV. §§ 97.053(5)(a)8., 97.0525(4)(b), Fla. Stat.

Those with a Florida driver's license number or Florida identification number who do not want to fill out a paper application can register online through the Department of State's secure portal using a "digital signature of the applicant on file with the [DHSMV]." *Id.* § 97.0525(4)(b). This "digital signature" is a copy of the original signature that the applicant provided to the DHSMV when applying for a driver's license or other government service. In this way, the DHSMV authenticates the

6

applicant's digital signature as belonging to, and affixed by, the applicant. *See id.* § 322.142 (requiring DHSMV officials to observe driver license applicants signing their license). "The online voter registration system [then] compare[s] the Florida driver license number or Florida identification number submitted" with the DHSMV's information "to confirm that the name and date of birth on the application are consistent" with the DHSMV's records. *Id.* § 97.0525(4)(a). If the information matches, then the application, along with the applicant's "digital signature," is transferred via the "Florida Voter Registration System" directly to the applicable Supervisor of Elections. *Id.* § 97.0525(4)(b).

If the DHSMV cannot verify the applicant's information against its records, or if the applicant indicates that he or she does not have a Florida driver's license or identification card, the applicant must sign and deliver a filled-out registration application to the applicable Supervisor of Elections. *Id.* §§ 97.0525(4)(c). Only under these circumstances, or if the applicant voluntarily chooses to fill out a paper application, must the applicant provide an original signature to register to vote.

After receiving a voter registration application, Supervisors must verify the applicant's eligibility, which includes verifying that the applicant is not fictitious, notifying the applicant if the application is incomplete, and providing the applicant with an opportunity to cure the deficiency. *Id.* §§ 97.052(6), 97.073(1), 98.045(1)(g). If the applicant cures the deficiency, he is registered to vote. Those who fail to cure can begin

the process again, whether online, through the DHSMV or their Supervisor's office, or through paper applications located throughout the State.

## II.    Procedural History

On March 16, 2023, Plaintiffs, three advocacy organizations and a technology platform, sued the Florida Secretary of State ("Secretary") and each of Florida's sixty-seven Supervisors of Elections ("Supervisors"). DE 1. The Plaintiffs, Vote.Org, Florida Alliance for Retired Americans ("Florida Alliance"), Florida State Conference of Branches and Youth Units of the NAACP ("NAACP"), and Disability Rights Florida ("DRF"), claim an interest in helping specific groups of citizens register to vote. They allege that the provisions of section 97.053(5)(a)8., Florida Statutes,[2] that require applicants to provide their original – i.e., *handwritten* – signature on paper applications, violate the Materiality Provision of the Civil Rights Act of 1964. That provision, previously codified at 42 U.S.C. § 1971(a)(2)(B), now appears as 52 U.S.C. § 10101(a)(2)(B).

The Republican National Committee and Republican Party of Pasco County moved to intervene, which the district court granted on May 26, 2023. DE 85. The Secretary and ten Supervisors moved to dismiss the Complaint on May 30, 2023. DE 91. Before responding, Plaintiffs amended their complaint to add DRF and refine their

---

[2] This requirement will be referred to as the "original signature requirement."

8

allegations. DE 101. The same group of Defendants and the Intervenors then moved to dismiss the Amended Complaint. DE 112.

On October 30, 2023, the district court granted the motions without prejudice and instructed Plaintiffs to show cause why the Court should not dismiss their claims against the non-moving Defendants as well and enter final judgment. DE 140. Plaintiffs filed a response preserving their argument that the district court erred, but recognized that the "natural extension of the Court's order is dismissal and final judgment in favor of all Defendants." DE 141. Accordingly, the district court entered a final order dismissing the Amended Complaint as to all Defendants. DE 142. Plaintiffs timely appealed on November 8, 2023. DE 144.

## STANDARD OF REVIEW

This Court reviews *de novo* an order granting a motion to dismiss under Rule 12(b)(6). *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face," meaning it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal marks omitted). But "conclusory allegations . . . are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations." *Randall v. Scott,* 610 F.3d 701, 709–10 (11th Cir. 2010).

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge Florida's requirement that those registering to vote provide an *original signature* for the purpose of "swearing or affirming," under penalty of perjury, that the information "contained in their registration application is true." § 98.053(5)(a)8., Fla. Stat. Plaintiffs claim this original signature requirement violates the Materiality Provision of the Civil Rights Act of 1964 because the method of signing an application is not "material" to determining whether the applicant is qualified to vote. Plaintiffs are wrong.

**I.** Plaintiffs do not state a claim under the Materiality Provision. Plaintiffs do not allege facts to show that an original signature is immaterial to determining whether the individual is qualified to vote under State law. Instead, the district court correctly found that handwritten signatures are inherently material. In fact, Plaintiffs acknowledge that signatures provide material information on voter registration applications. And the Materiality Provision does not deny Florida a choice of the means by which it obtains that admittedly material information. In addition, Plaintiffs cannot show – and have not pled – facts to demonstrate that the original signature requirement denies any individual the right to vote. And binding precedent confirms that original signatures are *per se* material to determining voter eligibility.

**II.** Plaintiffs do not have standing. They do not establish associational standing because they either do not allege that they have members, or they do not specifically identify any member and plausibly allege that the original signature requirement has

10

denied, or will deny, that member's right to vote. Likewise, Plaintiffs lack organizational standing because they do not allege where and how they diverted resources to counteract the original signature requirement, or that the resources they spent were distinct from their usual operating costs.

Plaintiffs also lack prudential standing to assert the constitutional rights of third-party voters under the Materiality Provision. The Materiality Provision protects actual voters – not advocacy organizations without the right to vote.

**III.** Last, Plaintiffs cannot use Section 1983 because Section 1983 does not confer a private right of action to enforce the Materiality Provision.

This Court should, accordingly, affirm the district court's dismissal of Plaintiffs' Amended Complaint.

## ARGUMENT

### I.    The Amended Complaint Does Not State A Claim That The Original Signature Requirement Violates The Materiality Provision.

The Materiality Provision forbids "person[s] acting under color of law" from "deny[ing] the right of any individual to vote in any election" based on "error[s] or omission[s]" on documents "requisite to voting" that are "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Plaintiffs claim the original signature requirement violates the Materiality Provision because an applicant's handwritten signature is not "material" to determining whether the applicant is qualified to vote. They insist an original signature is the same as any other form of signature. But "we know this not to be so." DE 140 at 15.

The district court correctly found that the Amended Complaint did not state a claim under the Materiality Provision because handwritten signatures are inherently more reliable – making them material to determining voter qualifications.

The record, moreover, supports affirming the district court's decision for at least three additional reasons. *See PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*, 65 F.4th 556, 562 (11th Cir. 2023) ("[T]his Court may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." (quoting *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) (cleaned up))).

First, all parties acknowledge that signatures are material, and the Materiality Provision does not deny States discretion to choose the means by which they obtain material information. Second, requiring an original signature on voter registration applications does not deny applicants the right to vote. Third, an original signature is *per se* material to verifying an applicant's qualifications to vote.

A.  <u>The district court correctly found that handwritten signatures are inherently material.</u>

Plaintiffs argue that original signatures are not material to determining whether an applicant is qualified to vote because "signing a voter registration application bears no relation to the statutory qualifications" for age, citizenship, and residence. DE 119 at 11; *see* § 97.041(1)(a), Fla. Stat. Plaintiffs concede, however, that they challenge "only the requirement that the application must bear the original, wet signature handwritten by the applicant," not the "the general requirement that an applicant must sign their application form." DE 101 ¶ 35. In other words, Plaintiffs acknowledge that signatures are material. They just argue that requiring an original signature is not material because "the act of signing – rather than the method used – affirms the information provided is true and accurate." DE 119 at 11. In effect, Plaintiffs claim the Materiality Provision gives each applicant unfettered discretion to choose the method by which they will sign their applications.

But it is "logically inconsistent" to argue that a signature is material, but an original signature is *not* material, because "the two requirements fall or stand together."

13

*Vote.Org v. Callanen*, 39 F.4th 297, 307 (5th Cir. 2022) (*Callanen* I) (finding that "the general requirement that an application be signed by the applicant is no more or less material . . . than the requirement that an application submitted by fax be in accordance with the wet signature requirement" (quotation marks omitted)). Because an original signature is the foundation for all other types of signatures, a claim that a signature is material means that the original signature must be material. It is impossible to separate an original signature from the requirement for a signature. Thus, Plaintiffs "cannot logically maintain that the one is valid and the other not." *Id.*

In addition, accepting Plaintiffs' argument that original signatures are immaterial to the applicant's qualifications would mean that "digital, electronic, facsimile, or stamped signature[s]" are just as reliable as handwritten signatures. *See* DE 101 ¶ 51 ("The method of signing a voter registration application bears no relation to the statutory qualifications and does not serve any purpose for which a digital, electronic or stamped signature would not suffice . . . ."). But Plaintiffs haven't "alleged facts plausibly showing" that non-original signatures match the force and effect of handwritten signatures made under penalty of false swearing. Doc.140 at 14. Nor could they because, as Judge Winsor noted, "we know this not to be so." DE 140 at 15.

"[O]riginal signatures carry different weight than other 'signatures.'" *Id.* at 15. "Physically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Id.*

14

(quoting *Callanen* I, 39 F.4th at 308). The former "impresses upon the signers . . . the seriousness of the act" in a way the latter doesn't. *Id.* (quoting *Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978)); *see also Vote.Org v. Callanen*, 89 F.4th 459, 471, 489 (5th Cir. 2023) (*Callanen* II) ("accept[ing]" this position). Original signature requirements are ubiquitous for this reason. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (noting signature requirements are a common fact of life); DE 111 at 2–3 (collecting such requirements).

In addition, legal formalities, including handwritten signatures, advance an important "cautionary function." Lon L. Fuller, *Consideration and Form*, 41 COLUMBIA L. REV. 799 (1941). They are cautionary reminders of the legal significance of the act performed and thus contribute to the care taken to ensure the accuracy and correctness of the information provided. Signing a document by hand not only furnishes information, it is a solemn act – an act that for centuries has signified an individual's assent and affirmation. *See Callanen* I, 39 F.4th at 308 (discussing "solemn weight" of "[p]hysically signing a voter registration form"); *Howlette*, 485 F. Supp. at 23 ("[I]ndividual notarization requirement impresses upon the signers of the petitions the seriousness of the act of signing a petition . . . ."). For that reason, the Legislature could reasonably have concluded that original signatures are more likely than other means to impress on the applicant the seriousness of the act he or she is about to perform and the gravity of the consequences of providing incorrect information. *See* Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 RUTGERS L. REV. 1307, 1331 (2005)

(explaining that a "click" does not serve the same "cautionary function" as a handwritten signature); Michael J. Hays, *The E-Sign Act of 2000: The Triumph of Function Over Form in American Contract Law*, 76 NOTRE DAME L. REV. 1183, 1206 (2001) (explaining that "the click of a mouse is extremely casual and non-deliberative"). Thus, while the State bears no burden to show that an original signature is the *best* method of verifying information provided on a voter registration application, or that an original signature is the *most material* information that an applicant could provide for verification purposes, the district court correctly concluded that an original signature is qualitatively different from the digital signature that, according to Plaintiffs, applicants are entitled to place on their applications.

Nonetheless, despite their reliability and ubiquity, Plaintiffs suggest that original signatures are immaterial because "Defendants accept electronic and digital signatures from some, but not all, Floridians." DE 101 ¶ 51. It is true that Florida accepts a "digital signature transmitted by" the DHSMV. § 97.053(5)(a)8., Fla. Stat. But the DHSMV creates that digital signature based on the original signature the person provides when applying for a driver's license, *id.* § 322.142(1), (4), and *only after* the person establishes compliance with a long list of eligibility criteria, such as proof of identity, social security, and residence, *id.* § 322.08(2). As this Court noted in *Browning*, "[the Materiality Provision] does not establish a least-restrictive-alternative test for voter registration applications." 522 F.3d at 1175. Thus, the fact that electronic signatures are accepted in certain circumstances does not render the original signature requirement immaterial.

The district court got it right. Plaintiffs cannot show that an original signature is immaterial to determining whether applicants are qualified to vote. And without that showing, the Amended Complaint fails to state a claim.

### B. The Materiality Provision does not deny Florida a choice of the means by which it obtains admittedly material information on voter registration applications.

The parties do not dispute that signatures on voter registration applications provide material information. Indeed, Plaintiffs acknowledge their materiality. *See* DE 101 ¶ 35 ("Plaintiffs do not through this action challenge the general requirement that an applicant must sign their application form."); Br. at 6–7. Florida law requires applicants to sign their applications to swear or affirm that all information contained in the applications – information needed to determine an applicant's qualifications – is true. § 97.052(2)(q), Fla. Stat. (requiring signature "under penalty for false swearing" by which the person "subscribes to the oath required by s. 3, Art. VI of the [Florida] Constitution . . . and swears or affirms that the information contained in the registration application is true"). Thus, the question is not whether signatures are material – they are – but whether the Materiality Provision prevents States from choosing how to secure that material information. It does not.

While the Materiality Provision forbids States from "disqualify[ing] a potential voter because of his or her failure to provide unnecessary information on a voting application," *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), it does not prohibit them from exercising their discretion to prescribe the form used to obtain material

17

information, *Ritter v. Migliori*, 142 S. Ct. 1824, 1826 (2022) (Alito, J., dissenting from denial of application for stay) (explaining that the Materiality Provision "does not address" whether a State's voter-qualification requirements serve an important interest, and "leaves it to the States to decide which voting rules should be mandatory"). Nor does it entitle each applicant to decide whether he or she will make the oath or affirmation by original signature, digital signature, or stamped signature – or any other method of the applicant's choosing.

States may develop their own forms to gather material information, 52 U.S.C. § 20505(a)(2), which "does not alter the materiality of the information itself," *Browning*, 522 F.3d at 1174 n.21; *see Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) (per curiam) ("[The] Federal Constitution gives States, not federal courts, the ability to choose among many permissible options when designing elections, and courts do not lightly tamper with that authority." (internal marks omitted)). And courts "must give weight to a state legislature's judgment when it has created evenhanded restrictions that protect the integrity and reliability of the electoral process." *Callanen* II, 89 F.4th at 471 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (plurality opinion)).

For example, in *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211–14 (S.D. Fla. 2006), the court upheld a requirement that voter-registration applicants check a box to affirm their citizenship. It did not invalidate that provision simply because some applicants might prefer to present naturalization papers to prove their citizenship. Similarly, in

*Howlette*, 485 F. Supp. at 22–23, the court affirmed a requirement that petition signatures be notarized to ensure that the signers were real people. Again, the court did not strike the notarization requirement simply because a signer might prefer to produce a passport to prove his identity. And in *Browning*, because the identification numbers were material to the State's efforts to identify applicants, it did not matter that some applicants might have preferred to prove their identities by presenting military IDs or passports. *Id.* at 1174–75. That the same information might have been provided by other means did not render the information the State requested immaterial.

Florida has chosen its approved methods and chooses not to use Plaintiffs' preferred methods. *See* § 97.052, Fla. Stat.; *see also Browning*, 522 F.3d at 1174–75 (explaining that the Materiality Provision "refers to . . . the nature of the underlying information requested" and not "the nature of the error"). The State need not prove that its methods are the best or only methods. As *Browning* made clear, the Materiality Provision neither permits nor requires courts to second-guess the merits of different methods of securing admittedly material information. 522 F.3d at 1175. It is enough that an original signature provides material information – even if other methods would too.

There are good reasons for the State's choice. In addition to the cautionary function that original signatures perform, *see supra* Part I(A), the State relies on signature comparisons to confirm the identities of voters who cast vote-by-mail ballots, § 101.68(2)(c)1., Fla. Stat., or provisional ballots, *id.* § 101.048(2)(b)1., and voters who

19

designate others to take possession of their vote-by-mail ballots from election officials, *id.* § 101.62(4)(c)4. The Legislature could reasonably have concluded that an original signature facilitates these verifications better than a stamped signature or a digital signature of poor quality.

The Materiality Provision was intended to do away with requirements that unjustly denied the ballot to eligible voters – such as a requirement to calculate the number of days and months in a voter's age, *Browning,* 522 F.3d at 1173, or to spell "Louisiana," *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024). It was not intended to deny States the freedom to ask applicants to sign their applications – even by hand. Because the Materiality Provision does not prohibit States from dictating how applicants provide material information, Plaintiffs cannot state a claim under that provision based on their dissatisfaction with the State's choice.

C.  The original signature requirement does not deny an individual the right to vote.

Plaintiffs do not state a claim for the additional reason that they cannot plead sufficient facts to show that the original signature requirement denies any individual the right to vote.

The Materiality Provision provides that government officials cannot "deny the right of any individual to vote" based on errors or omissions that are not material to determining whether the individual is qualified to vote. 52 U.S.C. § 10101(a)(2)(B).

20

Thus, to prove a violation, Plaintiffs must show that (1) the challenged requirement had "the effect of 'deny[ing]' an individual 'the right to vote,'" and (2) the "error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from denial of application for stay) (quoting 52 U.S.C. § 10101(a)(2)(B)).

As the Fifth Circuit noted regarding a similar requirement, "one strains to see how [the original signature requirement] burdens voting at all." *Callanen* I, 39 F.4th at 308 ("The wet signature requirement does not burden the right to vote in toto, it only affects the small subset of voter registration applicants that elect to register via fax. And even for those applicants, the burden is small."); *see Lemons*, 538 F.3d at 1104 (holding that a system analyzing voters' signatures imposed "only a minimal burden").

To the extent it imposes any burden, the Supreme Court has instructed courts to focus on the difficulty of complying with the law, rather than the potential consequences for failure to comply. In *Crawford*, for example, the Court upheld a voter ID law, even though it could disenfranchise those without photo identification, because producing a photo identification was not a severe burden on the right to vote. 553 U.S. at 198–200. Similarly, the Sixth Circuit upheld a cut-off date for requesting absentee ballots, despite the possibility of disenfranchising voters who miss the deadline, because the burden of timely requesting an absentee ballot is "minimal." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). So too here. Any burden of complying with the original signature requirement is minimal.

21

Moreover, the Court would have to stack assumption upon assumption to find that the original signature requirement denies the right to vote. Take, for example, the NAACP's allegations. They say that the requirement "threatens to deny members of the Florida Alliance and NAACP the opportunity to vote" and burdens their ability to register to vote because "[s]ome members" "lack easy access to a printer or may otherwise have difficulty printing, signing, and returning a voter registration application." DE 101 ¶ 27. Plaintiffs identify no such member and do not explain how the alleged lack of access to a printer prevents members from stopping by a Supervisor's office – or even a Walmart – to pick up and fill out a voter registration application. *See* § 97.052(1)(b), Fla. Stat. (requiring Florida's Division of Elections to disseminate voter-registration applications). Nor do they allege that a Supervisor has ever refused to allow an applicant to cure any deficiencies. *See id.* § 97.073(1) (requiring Supervisor to notify each applicant whether an application "is incomplete" and to request that those with incomplete applications "supply the missing information"). And failure to follow the rules of a chosen registration method "constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from denial of stay application); *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) ("Casting a vote . . . requires compliance with certain rules.").

D. <u>The original signature requirement is *per se* material to determining whether an individual is qualified to vote.</u>

Federal law also recognizes that signatures are material to determining an applicant's qualifications to vote. The NVRA requires the federal government to create a *federal* mail-in voter registration forms with "information necessary to enable the appropriate State election official to assess the eligibility of the applicant," including "the *signature* of the applicant." 52 U.S.C. § 20508(b)(1) (emphasis added). The NVRA also provides that this form "*shall* include a statement that" "*requires* the signature of the applicant, *under penalty of perjury*," *id.* § 20508(b)(2) (emphasis added), in lieu of "any requirement for notarization or other formal authentication," *id.* § 20508(b)(3). States may develop their own forms, provided they meet the NVRA's criteria – including the signature requirement. *Id.* § 20505(a)(2). If federal law elevates the status of a signature provided under penalty of perjury to a necessary requirement to assess eligibility, it strains credulity to argue that a state law requiring the same is "not material in determining whether [the] individual is qualified" to vote. 52 U.S.C. § 10101(a)(2)(B).

This Court's decision in *Browning* supports that commonsense notion. In *Browning*, plaintiffs challenged a statute under the Materiality Provision that required those registering to vote to disclose their Florida driver's license or identification card numbers or the last four digits of their social security numbers. 522 F.3d at 1174. This Court held that "because Congress required" the disclosure of the same information

under another federal statute, the Help America Vote Act, the information was "per se material" to determining eligibility. *Id.*

Put another way, if Congress requires applicants to provide certain information, then that information is material to establishing voter eligibility when States require it on their applications. Or as this Court put it: "because Congress required [a voter's identification numbers] to be on voter registration applications, they are *per se* material under § 1971(a)(2)(B)." *Id.* "Congress would [not] mandate the gathering of information . . . that it also deems immaterial." *Id.*

The same is true here. Congress has made clear that it deems an applicant's signature (under penalty of perjury) material to determining his or her eligibility to vote. Florida's requirement to gather the same information (under penalty of false swearing) is therefore *per se* material. *Id.*; *cf. Callanen* I, 39 F.4th at 307 (making similar point by referencing two provisions of Texas law); *Callanen* II, 89 F.4th at 489 (finding Texas's almost identical original signature requirement material because it helps "assur[e] the identity of the registrant" and "an original signature advances voter integrity," which together "makes such a signature a material requirement"); *Org. for Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2021 WL 1318011, at *5 (W.D. Mo. Mar. 9, 2021) (finding a signature to be material).[3] Plaintiffs cannot simultaneously contend that the

---

[3] Moreover, even if the state and federal signature requirements were different, this Court made clear in *Browning* that differences in the State's procedure for authenticating

NVRA's signature requirement is material to determining voter eligibility while arguing that Florida's version is not. *See Callanen* I, 39 F.4th at 307 ("[T]he text of [Texas law] suggest[s] that the general requirement that an application be 'signed by the applicant' is no more or less material under [the Materiality Provision] than the requirement that an application submitted by fax be 'in accordance with' the wet signature requirement. In short, the two requirements fall or stand together under [the Materiality Provision]. Vote.org cannot logically maintain that the one is valid and the other not.").

## II. Plaintiffs Do Not Have Standing To Challenge The Original Signature Requirement.

Federal courts resolve cases or controversies. Art. III, § 2, U.S. Const. "To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements," namely "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). When, as here, "plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Id.*

Standing, however, is not dispensed "in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343 (1996)). In a case with multiple plaintiffs, at least one must establish standing "for each claim . . . and for each form of

---

signatures "do[ ] not alter the materiality of the information itself." 522 F.3d at 1174 n.21.

relief that is sought." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019)

(quoting *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017)). "That a plaintiff

has standing to bring one claim does not save another claim for which he does not."

*Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1356 (11th Cir. 2021).

Plaintiffs asserting the legal rights or interests of absent third parties must

demonstrate third-party, or *prudential*, standing. *Lexmark Int'l, Inc. v. Static Control

Components, Inc.*, 572 U.S. 118, 126 (2014). And Plaintiffs suing under Section 1983 must

also show that they are intended beneficiaries of the statute the Plaintiffs seek to

enforce. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005).

A.  Plaintiffs do not establish associational or organizational standing.

Because Plaintiffs are organizations, they must establish their injury in fact in one

of two ways: "(1) through [their] members (i.e., associational standing)" or "(2) through

[their] own injury in fact that satisfies the traceability and redressability elements." *Ga.

Ass'n of Latino Elected Offs. v. Gwinnett Cnty. Bd. of Registration & Elections (GALEO)*, 36

F.4th 1100, 1114 (11th Cir. 2022).

An organization has *associational standing* "when [its] members would otherwise

have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit." *Browning*, 522 F.3d at 1160.

Thus, for an organization to have associational standing, "[a]t least one member of the

association must meet the standing requirements." *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005).

*Organizational standing*, on the other hand, requires the plaintiff to allege "actual present harm" or "threat of imminent harm" to the entity itself. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 638 (11th Cir. 2023). Such allegations typically rely on a diversion of resources theory. *Jacobson*, 974 F.3d at 1250. Under this theory, an organization suffers actual harm "if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* (quoting *Browning*, 522 F.3d at 1165). But to have standing under this theory, organizations must allege not only where they are diverting resources from and what they are diverting resources to, but also how the diversion differs from their usual course of conduct. *Id.*

1. *Plaintiffs do not have associational standing because they do not identify a single member that would have standing to sue in his own right.*

Three of the four Plaintiffs assert associational standing. Each fails.

**A.** Vote.Org does not claim to have members. DE 101 ¶¶ 11–12. Thus, it cannot rely on associational standing. *Jacobson*, 974 F.3d at 1249 ("[F]ive of the six organizations failed to even allege, much less prove, that they have any members . . . That failure is fatal to their associational standing.").

**B**. Florida Alliance and NAACP claim to have "tens of thousands" and "12,000" members, respectively, DE 101, ¶¶ 15, 17, but neither identifies a single member that

has been, or will be, denied the right to vote because of the original signature requirement. Rather, they allege that their "members" will be unduly burdened if forced to "physically sign an application form with wet ink," find a "printer," and otherwise be exposed to "multiple points of failure or delay." DE 101 ¶¶ 16, 27. Abstract claims of harm to unnamed, unknown people do not create associational standing because organizational plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

Plaintiffs acknowledge this requirement. Br. at 17 ("[O]rganizational plaintiffs need only establish that at least one member faces a realistic danger of suffering an injury." (quoting *Schalamar Creek Mobile Homeowner's Ass'n, Inc. v. Adler*, 855 F. App'x 546, 552 (11th Cir. 2021) (internal marks omitted))). But they insist that the member "does not need to be specifically identified." Br. at 17.

Not so. The Supreme Court "require[s] plaintiffs claiming organizational standing to identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 498. This Court has dismissed organizational plaintiffs that "fail[] to allege that a specific member will be injured." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992) (holding organization lacked standing because it failed to "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected"). *Jacobson*, 974 F.3d at 1245 (plaintiff organization lacked standing because it "failed to

28

identify any of its members, much less one who will be injured"). And this Court made clear in *Georgia Republican Party* that its previous decisions "[ha]d not relax[ed] the requirement that an organization name at least one member who can establish an actual or imminent injury." 888 F.3d at 1204.

Florida Alliance and the NAACP do not attempt to identify even one injured member. Thus, both lack associational standing. *Cf. S. River Watershed All., Inc. v. Dekalb County*, 69 F.4th 809, 820 (11th Cir. 2023) (organization had associational standing because it "identif[ied] one specific member, plaintiff Echols, who ha[d] suffered a cognizable injury").

Plaintiffs also suggest that Florida Alliance and the NAACP have standing because it is likely that the original signature requirement will harm at least one of their members. Br. at 17. Plaintiffs cite *Browning*, where this Court affirmed an organization's associational standing even though the organization did not identify a member that suffered harm, because "[g]iven that the [Plaintiffs] collectively claim around 20,000 members state-wide, it is highly unlikely . . . that not a single member will have his or her application rejected due to [the challenged statute]." 522 F.3d at 1160. But this Court has recognized that "[s]ince *Browning*, the Supreme Court has rejected [this] probabilistic analysis as a basis for conferring standing." *Ga. Republican Party*, 888 F.3d at 1204; *see also Summers*, 555 U.S. at 498–99 ("This requirement of naming the affected members has never been dispensed with in light of statistical probabilities . . . ."). That is because "probabilistic standing ignores the requirement that organizations must 'make specific

29

allegations establishing that at least one identified member had suffered or would suffer harm.'" *Ga. Republican Party*, 888 F.3d at 1204 (quoting *Summers*, 555 U.S. at 498); *see also Summers*, 555 U.S. at 497 (rejecting this "hitherto unheard-of test" because it "would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm").

Standing "is not an 'ingenious academic exercise in the conceivable'" but rather requires "a factual showing of perceptible harm." *Summers*, 555 U.S. at 499 (quoting *Lujan*, 504 U.S. at 566). Florida Alliance and the NAACP do not have standing simply because "there is a statistical probability that some of [their] members are threatened with concrete injury." *Ga. Republican Party,* 888 F.3d at 1204 (quoting *Summers*, 555 U.S. at 497); *see also Jacobson*, 974 F.3d at 1249 (rejecting theory of associational standing based on statistical probability).

Even if they specifically identified one of their members, Florida Alliance and NAACP would still lack standing because they do not plausibly allege that the original signature requirement has harmed or will harm one of those members. They claim that the original signature requirement "threatens to deny members of Florida Alliance and NAACP the opportunity to vote" because "[s]ome members of these organizations lack easy access to a printer or may otherwise have difficulty printing, signing, and returning a voter registration application." DE 101 ¶ 27. But "plaintiff[s] alleging a threat of harm do[ ] not have Article III standing unless the hypothetical harm alleged is either

'certainly impending' or there is a 'substantial risk' of such harm." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). A harm is substantially likely to occur if it "pose[s] a realistic danger" and is neither "hypothetical [n]or conjectural." *Browning*, 522 F.3d at 1161; *see Ga. Republican Party*, 888 F.3d at 1204 (finding that even if "it is certainly possible – perhaps even likely – that one individual will suffer an injury from [the challenged rule], that speculation does not suffice"). In other words, "[a]llegations of *possible* future injury" do not "constitute injury in fact. *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original).

Florida Alliance and the NAACP's allegations, however, do not demonstrate that the threat of the original signature requirement denying their members' right to vote is either "realistic" or "certainly impending" because they do not allege that the provision even applies to their members. Applicants may register to vote either at the DHSMV (with a Florida driver's license or identification number or a social security number) or online (with a Florida driver's license or identification number) using a digital signature on file with the DHSMV. §§ 97.0525, 97.057(2)(b)1.c., Fla. Stat.

This means the original signature requirement would not apply to any Florida Alliance or NAACP member – and cannot deny his or her right to vote – unless the member did not have a Florida driver's license or identification number or a social security number. Plaintiffs do not identify such a person. *See* DE 101 ¶¶ 15–22, 27–28. Thus, their allegations offer nothing more than speculative and "hypothetical harm."

*See Tsao*, 986 F.3d at 1339. And this Court has "held many times that a plaintiff fail[s] to establish an injury in fact when the likelihood of future constitutional injury was too speculative." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1233 (11th Cir. 2019); *see also City of S. Miami*, 65 F.4th at 637 (plaintiffs challenging statute outlawing sanctuary city policies did not have standing because their argument "rest[ed] on speculation about the decisions of independent actors"); *Corbett*, 930 F.3d at 1236 (holding frequent flyer did not have standing to challenge TSA's airport security measures because "it's entirely too speculative to assume [plaintiff] would be subjected to TSA's new policy in an unconstitutional manner"); *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1268 (11th Cir. 2018) (students challenging policy for using chemical spray did not have standing because the "likelihood of future constitutional injury [was] too speculative"); *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (protestors challenging Secret Service policy of relocating protestors did not have standing because it was "entirely conjectural that President Bush would return to speak at a political rally [near them]").[4]

---

[4] *See also Clapper*, 568 U.S. at 401 (intelligence professionals alleging injury from the federal government intercepting their communications under a federal statute lacked standing because they "merely speculate[d] and ma[de] assumptions about whether their communications with their foreign contacts w[ould] be acquired"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (plaintiff seeking to enjoin law enforcement from using a specific chokehold technique did not have standing because "it is surely no more than speculation to assert either that [plaintiff] will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of [the] chokehold").

**C**. DRF, on the other hand, alleges that it is a nonprofit "designated as Florida's federally funded Protection and Advocacy ('P&A') system for individuals with disabilities" and that its "constituents . . . include millions of disabled registered voters throughout the state, as well as disabled Floridians who are not yet registered to vote." DE 101 ¶ 23. DRF claims it has standing to sue on behalf of its constituents because the Protection and Advocacy of Individual Rights ("PAIR") Act, 29 U.S.C. § 794e, authorizes it, "as Florida's designated P&A system," to "pursue legal, administrative, and other appropriate remedies to ensure the protection of and advocacy for the rights of individuals with disabilities." *Id.* ¶ 24.[5]

There are two problems with this claim. First, DRF's constituents are not "members" for purposes of associational standing. The Supreme Court established in *Hunt v. Washington State Apple Advertising Commission* that non-membership advocacy organizations do not have associational standing unless their "constituents" possess "indicia of membership" such that the organization "[r]epresent[s] the [constituents] and provide[s] the means by which they express their collective views and protect their collective interests." 432 U.S. 333, 344 (1977). Specifically, the Court determined that the constituents in *Hunt* – apple growers and dealers – possessed these indicia because "they alone elect the members of the Commission; they alone may serve on the

---

[5] DRF claims it has standing under 42 U.S.C. § 15043 for the same reason.

Commission; they alone finance its activities . . . through assessments levied upon them." *Id.*

Applying this test, this Court in *Doe v. Stincer* held that a P&A system's constituents – individuals with mental illnesses – similarly "possess[ed] the means to influence the priorities and activities the [organization] undertakes" because the statute creating the organization requires that it (1) "include individuals who have received or are receiving mental health services and family members of such individuals," (2) establish "advisory councils, sixty percent of whose membership as well as the chair of the council must be comprised of individuals who have received or are receiving mental health services," and (3) "establish a grievance procedure for clients and prospective clients to assure that individuals with mental illness have full access to the services of the system." 175 F.3d 879, 886 (11th Cir. 1999).

Here, DRF does not allege that its constituents possess any of these "indicia of membership." *See* DE 101 ¶¶ 23–26. Thus, it does not have associational standing to assert claims on their behalf.

Second, even if DRF alleged the required indicia, it still lacks associational standing because it does not demonstrate that its constituents "would otherwise have standing to sue in their own right." *See Hunt*, 432 U.S. at 343; *Doe*, 175 F.3d at 886 ("The right to sue on behalf of its constituents, however, does not relieve the [organization] of its obligation to satisfy *Hunt*'s first prong by showing that one of its constituents otherwise had standing."). Indeed, in *Doe*, this Court determined that even though the

constituents of a similar P&A system bore the "indicia of membership," the organization lacked associational standing because it did not "show that any of its [constituents] suffered a concrete injury." 175 F.3d at 887.

DRF's allegations fail for the same reason. It claims that "some of [its] constituents are unhoused, lack stable housing, do not drive, or lack easy access to transportation." DE 101 ¶ 23. It neither identifies them nor alleges that any "ha[s] suffered or would suffer [imminent] harm." *Summers*, 555 U.S. at 498.[6] For each of those reasons, it too lacks associational standing. *See, e.g.*, *id.* at 496 (first reason); *Lujan*, 504 U.S. at 564 (second reason); *cf. Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1378 (N.D. Fla. 2021) (finding DRF had associational standing to challenge absence of interpreters during emergency press briefings because it plausibly alleged that its members planned to watch, and would not be able to understand, future briefings).

> 2. *Plaintiffs do not have organizational standing because they do not allege where they are diverting their resources from, to what they are diverting those resources, and how the diversion differs from their usual course of conduct.*

Plaintiffs' diversion of resources arguments for organizational standing fare no better.

**A.** Vote.Org alleges that it has developed a "web application that allows prospective registrants nationwide to see if they are already registered, and if not, to

---

[6] DRF's allegations, even if they suggested future harm, would still be speculative and hypothetical because they do not demonstrate that any of its constituents lack a Florida driver's license number, Florida identification number, or social security number. *See supra* at p. 31.

register to vote." DE 101 ¶ 12. It explains that it has "invested significant resources in developing an e-signature function of its web application to help voters complete their registration forms" and "would like to offer [its product] to Florida citizens." *Id.* ¶ 13.

These allegations do not establish organizational standing. Vote.Org is simply identifying a software platform it has invested in and would expand to Florida, but for the original signature requirement. It does not allege that it has spent resources to counteract the effects of that requirement. Losing out on a business opportunity is not diversion of resources to "comba[t] the effects of the defendant's alleged conduct." *Jacobson*, 974 F.3d at 1250.

Vote.Org also does not allege *from where* it is diverting its resources to comply with the statutory requirement. *See GALEO*, 36 F.4th at 1113 ("[A]n organizational plaintiff must explain where it would have to 'divert resources away *from* in order to spend additional resources on combating' the effects of the defendant's alleged conduct." (quoting *Jacobson*, 974 F.3d at 1250) (emphasis in *Jacobson*)). Rather, it simply claims that because the original signature requirement prohibits using its product, it "must devote resources to alternative registration efforts in Florida that otherwise would be used for absentee ballot and [get-out-the-vote] projects in Florida and elsewhere." DE 101 ¶ 13. That is not enough. *See Jacobson*, 974 F.3d at 1250.

Vote.Org also notes that, "in states that require wet signatures," it "prints and mails the registrant their completed application form to sign and mail to their election official," which "requires significant resources." DE 101 ¶ 14. But it does not allege

that it offers that program in Florida or that it undertakes either activity to comply with the original signature requirement or "to combat[] the effects of the defendants' alleged conduct." *GALEO*, 36 F.4th at 1113; *cf. Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (NAACP had standing to challenge voter ID law because it alleged that it "divert[ed] resources from its regular activities to educate and assist voters in complying with" the law).

Last, to the extent Vote.Org diverted any resources, those costs did not "impair" its mission because they are part of its usual operating costs. Vote.Org alleges that it "uses technology to simplify political engagement, increase voter turnout, and strengthen American democracy." DE 101 ¶ 11. Thus, "invest[ing] significant resources in developing an e-signature function of [a] web application to help voters complete their registration forms" is Vote.Org's day-to-day work, *id.* ¶ 13, not a diversion of resources away from that work. Organizations "cannot convert ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

**B.** NAACP similarly alleges that it "divert[ed] time, money, and resources away from other activities, such as programming and initiatives concerning educational inequities, the school-to-prison pipeline, and mass incarceration" to "help[] registrants who cannot use Florida's other methods of registration to print, sign, and physically return their voter registration applications." DE 101 ¶ 21. But, again, NAACP does not "explain where it would have to divert resources away *from*." *GALEO*, 36 F.4th at 1114

37

(internal marks omitted). It simply claims that it must divert resources away "from other activities, such as programming and initiatives." DE 101 ¶ 21. Again, this is not enough.

In cases where this Court has found standing under a diversion of resources theory, the organizational plaintiffs identified specific projects or activities they ended, or otherwise would have conducted, but for the diversion. For example, in *GALEO*, this Court found that a voter registration organization had standing because it alleged that it diverted its resources from its "civic engagement, voter registration and get out the vote work" to "educat[ing] [limited-English proficient,] Spanish-speaking voters about how to navigate the mail voting process and how to complete the application." 36 F.4th at 1115 ("GALEO staff members . . . are assisting [limited-English proficient] voters who received English-only applications . . . with navigating the absentee voting process.").

The plaintiffs there specifically alleged which projects they were forced to cancel, or were unable to undertake, after they diverted their resources to counteract the challenged law – e.g., voter registration and "get[ting] out the vote work." *Id.*

The same is true in *Common Cause/Georgia* and *Browning*. In *Common Cause/Georgia*, plaintiffs alleged that they "divert[ed] volunteers and resources from getting voters to the polls to helping them obtain acceptable photo identification." 554 F.3d at 1350 (cleaned up). In *Browning*, the plaintiffs "averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by [the challenged law's] enforcement," including that they diverted "personnel and time" from

"registration drives and election-day" activities to "educating" "voters on compliance with" new voting rules. 522 F.3d at 1166; *see also Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (immigration organization had standing because it alleged that it "cancelled citizenship classes to focus" its "volunteer time and resources to educating affected members of the community and fielding inquiries" about the challenged law).

Here, on the other hand, as the district court noted, NAACP simply identified its "specific Florida NAACP projects and programs," noted that "Florida NAACP has limited resources," and alleged that its "resources and effort expended in one area necessarily detract from the resources and effort available for Florida NAACP to direct to others." DE 140 at 5. But if an organization could show standing simply by identifying projects it undertakes and alleging that it has finite resources, then practically every organizational plaintiff would have organizational standing in every case. *Cf. Callanen* II, 89 F.4th at 471 (Vote.Org sufficiently alleged diversion of resources because it "provided substantial evidence that, because of the requirement for original signatures, it had to expend additional time beyond the routine activities of multiple departments and divert resources away from particular projects" (internal marks omitted)).

NAACP's allegations that it diverts resources to "engage in additional door-to-door canvassing activities to ensure that potential voters who cannot register online and lack easy access to printers are registered" also do not establish its standing. DE 101

¶ 22. Organizations must demonstrate that the "defendant's illegal acts impair[ed] [their] ability to engage in [their] projects by forcing the organization to divert resources to counteract those illegal acts." *Ga. Republican Party,* 888 F.3d at 1203 (quoting *Ga. Latino Alliance for Hum. Rts.*, 691 F.3d at 1259–60); *see Nat'l Taxpayers Union,* 68 F.3d at 1434 (finding plaintiff did not have standing because challenged statute "has not forced [plaintiff] to expend resources in a manner that keeps [it] from pursuing its true purpose of monitoring the government's revenue practices").

But registering voters *is* one of NAACP's "true purpose[s]." *See Nat'l Taxpayers Union,* 68 F.3d at 1434. Indeed, it alleges that "[f]or decades, the Florida NAACP has engaged heavily in registration" to "encourage civic and electoral participation among its members and other voters." DE 101 ¶ 18. Specifically, NAACP "register[s] voters by holding registration events in coordination with local partners" and "work[ing] with churches and other faith-based organizations to register voters." *Id.* ¶ 19. Investing its resources to help citizens register did not divert resources from the NAACP's work – that is its work. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (dismissing case for lack of organizational standing where plaintiffs "ha[d] not explained how the activities described above, which basically boil down to examining and communicating about developments in local zoning and subdivision ordinances, differ from the [plaintiff's] routine lobbying activities"). And these activities certainly did not "perceptibly impair[]" its "mission" to "ensure the political, social, educational, and economic quality of all persons, and to eliminate race-based discrimination." DE 101

¶ 17. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) (finding plaintiffs had standing because defendant's practices "perceptibly impaired the plaintiff's ability to provide counseling and referral services for low- and moderate-income homeseekers").

Moreover, alleging diversion of resources – even properly – does not establish standing without more. Instead, an organizational plaintiff must demonstrate "both that it has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *City of S. Miami*, 65 F.4th at 638–39 (emphasis added). In other words, "to establish an injury based on resource diversion, an organization must 'present . . . concrete evidence to substantiate [its] fears,' not commit resources based on 'mere conjecture about possible governmental actions.'" *Id.* at 639 (quoting *Clapper*, 568 U.S. at 420).

In cases where this Court has found standing under diversion of resources, the plaintiff alleged concrete harm to an identifiable community – not speculative fears of future harm. For instance, in *Georgia Latino Alliance for Human Rights*, the plaintiff organizations diverted their volunteers from teaching citizenship classes to educating their members about how to deal with a new immigration law. 691 F.3d at 1260. The Court held this diversion was a concrete injury because the members faced a "credible threat of detention" under the new immigration law, which "forc[ed]" the organizations to divert their resources to protect them from this imminent harm. *Id.* at 1258 & 1260.

Recall that the original signature requirement would be required only for those eligible citizens without a Florida driver's license number, Florida identification number, or a social security number because those with this information can register online or at the DHSMV. *See supra* at p. 31. The NAACP, however, does not identify such a person. DE 101 ¶¶ 17–22, 27–28. Thus, it does not plausibly allege that its members face a credible threat of being forced to provide an original signature when registering to vote – much less that doing so threatens to deny their right to vote.

Instead, the NAACP simply alleges that it diverted its resources to address "fears of hypothetical future harm that is not certainly impending" – i.e., the chance that one of its members must provide an original signature because the member cannot register online or at the DHSMV. *City of S. Miami*, 65 F.4th at 638–39 (quoting *Clapper*, 568 U.S. at 416). In other words, at best, the NAACP's diversion of resources "amount[] to a self-imposed injury 'based on speculative fears of future harm.'" *Id.* at 638 (quoting *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020)). "Speculative harms are no more cognizable dressed up as an organizational injury than as an associational one." *Id.* at 640. And "an organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Id.* at 639 (quoting *Hargett*, 947 F.3d at 982); *see also Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1142 (D.C. Cir. 2011) ("[B]ecause the organization failed to prove an injury from the law's actual application to the community the organization sought to support, any diversion was a 'self-inflicted' injury that could not support standing.").

42

At most, the NAACP alleges "simply a setback to [its] abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379. But a setback does not confer standing. "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *accord Browning*, 522 F.3d at 1166 (upholding standing because, "[i]nstead of 'abstract social interests,' the plaintiffs have averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by Subsection 6's enforcement").

**C**. Florida Alliance and DRF's allegations, to the extent they allege diversion of resources, fail for the same reasons. Florida Alliance does not allege that it diverted resources to counteract the original signature requirement. DE 101 ¶¶ 15–16; *see Ga. Republican Party,* 888 F.3d at 1203 ("Because the [plaintiff] offers no facts whatsoever to support [a diversion of resources] theory, it necessarily fails."). And DRF simply alleges that "[e]ducating and assisting its constituents and other Florida voters who have difficulty registering to vote because of the Wet Signature Requirement will force DRF to divert time, money, and resources away from its other activities." DE 101 ¶¶ 26. Such allegations neither "explain where it would have to divert resources away from . . . to comba[t] the effects of the [original signature requirement]," *GALEO*, 36 F.4th at 1113, nor demonstrate how the original signature requirement prevented it from "pursuing its true purpose," *Nat'l Taxpayers Union*, 68 F.3d at 1434. Thus, they do not establish organizational standing.

B. <u>Plaintiffs do not establish prudential standing to challenge the Materiality Provision on behalf of third parties.</u>

Even if Plaintiffs alleged Article III standing, they failed to plead prudential standing to challenge the Materiality Provision on behalf of third parties. The "prudential branch" of the Supreme Court's standing precedent bars federal courts from entertaining suits that seek to vindicate the rights of absent third parties. *Lexmark*, 572 U.S. at 126 (2014). A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Plaintiffs may establish third-party standing by making "two additional showings": (1) the plaintiff "has a 'close' relationship with the person who possesses the right," and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).[7]

The Materiality Provision provides that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an [immaterial] error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). This Court has explained that the "focus" of that language is "the protection of each individual's right

---

[7] The district court found that the Defendants "argued with some force that the court should dismiss on prudential grounds," but ultimately found it unnecessary to decide whether Plaintiffs had alleged prudential standing. DE 140 at 9.

to vote." *Schwier*, 340 F.3d at 1297. Thus, the Materiality Provision's intended beneficiary class is clear – it protects actual voters.

Plaintiffs, however, are advocacy organizations that have no right to vote. Moreover, as discussed, they do not sufficiently allege that the original signature requirement would deny any of their members the right to vote. Thus, Plaintiffs' claims clearly rest on the rights of third parties – i.e., persons eligible to vote in Florida. *See* DE 101 ¶¶ 35, 38, & 42. As the Fifth Circuit concluded when reviewing Vote.Org's claim under the Materiality Provision against Texas's similar "wet signature" requirement, "Vote.org invokes the rights of Texas voters and not its own – an organization plainly lacks the right to vote." *Callanen* I, 39 F.4th at 303. So too here. None of the Plaintiffs, however, can make either of the required showings.

First, a relationship between a plaintiff and an absent third party is sufficiently close if "the former is fully, or very nearly, as effective a proponent of the right as the latter." *Powers*, 499 U.S. at 413. Exemplary relationships include those between doctors and patients,[8] employers and employees,[9] and vendors and customers.[10] On the other hand, *Kowalski* held that the relationship between criminal defense attorneys and "as yet unascertained . . . criminal defendants who will request, but be denied, the appointment

---

[8] *See June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2118–19 (2020), *abrogated by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

[9] *See Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995).

[10] *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020), *as amended* (Aug. 31, 2020) (collecting cases).

of appellate counsel, based on the operation of the statute" was "no relationship at all." *Kowalski*, 543 U.S. at 130 (internal marks omitted).

In the same way, the third parties with whom Vote.Org will claim a close relationship are "as yet unascertained" Floridians who may someday decide to use its digital platform to register to vote. The same goes for the NAACP – it does not identify its members who have been or will be deterred from registering by the original signature requirement. As for Florida Alliance, the Amended Complaint does not even allege that the organization attempts to help its members register. *See* DE 101 ¶¶ 15–16. Plaintiffs cannot sue under the Materiality Provision simply because they claim an injury from the alleged future denial of someone else's right to register to vote. *Cf. Lexmark*, 572 U.S. at 128 ("Read literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III . . . [T]he unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that [the statute] should not get such an expansive reading." (cleaned up)); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–66 (1992) (concluding that statutory language providing that "[a]ny person injured in his business or property by reason of a violation of [the federal statute] may sue therefor" did not mean that any plaintiff injured "by reason of" the violation could sue).

Courts consider a plaintiff's monetary incentives for asserting a third party's rights when determining whether that plaintiff will advocate as effectively as the third parties themselves. *See, e.g., Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1042

(11th Cir. 2008) (apartment complex's "pursuit of economic damages" gave it a "concrete interest in the outcome of the issue in dispute" that was "sufficient to ensure that it would be an effective advocate"). The Amended Complaint, however, does not allege that Vote.Org or the NAACP charges any fees for the registration tools or assistance they provide. *See Powers*, 499 U.S. at 413. Thus, both are worse off even than the attorneys in *Kowalski*, who at least demonstrated a potential vendor-customer relationship. *Callanen* I, 39 F.4th at 304 ("Vote.org's relationship with prospective users is no closer than the hypothetical attorney-client relationship rejected as insufficiently close to support third-party standing in *Kowalski*.").

Likewise, courts consider "the causal connection between the [plaintiff]'s injury and the violation of the third parties' constitutional rights." *Mata Chorwadi, Inc. v. City of Boynton Beach*, 566 F.4th 1259, 1266 (11th Cir. 2023). When a law imposes a "legal duty" on the plaintiff that necessarily deprives a third party of his or her constitutional rights, the plaintiff may stand in the shoes of the third party. *Id.* Here, however, the original signature requirement imposes no legal duty on Plaintiffs. Rather, it governs how voters register in Florida. *Cf. Craig v. Boren*, 429 U.S. 190, 192–97 (1976) (vendor prohibited from selling beer to males under age 21 had third-party standing to bring equal protection claims on their behalf); *Griswold v. Connecticut*, 381 U.S. 479, 480–81 (1965) (medical providers convicted of prescribing contraceptives had third-party standing to assert the constitutional rights of married couples).

Second, nothing hinders unregistered Floridians allegedly injured by the original signature requirement from protecting their own rights by joining this lawsuit or filing their own. *See Kowalski*, 543 U.S. at 130; *Callanen* I, 39 F.4th at 304 (expressing "no doubt" that voters injured by Texas's original-signature requirement "could protect their rights"). While some of Florida Alliance's and the NAACP's members may not own a printer or drive a vehicle, DE 101 ¶¶ 16, 22, 27, surely those members are no more inhibited than the indigent prisoners in *Kowalski* – whom the Supreme Court determined could advance their own constitutional rights via *pro se* litigation, *Kowalski*, 543 U.S. at 131. *Cf. Singleton v. Wulff*, 428 U.S. 106 (1976) (abortionists established third-party standing where women seeking abortions were hindered from bringing suit by their "desire to protect their privacy and the prospect of mootness").

But even if Plaintiffs had third-party standing based on the public's right to vote, "that does not mean [that they] may invoke that right" by bringing a Section 1983 suit to enforce the Materiality Provision. *Callanen* I, 39 F.4th at 305 n.5. An advocacy organization's "broader . . . interest[]" in voter registration, divorced from any particularized injury, cannot satisfy the "threshold" requirement that a Section 1983 plaintiff "demonstrate that the federal statute [he seeks to enforce] creates an individually enforceable right in the class of beneficiaries to which he belongs." *Rancho Palos Verdes*, 544 U.S. at 119–20. And because Plaintiffs do not belong to the class of beneficiaries in whom the Materiality Provision vests a right, they cannot police alleged violations of the provision through a Section 1983 action.

### III.    Section 1983 Does Not Confer A Private Right Of Action To Enforce The Materiality Provision.

To bring a Section 1983 claim challenging a violation of federal law, Plaintiffs must demonstrate that the federal statute "manifests an intent to create not just a private *right* but also a private *remedy*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quotations omitted). The Materiality Provision includes no such intent.

The Attorney General may bring an enforcement action when "any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice" that would violate the Materiality Provision. 52 U.S.C. § 10101(c). Public enforcement by the Attorney General is supplemented by a limited private remedy that provides every person of the disadvantaged race "within the affected area" the right to seek a federal-court judgment "declaring him qualified to vote" if the Attorney General prevails in an enforcement action and proves that vote denial occurred "on account of race or color" and "pursuant to a pattern or practice." 52 U.S.C. § 10101(e).

Subsection (e)'s private remedy is narrower than that available under Section 1983 in most respects, and it is qualitatively distinct in a way that renders Section 10101 "fundamentally incompatible" with the private remedy offered by Section 1983. *Rancho Palos Verdes*, 544 U.S. at 129. The existence of a comprehensive, specialized remedial scheme strongly suggests that "Congress intended to preclude" the application of more generalized remedies. *Id.* at 121. And by providing "an express, private means of redress

in the statute itself," Congress indicated that it "did not intend to leave open a more expansive remedy under § 1983." *Id.*[11]

## CONCLUSION

For the reasons stated, this Court should affirm the district court's order dismissing the Amended Complaint.

/s/ *Andy Bardos*

ANDY BARDOS
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
*andy.bardos@gray-robinson.com*

*Counsel for Appellees Supervisors Chris Anderson, James Satcher, Melissa Blazier, Brian Corley, Tommy Doyle, Joyce Griffin, Alan Hays, Leslie Rossway Swan, Leah Valenti, and Wesley Wilcox*

/s/ *Nicholas J.P. Meros*

NICHOLAS J.P. MEROS
*Deputy General Counsel*

EXECUTIVE OFFICE OF THE GOVERNOR
400 S. Monroe Street
Tallahassee, FL 32399
(850) 717-9310
*Nicholas.meros@eog.myflorida.com*

---

[11] Of course, this Court concluded in *Schwier* that private parties may enforce the Materiality Provision via Section 1983. 340 F.3d at 1297. But the Secretary raises this argument to preserve it for *en banc* review to repair, or at least clarify, the existing circuit split on this issue. *See Turquitt v. Jefferson County*, 137 F.3d 1285, 1287 (11th Cir. 1998) (granting en banc review despite controlling circuit precedent).

/s/ *Joseph Van de Bogart*
JOSEPH VAN DE BOGART
*General Counsel*
ASHLEY DAVIS
*Chief Deputy General Counsel*
GENEVIEVE MCNALIS
*Assistant General Counsel*

FLORIDA DEPARTMENT OF STATE
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536
*Joseph.vandebogart@dos.myflorida.com*
*Ashley.davis@dos.myflorida.com*
*Genevieve.mcnalis@dos.fl.gov*

*Counsel for Appellee Secretary Byrd*

## CERTIFICATE OF COMPLIANCE

1.    This motion complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.

2.    This motion complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,289 words.

/s/ *Andy Bardos*
*Counsel for Appellee Supervisors*

## CERTIFICATE OF SERVICE

I certify that on May 15, 2024, I electronically filed this motion with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

/s/ *Andy Bardos*
*Counsel for Appellee Supervisors*