No. 23-13727

# United States Court of Appeals
# for the Eleventh Circuit

DISABILITY RIGHTS FLORIDA, ET AL.,
*Plaintiffs-Appellants,*

v.

SECRETARY, STATE OF FLORIDA, ET AL.,
*Defendants-Appellees,*
and

REPUBLICAN NATIONAL COMMITTEE, ET AL.
*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:23-cv-111 (Winsor, J.)

## BRIEF OF APPELLEES THE REPUBLICAN NATIONAL COMMITTEE AND THE REPUBLICAN PARTY OF PASCO COUNTY

Daniel E. Nordby
Benjamin J. Gibson
Denise M. Harle
SHUTTS & BOWEN, LLP
215 S Monroe St., Ste. 804
Tallahassee, FL 32301
850-241-1717
dnordby@shutts.com
bgibson@shutts.com
dharle@shutts.com

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S Main St., Fl. 5
Salt Lake City, UT 84101
703-243-9423
tyler@consovoymccarthy.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Intervenor-Defendants-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1 to 26.3, Counsel for Intervenor-Defendants-Appellees certify that, in addition those persons identified by Plaintiffs-Appellants and the United States as amicus curiae, the following persons may have an interest in the outcome of this appeal:

1. Fitzpatrick, Martin A., Magistrate Judge

2. Glenton Gilzean, Defendant

3. Harle, Denise, Counsel for Intervenor-Defendants

4. Satcher, James, Defendant

5. Ward, Nina, Defendant

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Tyler R. Green
Counsel for Intervenor-Defendants-Appellees

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The Intervenor-Defendants respectfully request oral argument, as this appeal presents important questions of federal law that will affect elections nationwide.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUE ............................................................. 2

STATEMENT OF THE CASE .............................................................. 2

STANDARD OF REVIEW................................................................... 6

SUMMARY OF THE ARGUMENT .................................................... 6

ARGUMENT .................................................................................... 10

    I.    Original signatures are material in determining voter qualifications. ........... 10

        A.    An original signature is evidence that the applicant is who she says she is.......................................................................... 11

        B.    Original signatures are "material in determining" qualifications because they serve a variety of helpful functions in the registration process. ....................................................... 16

    II.    The materiality provision does not preempt state law. ................................. 22

        A.    Plaintiffs' preemption theory finds no support in the text................. 23

        B.    Plaintiffs' preemption theory finds no support in caselaw................. 25

        C.    Plaintiffs' preemption theory finds no support in historical practice. ..................................................................... 27

    III.    The original-signature requirement does not deny anyone the right to vote.................................................................. 31

CONCLUSION ................................................................................. 35

CERTIFICATE OF COMPLIANCE .................................................. 37

CERTIFICATE OF SERVICE ........................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Alabama v. United States,*
    304 F.2d 583 (5th Cir. 1962) ................................................................. 35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................... 6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................... 6

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) ................................................................... 23, 31

*Brown v. Electrolux Home Prod., Inc.,*
    817 F.3d 1225 (11th Cir. 2016) ........................................................... 25

*Comm. to Impose Term Limits on Ohio Supreme Ct. v. Ohio Ballot Bd.,*
    885 F.3d 443 (6th Cir. 2018) ............................................................... 22

*\*Common Cause v. Thomsen,*
    574 F. Supp. 3d 634 (W.D. Wis. 2021) ............................................... 26

*Condon v. Reno,*
    913 F. Supp. 946 (D.S.C. 1995) .................................................... 28, 29

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ..................................................................11, 15, 21

*EEOC v. Catastrophe Mgmt. Sols.,*
    852 F.3d 1018 (11th Cir. 2016) ........................................................... 16

*\*Fla. State Conf. of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ........... 7, 8, 9, 14, 15, 16, 18, 19, 20, 24, 25, 29, 32, 33

*Hopper v. Solva Pharms., Inc.,*
    588 F.3d 1318 (11th Cir. 2009) ............................................................. 6

*\*Jones v. Jessup,*
    615 S.E.2d 529 (Ga. 2005) .................................................................. 26

*League of Women Voters of Minn. Educ. Fund v. Simon,*
    No. 0:20-cv-1205, 2021 WL 1175234 (D. Minn. Mar. 29, 2021) ................ 22

*\*Liebert v. Millis,*
    No. 3:23-cv-672, 2024 WL 2078216 (W.D. Wis. May 9, 2024) .............. 17, 21, 24, 30

*Martin v. Crittenden,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) .............................................................26

McKay v. Altobello,
    No. 1:96-cv-3458, 1996 WL 635987 (E.D. La. 1996) ..................................29

Migliori v. Cohen,
    36 F.4th 153 (3d Cir. 2022) ............................................................................19

*Org. for Black Struggle v. Ashcroft,
    493 F. Supp. 3d 790 (W.D. Mo. 2020) ..........................................................23

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.,
    97 F.4th 120 (3d Cir. 2024) ........................................ 1, 7, 17, 19, 20, 24, 29, 31

Purcell v. Gonzalez,
    549 U.S. 1 (2006) .............................................................................................21

Ritter v. Migliori,
    143 S. Ct. 297 (2022) .......................................................................................20

Sandifer v. U.S. Steel Corp.,
    571 U.S. 220 (2014) .........................................................................................16

*Schwier v. Cox,
    340 F.3d 1284 (11th Cir. 2003) .........................................................29, 34, 35

*Schwier v. Cox,
    412 F. Supp. 2d 1266 (N.D. Ga. 2005) ...............................................8, 25, 26

*Schwier v. Cox,
    439 F.3d 1285 (11th Cir. 2006) .................................................................8, 26

Thornburg v. Gingles,
    478 U.S. 30 (1986) ...........................................................................................19

United States v. Campbell,
    26 F.4th 860 (11th Cir.) ...................................................................................10

United States v. Ross,
    456 U.S. 798 (1982) .........................................................................................29

Veasey v. Abbott,
    830 F.3d 216 (5th Cir. 2016) ...........................................................................18

*Vote.Org v. Callanen [Vote.Org I],
    39 F.4th 297 (5th Cir. 2022) .................................................1, 17, 18, 20, 31

*Vote.Org v. Callanen [Vote.Org II],
    89 F.4th 459 (5th Cir. 2023) .................... 1, 7, 12, 16, 18, 19, 20, 21, 22, 31

## Statutes

5 U.S.C. §552a (note) ..............................................................................26

*52 U.S.C. §10101 ..........2, 4, 6, 8, 9, 11, 17, 19, 22, 23, 25, 26, 27, 28, 30, 31, 33, 34, 35

Act of June 20, 2005, 2005 Fla. Sess. Law Serv. Ch. 2005-278, §5 ..................32

An Act to Enforce the Constitutional Right to Vote, Pub. L. 88-352,
78 Stat. 241 (July 2, 1964) ..............................................................28

Fla. Stat. §100.361 ..............................................................................4

Fla. Stat. §100.371 ..............................................................................4

Fla. Stat. §104.011 ..............................................................................10

Fla. Stat. §322.051 ..............................................................................12, 13

Fla. Stat. §322.08 ..............................................................................13

*Fla. Stat. §322.142 ..............................................................................2, 3, 12, 13

Fla. Stat. §97.041 ..............................................................................8, 23, 24

Fla. Stat. §97.052 ..............................................................................31, 32

*Fla. Stat. §97.0525 ..............................................................................3, 13, 14

*Fla. Stat. §97.053 ..............................................................................3, 8, 10, 23

Fla. Stat. §97.057 ..............................................................................2, 13

Fla. Stat. §97.073 ..............................................................................31

*Fla. Stat. §98.045 ..............................................................................7, 11, 12, 23

Ga. Code §34-609 ..............................................................................25

## Other Authorities

Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961),
perma.cc/WA4A-QEYK ..............................................................27, 28, 32

H.R. Rep. No. 88-914 (Nov. 20, 1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391 ...........28

IRS, *1040 (and 1040-SR): Instructions* 61 (2022), perma.cc/Z9YR-X2DJ ....................17

*Material*, The Oxford English Dictionary (1961) ..............................................16

*Material*, Webster's Legal Dictionary (1996) ..............................................16, 17

*Material*, Webster's Third New International Dictionary (1976) ..........................16

Misc. Proposals Regarding the C.R. of Persons Within the Jurisdiction of the U.S.:
   Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary,
   88 Cong. 915 (May 8, 1963) (statement of Rep. Peter W. Rodino, Jr.) .....................28

## Rules

Fed. R. Civ. P. 12 ........................................................................................... 6

N. Dist. Fla. Local Rule 5.1(E) ...................................................................17

## Regulations

Fla. Admin. Code r. 1S-2.039 ........................................................................ 3

Fla. Admin. Code r. 1S-2.045 ........................................................................ 4

## Constitutional Provisions

Fla. Const. art. VI, §3 .................................................................................10

Fla. Const. art. VI, §3 (1968) ........................................................................ 4

Fla. Const. art. XIV, §1 (1868) ...................................................................... 4

La. Const. of 1921, art. VIII, §1 ...................................................................27

## INTRODUCTION

This is not the first time that plaintiff Vote.Org has argued that States violate the Civil Rights Act by requiring applicants to actually sign their voter registration forms. Shortly before the district court rejected those arguments, Vote.Org raised them in the Fifth Circuit when defending a preliminary injunction. It lost. *See Vote.Org v. Callanen* [*Vote.Org I*], 39 F.4th 297 (5th Cir. 2022) (staying preliminary injunction). Vote.Org tried again on a direct appeal with a different panel. It lost again. *See Vote.Org v. Callanen* [*Vote.Org II*], 89 F.4th 459 (5th Cir. 2023) (reversing grant of summary judgment). Undeterred, it now tries the same arguments before this Court. These arguments should fail for the fourth time.

"Until recently, the Materiality Provision received little attention from federal appellate courts." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 127 (3d Cir. 2024). That's because, until recently, courts and lawyers understood that the materiality provision does not preempt state law, does not prohibit States from deterring and detecting fraud in the registration process, and does not require that every stroke of an applicant's pen indicate whether a voter is "qualified" to vote. "Until recently," lawyers and courts understood that the materiality provision prohibits state officials from discriminating against voters by imposing arbitrary registration procedures not required by state law. *Id.* The materiality provision is not a preemption statute. It does not supersede state-law registration rules. And it does not permit facial attacks on state law. Plaintiffs' claim fails for all those reasons.

If that weren't enough, Plaintiffs' claim fails for the additional reason that original signatures are material in determining whether an applicant is qualified to vote. Original

signatures help confirm an applicant's identity, and they assure election officials that the applicant reviewed and signed the registration form. The signatures subject applicants to felony penalties for lying on the form. They help deter and detect identity fraud. And they foster public confidence in the electoral process. All of those are legitimate state interests, and they are "material in determining" whether a voter is qualified. 52 U.S.C. §10101(a)(2)(B). For these reasons, the Court should affirm.

## STATEMENT OF THE ISSUE

Whether Appellants have stated a claim that Florida's original-signature requirement for physical voter registration applications violates the Civil Rights Act.

## STATEMENT OF THE CASE

**A.** Florida offers many secure, convenient ways to register to vote. Many Floridians will register as a matter of course when they appear in person to apply for, renew, or update their address on a driver's license or identification card. Fla. Stat. §97.057(1). The Department of Highway Safety and Motor Vehicles transfers the relevant information to a voter registration application, which is used to establish the applicant's eligibility under Florida law. *Id.* §97.057(2)(b). The applicant must then verify the identifying information and provide her "electronic signature" affirming the accuracy of the information. *Id.* §97.057(2)(b)1.c. That "electronic signature" is simply a "digital image" of the applicant's "usual signature" affixed to her driver's license or identification card "in the presence of an authorized agent" of the DMV. *Id.* §322.142.

Those who wish to avoid the DMV can register at home, at work, at the library, or anywhere else they can access the internet. Once online, they go to www.registertovoteflorida.gov, which accesses the Florida Online Voter Registration

System. *Id.* §97.0525; Fla. Admin. Code r. 1S-2.039(2)(c). The system compares the applicant's driver's license or identification card with DMV records to confirm that the applicant's name and date of birth are consistent. Fla. Stat. §97.0525(4)(a). If the applicant's name and date of birth are consistent with DMV records, then the voter registration application, along with the "digital signature of the applicant on file with the [DMV]," are transmitted to the county supervisor of elections. *Id.* §97.0525(4)(b). The "digital signature" is a digital copy of the applicant's signature ascribed in person "in the presence of an authorized agent" of the DMV. *Id.* §322.142(1).

A third registration option is available for those whose name and date of birth cannot be verified against DMV records, or for those who do not have a driver's license or identification card. In such cases, the State does not have the security and confidence afforded by a signature that has been affixed "in the presence of an authorized agent" of the DMV. *Id.* Nevertheless, the applicant can still register to vote by completing a printed application, including her original signature and the date, and delivering or mailing it to her county supervisor of elections. *Id.* §97.0525(4)(c). Each applicant who signs the application under any of these options "swear[s] or affirm[s]" that the information "contained in the registration application is true," that the applicant is qualified to vote under the laws and Constitution of Florida, and that the applicant subscribes to the oath required by the Florida Constitution that she will protect and defend the United States and Florida Constitutions. *Id.* §97.053(5)(a)(8).

The signatures required to register to vote are just some of many signatures that Florida requires throughout the electoral process. Since at least 1868, the Florida Constitution has required citizens registering to vote to "subscribe" an oath to support

3

and defend the United States and Florida Constitutions. *See* Fla. Const. art. XIV, §1 (1868); Fla. Const. art. VI, §3 (1968). Today, ballot initiative petitions require "the original signature of the purported elector." Fla. Stat. §100.371(11)(a)(1). Candidate petitions to gain ballot access require a "voter's original, ink signature." Fla. Admin. Code r. 1S-2.045(5)(f)(4). And electors can petition for removal of members of governing municipal bodies only by providing an "original signature" in "ink or indelible pencil." Fla. Stat. §100.361(2)(e).

**B.** Plaintiffs are nonprofit organizations engaged in political advocacy and voter-turnout efforts for various interest groups. App. 39-45. Plaintiffs' sole claim is under the materiality provision of the Civil Rights Act. That provision prohibits state officials "acting under color of law" from "deny[ing] the right of any individual to vote … because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. §10101(a)(2)(B). Plaintiffs don't assert that the electronic signature requirement, or even the requirement that applicants must sign the paper application, violate the materiality provision. Rather, they challenge only the requirement that the signature on the paper application be "original." Blue Br. 3. Plaintiffs assert that the original-signature requirement burdens some of their members "who cannot register online," "lack easy access to printers," and "have difficulty obtaining, printing, signing, or returning a voter registration application." App. 45.

Shortly after Plaintiffs filed their initial complaint, the Republican National Committee and the Republican Party of Pasco County moved to intervene under

Federal Rule of Civil Procedure 24. R.58. The district court granted the motion to intervene. R.85. Plaintiffs then amended their complaint, App. 31, and the Secretary of State, the Intervenors, and a group of ten supervisors of elections all moved to dismiss, App. 110, 133.

The district court granted the motions to dismiss. App. 323. The court concluded that the Florida NAACP had sufficiently alleged a redressable injury, so it declined to address the standing of the other Plaintiffs. App. 324-28. The court also declined to address whether Plaintiffs had statutory standing to sue under the Civil Rights Act. But it noted that Plaintiffs' cases "provide little support for their position that anyone can sue under the Materiality Provision so long as they claim injury from denial of someone else's right to vote." App. 330. Instead, the court dismissed on the "more straightforward" ground that Plaintiffs failed to state a claim. App. 331.

In so holding, the court concluded that Plaintiffs failed to allege facts "plausibly showing that the wet-signature requirement is immaterial." App. 336. The court rejected Plaintiffs' premise "that a copied, faxed, or otherwise non-original signature is equal in stature to an original, wet signature." App. 337. Noting "the ubiquity" of original signatures throughout public life, the court recognized that "original signatures carry different weight than other 'signatures.'" App. 337. In reaching this conclusion, the court determined that racial discrimination was not an element of pleading a violation of the materiality provision. App. 334-336. And the court did not reach the question of whether the materiality provision displaces state law, or of whether the opportunity to cure defective signatures defeats Plaintiffs' facial challenge. App. 338-39 n.8. After the court dismissed Plaintiffs' claim, App. 338, Plaintiffs appealed.

5

## STANDARD OF REVIEW

This Court reviews *de novo* an order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Hopper v. Solva Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The Court must accept Plaintiffs' factual allegations as true, but it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). If the complaint fails to state a plausible claim that Plaintiffs are entitled to relief, the Court must affirm the dismissal of the complaint. *See* Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF THE ARGUMENT

The district court dismissed the complaint because Plaintiffs fail to allege facts that plausibly state a violation of 52 U.S.C. §10101(a)(2)(B). This Court should affirm for three independent reasons:

**I.**    Original signatures are material in determining voter qualifications. They serve a variety of important purposes during the voter registration process: They confirm an applicant's identity. They impose felony penalties for falsifying information. And they help to detect and deter identity fraud. Each is a legitimate state interest, and each is material in determining a voter's qualifications. Plaintiffs argue that the *manner* of the mark must *itself* indicate whether a voter is qualified. But the materiality provision is not so demanding. Text, context, history, and precedent indicate that States can impose requirements that serve a variety of interests in the registration process.

**A.** Even under Plaintiffs' novel reading of the materiality provision, original signatures are material to confirming an applicant's identity. A signature in the applicant's own handwriting indicates that the signature was signed by the person who is applying to vote. It is prima facie evidence that the applicant is not "deceased" or "a fictitious person." Fla. Stat. §98.045(1). Even if those qualifications were not explicit in the Florida Statutes, it is "[u]ndeniable" that confirming a voter's identity is a necessary "premise" in determining whether a voter meets the "age, citizenship, residency, capacity, and criminal history qualifications" under state law. *Vote.Org II*, 89 F.4th at 487. That voter-identity-confirmation process happens in person when an applicant registers through the DMV. But Florida's generous voter-registration laws allow even those without DMV credentials to register via a paper application by mail or drop-off. And the State has determined that an original signature on a paper application is a sufficient substitute for the in-person identification and signature required of every other applicant.

**B.** Original signatures are material for additional reasons. They serve a variety of legitimate state functions in the registration process. Contrary to Plaintiffs' view, the materiality provision does not require that every stroke of the pen on a registration form indicate whether a voter is a citizen, over the age of eighteen, and a resident of the State. For one, the word "material" in the statute is broad. This Court has noted the term requires only "minimal relevance" in certain contexts. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1174 (11th Cir. 2008). And the statute requires only that information be material "in determining" whether an individual is qualified—not material "to" whether an individual is qualified. *Penn. State Conf. of NAACP*, 97 F.4th at

131. Put simply, original signatures must "matter" to the State in the registration process. And they do: They help deter and detect fraud. They impress the finality and "solemn weight" of the voting process. And they promote public confidence in elections. All those considerations are material to the State as it is "determining" whether a voter is qualified. And because those justifications are legitimate as a matter of law, Plaintiffs fail to state a claim.

**II.**      The materiality provision does not preempt state law. The statute *asks* whether errors or omissions are material "under State law." 52 U.S.C. §10101(a)(2)(B). The text does not restrict what information "State law" can determine is material.

**A.** Plaintiffs' preemption theory finds no support in the text. Florida law explicitly requires, as a qualification to register and vote, that each individual "[r]egisters pursuant to the Florida Election Code." Fla. Stat. §97.041(1)(a)(5). If an applicant "fails to complete" the application by not providing an original signature, the applicant "shall not be eligible to vote in that election." *Id.* §97.053(2). A voter who fails to meet those qualifications has necessarily committed an error that is "material in determining" whether the voter is qualified "under State law." 52 U.S.C. §10101(a)(2)(B).

**B.** Plaintiffs' preemption theory finds no support in the caselaw. This Court has held that information *must be* material if federal law requires it. *See Browning*, 522 F.3d at 1172-75. And it has held the inverse: information *cannot be* material if federal law prohibits it. *See Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd* 439 F.3d 1285 (11th Cir. 2006). This Court has not addressed whether information is material because *state law* requires it. But if federal law can be a proxy for materiality, state law is the direct

8

measure of materiality. The statute, after all, asks whether errors or omissions are material "under State law." 52 U.S.C. §10101(a)(2)(B).

**C.** Plaintiffs' preemption theory finds no support in history. The legislative history of the Civil Rights Act indicates that the materiality provision addressed arbitrary practices used by election registrars to discriminate against black applicants in the Jim Crow South. It prohibited practices such as "disqualifying an applicant who failed to list the exact number of months and days in his age." *Browning*, 522 F.3d at 1173 (citation omitted). The provision did not prohibit States from establishing rules to ensure the integrity and efficiency of the voter registration process. It prohibited *state officials* "acting under color of law" from imposing arbitrary, extra-textual requirements to induce errors that were not material "under State law." 52 U.S.C. §10101(a)(2)(B).

**III.**    The original-signature requirement does not deny anyone the right to vote. Because Florida permits applicants to cure defects in their registration, requiring an original signature on its own doesn't "deny the right of any individual to vote." *Id.* At most, Plaintiffs could bring an as-applied challenge as to a voter who is unable to cure a signature deficiency. That's precisely the process that §10101 provides. Plaintiffs' contrary theory would transform the statute into an undue-burden test. But this Court has already held that the materiality provision "does not establish a least-restrictive-alternative test for voter registration applications." *Browning*, 522 F.3d at 1175. The provision applies only to actions by state officials that "deny" the right of an "individual" to vote. 52 U.S.C. §10101(a)(2)(B). Plaintiffs don't allege that the original signature has denied any individual the right to vote, so their claim fails.

## ARGUMENT

This Court should affirm the judgment below for three independent reasons. The district court found that original signatures are "material" as a matter of law, and thus Plaintiffs don't state a claim under the materiality provision. App. 337. That conclusion is correct, and it's reason alone to affirm the dismissal of Plaintiffs' complaint. But the Court can "affirm on any ground supported by the law and the record that will not expand the relief granted below." *United States v. Campbell*, 26 F.4th 860, 879 (11th Cir.) (en banc) (quoting *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018)), *cert. denied*, 143 S. Ct. 95 (2022). And here the law and record confirm at least two more fundamental reasons why Plaintiffs don't state a claim. First, the materiality provision doesn't preempt state law. Second, the original-signature requirement doesn't deny anyone the right to vote. Both reasons would better ground this Court's opinion in the statutory text, and both were raised below. *See* App. 338-39 n.8. Regardless, each of the three paths lead to the same result: affirming the judgment dismissing Plaintiffs' complaint.

## I.    Original signatures are material in determining voter qualifications.

A voter's signature on a registration application assists the State in determining whether the voter is qualified. It is the final act that indicates an application is complete and correct. It assures election officials that the information in the application is true, and that the voter is qualified to vote. Fla. Stat. §97.053(5)(a)(8). It subjects the applicant to penalty of felony for willfully submitting false information. *Id.* §104.011. It satisfies the requirement that the applicant swear to protect and defend the United States and Florida Constitutions. *See* Fla. Const. art. VI, §3.

10

Plaintiffs don't dispute these facts—they don't challenge the legality or materiality of signatures themselves. *See* App. 52. Rather, they challenge the requirement that signatures on paper applications be "original," which they say is a "method" of signing that does not help election officials determine whether the applicant is qualified. Blue Br. 10. But a signature in the applicant's own hand is material in determining qualifications for a variety of reasons. Most directly, it indicates that the person who filled out, signed, and submitted the application is the same person who is registering to vote. The original signatures thus satisfy even Plaintiffs' strained reading of "material."

But the materiality provision doesn't require that every step of a registration application be essential to determining whether a voter is qualified. A step is "material" so long as it is relevant in the process. 52 U.S.C. §10101(a)(2)(B). And each step need only be relevant to the state's process "in determining" a voter's qualifications, which describes the whole system of registration and its supporting rationales. *Id.* Original signatures are "material in determining" voter qualifications because they serve a variety of important purposes during the registration process: detecting and deterring fraud, ascribing the oath, and imposing solemnity, among others. All of these interests are material in the process of registration, and thus material "in determining" whether a voter is qualified to vote.

### A.    An original signature is evidence that the applicant is who she says she is.

The simplest reason to affirm is that original signatures help establish a voter's identity. Not even Plaintiffs dispute that a voter's identity is material in determining

whether a voter is qualified to vote, and that States have an interest in "carefully identifying all voters participating in the election process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008). Under Florida law, an applicant is "ineligible" to vote if, for example, she "is deceased" or is "a fictitious person." Fla. Stat. §98.045(1). The original signature is one way for the State to confirm that the person submitting the application is the person whom the State is declaring qualified to vote. And a signature in the applicant's own hand is prima facie evidence that the applicant is not "deceased" or "a fictitious person." *Id.*

Florida law makes those criteria explicit. But original signatures would be material in determining identity even if the law didn't explicitly require the applicant to be "alive" and "a real person." That's because the voter's identity is an implicit, necessary part of registering and voting. "[A] premise for all the statutory qualifications" is that "the individuals who are trying to register actually [are] who they say they are." *Vote.Org II*, 89 F.4th at 487. The Fifth Circuit didn't need state law to tell them that a voter cannot be "deceased" or "fictitious." Fla. Stat. §98.045(1). The court found it "[u]ndeniable" that confirming a voter's identity is a necessary "premise" in determining whether a voter meets the "age, citizenship, residency, capacity, and criminal history qualifications" under state law. *Vote.Org II*, 89 F.4th at 487. That conclusion is equally "[u]ndeniable" here. *Id.* In fact, it's even more explicit here because Florida law declares "ineligible" any application by a "deceased" or "fictitious person." Fla. Stat. §98.045(1). Florida's explicit criteria removes any doubt that original signatures are "material in determining" whether an applicant is qualified to vote.

Underscoring the identity interest is the fact that the original-signature requirement applies only to applicants who have not previously verified their identity in person at the DMV. When an applicant registers at the DMV, he physically presents himself to the State, in person, before an agent of the DMV. *See id.* §§322.051, 322.142. He provides several documents to confirm his identity: an application for an ID card or driver license must contain the applicant's "name," "gender," and other essential information, and it must be accompanied by "proof of social security card number," "[p]roof of birth date" and "[p]roof of identity" from a list of acceptable documents. *Id.* §§322.051(1)(a), 322.142(1). The applicant is required to "affix his or her usual signature … in the presence of an authorized agent of the department." *Id.* §§322.051(1)(a), 322.08(2). That information and confirmation of the applicant's identity "must be transferred to a voter registration application" if the applicant "chooses to register to vote or to update a voter registration record." *Id.* §97.057(2)(b). When a voter registration applicant registers online, the Florida Online Voter Registration System compares the name and date of birth of the applicant with what was already verified and recorded with the DMV. *Id.* §97.0525(4)(a).[1] If the information matches, the online voter registration application and a copy of the signature signed "in the presence of an authorized agent of the [DMV]" are sent to the county supervisor of elections. *Id.* §§97.0525(4)(b), 322.051(1)(a), 322.142(1).

Voter-registration applicants who have not previously gone through this DMV process have not had a representative of the state confirm their identity in a face-to-face encounter. They have not physically presented themselves to the DMV, provided

---

[1] *See also* Fla. Dep't of State, *Florida Online Voter Registration System*, www.registertovoteflorida.gov.

proof of who they are, and affixed their signature in the presence of a DMV agent. Nevertheless, Florida still provides those applicants with an easy way to register to vote: they can complete and submit a printed application that includes an original signature. *Id.* §97.0525(4)(c). They can sign the application at home in their own hand without the need to sign "in the presence" of a DMV agent who would witness the signature in the applicant's own hand. *Id.* §97.0525(4)(b). Through this act, which requires an action in the physical—as opposed to the digital—world, the State can have increased confidence that the person submitting the application actually exists. In all applications, the signature bears a quality that reflects the applicants' identity: in person, the identity is confirmed by witnessing a real, physical person sign; at home, the identity is confirmed by an original, physical signature. In both cases, the signature is material in confirming the applicant's identity.

In conclusory fashion, Plaintiffs assert that "the method of signing a voter registration application bears no relation to these qualifications" to vote. Blue Br. 4. But the method helps ensure that the applicant is a real, physical person. Those who register at the DMV establish as much through their physical presence. Those who register by mail do so through their physical signature. But if States could not require particular signature methods, they would be forced to accept any mark made by any means: not just electronic signatures, but also pencil marks and etchings, facsimiles and photos, stamps and stickers, and signatures mailed or emailed separate from the application. As a result, far from undermining the district court's opinion, "the fact that those Floridians who register to vote through the DMV may provide an electronic signature," Blue Br. 12 n.4, does nothing to advance Plaintiffs' case.

14

Finally, original signatures help confirm identity regardless of whether Florida matches original signatures or checks for forgeries. As explained, they are evidence of the applicants' status as a physical person. That a law "does not require that states authenticate" certain information does not mean that information is immaterial. *Browning*, 522 F.3d at 1174 n.21. "States employ different methods of identifying eligible voters," and original signatures are one of several identification methods that Florida employs for accepting applications. *Crawford*, 553 U.S. at 197. Other methods—such as requiring photo identification, matching signatures, or training officials to detect forgeries—might provide varying degrees of security, cost, and efficiency. Florida has determined that for applicants who do not appear in person at the DMV, providing an original signature is necessary and sufficient to assure the State that it was *that applicant*— a real, physical person—who signed the registration form. "While the most effective method" of identifying voters and preventing fraud "may well be debatable, the propriety of doing so is perfectly clear." *Id.* at 196. Florida chose to make voter registration easier and more accessible for applicants who do not have DMV records. And Florida is "free to accept the [information] provided on [the] application form, which at least in Florida are completed with an oath or affirmation under penalty of perjury, as self-authenticating." *Browning*, 522 F.3d at 1174 n.21. That choice "does not alter the materiality of the information itself." *Id.*

15

**B.    Original signatures are "material in determining" qualifications because they serve a variety of helpful functions in the registration process.**

Besides helping to determine an applicant's identity, original signatures serve other purposes that make them "material" in the process of determining qualifications. They help deter and detect fraud, increase public confidence in the election, and imprint a solemn weight to the process that electronic signatures do not. These purposes are all "material" in the registration process because they are valid state interests in ensuring that only qualified voters are registered. Indeed, determining qualifications is a core obligation of state government. A State that does it well will earn the trust and confidence of its people with respect to the conduct of elections. A State that does it poorly will squander that essential ingredient of self-government.

The term "material" in the Civil Rights Act is broad. The word is undefined in the statute, so it takes on its "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). Dictionaries "in existence around the time of enactment" are "one of the ways to figure out that meaning." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016). Material means "relevant," "pertinent," or "requiring serious consideration by reason of having a certain or probable bearing on the proper determination of a law case or … on some similar unsettled matter." *Material*, Webster's Third New International Dictionary (1976); *see also Material*, The Oxford English Dictionary (1961) ("[o]f serious or substantial import," or, as to legal matters, "likely to influence the determination of a cause").

To be sure, the word "signifies different degrees of importance in different legal contexts." *Browning*, 522 F.3d at 1173. Some definitions indicate a fact is "material" if it

16

is simply "of consequence" or "likely to influence" a decision, while others raise the bar to "potentially dispositive." *Material*, Webster's Legal Dictionary (1996). These definitions reflect a scale from "minimal relevance" to "outcome-determinative." *Browning*, 522 F.3d at 1174. This Court has not yet resolved this issue, but the Fifth Circuit recently "reject[ed]" the definitions imposing a higher bar for materiality. *Vote.Org II*, 89 F.4th at 478 ("We reject 'essential' as a reasonable meaning, but the rest of the variations seem about right."). The materiality provision fairly incorporates a broader range of relevance: "[t]o say that something is 'material' usually simply means that it matters." *Material*, Webster's Legal Dictionary, *supra*.

Statutory context confirms that the materiality provision adopts a low threshold for relevance. As the Third Circuit observed, "the text does not say the error must be immaterial 'to' whether an individual is qualified to vote. It uses the words 'in determining,' and that choice must mean something." *Penn. State Conf. of NAACP*, 97 F.4th at 131. "Read naturally," these words "describe a process" of "determining whether an individual is qualified to vote." *Id.* Registration requirements must be material "in" that process, not "to" a given qualification. *See also Liebert v. Millis*, No. 3:23-cv-672, 2024 WL 2078216, at *13 (W.D. Wis. May 9, 2024) ("By using the words 'in determining,' Congress was expressing its intent that the Materiality Provision applies only when the state *is* 'determining' whether a person is qualified to vote."). The statute does not require that every stroke of the pen prove that a voter is a citizen or is over the age of eighteen. A registration requirement that promotes and protects valid state interests is thus a "material" requirement "in" the registration process. 52 U.S.C. §10101(a)(2)(B).

Original signatures "matter[]" in the process of determining voter qualifications. *Material*, Webster's Legal Dictionary, *supra*. Original signatures help deter and detect fraud, which is why the IRS requires them on physical tax returns. *See* IRS, *1040 (and 1040-SR): Instructions* 61 (2022), perma.cc/Z9YR-X2DJ. Original signatures impress the finality and "solemn weight" of the process, *Vote.Org I*, 39 F.4th at 308, which is likely why the Northern District of Florida and other federal courts require original signatures on various documents, *e.g.*, N. Dist. Fla. Local Rule 5.1(E) (requiring pro se parties to "include a signature block with the party's handwritten signature" on documents filed with this Court). And for those and other reasons, original signatures "promot[e] public confidence in the voting process." *Vote.Org II*, 89 F.4th at 488 (quoting *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016)). All those purposes indicate that original signatures "matter" in the voter registration process.

Those justifications are "material" under the statute, as the Fifth Circuit recently held. Courts must "acknowledge[] the significance of a State's authority to set its electoral rules and the considerable deference to be given to election procedures." *Id.* at 481. "[A] State has considerable discretion in deciding what is an adequate level of effectiveness to serve its important interests in voter integrity. When [courts] evaluate the materiality of a measure, [they] must give weight to the State's justification for it." *Id.* at 485. That court thus held that "[v]oter integrity" is, "[a]s a matter of law … , a substantial interest." *Id.* at 488. The process of "physically signing the form with the warnings in front of the applicant, threatening penalties for perjury and stating the needed qualifications, has some prospect of getting the attention of many applicants and dissuading false statements that an electronic signature, without these warnings,

18

does not." *Id.* at 488-89. And the physical signature "carries 'solemn weight' that an imaged signature does not." *Id.* at 489 (quoting *Vote.Org I*, 39 F.4th at 308). For these reasons, "[s]igning an application is related to voting qualifications." *Id.*

This Court has not yet resolved whether state interests such as election security and public confidence are "material" under the statute. In *Browning*, the Court addressed whether ID numbers were "material," noting the "different degrees of importance" that word can take. *Browning*, 522 F.3d at 1173. But it didn't need to resolve the meaning in that case because federal law required ID numbers, which "indicate[d] that Congress deemed the identification numbers material to determining eligibility to register and to vote." *Id.* at 1174. And as discussed, the Fifth Circuit noted the breadth of the word "material," but it also looked to Voting Rights Act cases to determine the relevance of various state interests. *Vote.Org II*, 89 F.4th at 482 (citing *Thornburg v. Gingles*, 478 U.S. 30, 34 (1986)).

A better foundation is the text of the materiality provision itself. As the Third Circuit observed, requirements must be material "in determining" whether a voter is qualified—*not* material "to" whether a voter is qualified. *Penn. State Conf. of NAACP*, 97 F.4th at 131. The upshot of these cases is that original signatures are "material" because they promote valid state interests such as preventing fraud and promoting voter confidence.

Plaintiffs have no answer to these cases. They claim that a signature is "[p]lainly" not material in determining whether a voter is qualified, but they don't even try to define the word "material." Blue Br. 10. They ignore that this Court has recognized the term fairly encompasses information of "minimal relevance" in certain contexts. *Browning*,

522 F.3d at 1174. They sidestep the Fifth Circuit's recognition of various state interests under the materiality provision. *See Vote.Org II*, 89 F.4th at 482. Perhaps inadvertently, they misrepresent the statute throughout their brief, consistently referring to requirements that are material "to" whether a voter is qualified, Blue Br. 1, 2, 3, 7, 10, even though the statute concerns materiality "in determining" whether a voter is qualified, 52 U.S.C. §10101(a)(2)(B). And they rely on a vacated Third Circuit case to suggest that "fraud deterrence or prevention … in no way helps the state determine voters' qualifications." Blue Br. 11 (cleaned up) (quoting *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir.), *cert. granted, judgment vacated Ritter v. Migliori*, 143 S. Ct. 297 (2022)). After Plaintiffs filed their brief, the Third Circuit corrected the errors it made in *Migliori. See Penn. State Conf. of NAACP*, 97 F.4th at 128.

The United States fares no better with the caselaw than Plaintiffs, although it does try to define "material." Its chosen definitions, however, cut against Plaintiffs. *See* U.S. Br. 23. The dictionaries the United States cites indicate that requirements are material if they are "important" or have a "probable bearing" on "an unsettled matter." *Id.* (citations omitted). Those definitions are unsurprising, as this Court has already recognized that "material" has a range of meanings. *Browning*, 522 F.3d at 1173. Between the "two kinds of 'materiality,'" *id.* at 1174, the United States cannot explain why it thinks that Congress adopted definitions such as "necessary" as opposed to merely "important," *see* U.S. Br. 23. And, like Plaintiffs, the United States ignores that the Fifth Circuit has "reject[ed]" outcome-determinative definitions such as "'essential' as a reasonable meaning." *Vote.Org II*, 89 F.4th at 478. That leaves "minimal relevance" as

the other of the "two kinds of 'materiality.'" *Browning*, 522 F.3d at 1174. Congress required nothing more.

Moreover, Plaintiffs' strict definition of "material" proves too much. They argue that an original signature is "[p]lainly" not material in determining whether a voter is qualified. Blue Br. 10. But they don't challenge "the general requirement that an applicant must sign their application form." App. 52. Having effectively conceded that a signature requirement does not violate the materiality provision, Plaintiffs' case falls apart quickly. "Vote.org cannot logically maintain that the one is valid and the other not." *Vote.Org I*, 39 F.4th at 307. Under Plaintiffs' definition of materiality, an electronic signature has no more "bearing" than an original signature on "the voter's age, citizenship, residency, and adjudicated legal status." Blue Br. 7. But their requested relief would still require some form of signature on paper applications, even if "electronic or imaged." Blue Br. 3; *see also* App. 58. That Plaintiffs' requested relief would violate their own definition of "material" shows that their position is unworkable and unsupported by the statute.

Finally, the district court rightly credited the State's interests at the pleading stage. App. 338-39. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). "[P]ublic confidence in the integrity of the electoral process" is compelling, as is "the State's interest in preventing voter fraud." *Crawford*, 553 U.S. at 197. And a State has a valid interest in imprinting a "solemn weight" to the voting process. *Vote.Org II*, 89 F.4th at 489. Among other things, "physically signing the form" with accompanying "penalties for perjury … has some prospect of getting the attention of many applicants

21

and dissuading false statements" that an electronic or facsimile signature do not. *Id.* at 488-89. Given "the Supreme Court's repeated observations that states have substantial authority over the time, place, and manner of voting and a legitimate interest in preventing and deterring abuses such as fraud," it would be odd for Congress to pass a law *forbidding* States from pursuing those interests. *Liebert*, 2024 WL 2078216, at *16.

None of these State interests require evidentiary development because "as a matter of law" they are "substantial." *Vote.Org II*, 89 F.4th at 489. Unlike the *Anderson-Burdick* standard, the materiality provision "is not a constitutional claim necessitating the application of a balancing test." *Id.* at 480. And even under the interest-balancing *Anderson-Burdick* test, courts dismiss claims at the pleading stage. *See, e.g.*, *Comm. to Impose Term Limits on Ohio Supreme Ct. v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018) (dismissing as "meritless" the argument that courts cannot dismiss *Anderson-Burdick* claims "at the motion-to-dismiss stage"); *League of Women Voters of Minn. Educ. Fund v. Simon*, No. 0:20-cv-1205, 2021 WL 1175234, at *9 (D. Minn. Mar. 29, 2021) (dismissing claim that Minnesota's limits on who may witness an absentee ballot unduly burdened the right to vote). "[A] reasonable understanding of the legislative judgment" would credit the several important interests put forward by the State. *Vote.Org II*, 89 F.4th at 488. And because Florida's original-signature requirement is "more than tenuously connected" to those interests, it is valid under the materiality provision. *Id.*

## II. The materiality provision does not preempt state law.

As explained in the previous section, original signatures are "material" as a matter of law "in determining" whether a voter is qualified. This Court can affirm on that basis. But there's a more fundamental reason that Plaintiffs fail to state a claim: the materiality

provision does not displace state law. The statute forbids actions by state officials based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). That is, it asks whether the error or omission is material "under State law." *Id.* The text does not apply to errors or omissions that state law determines are material. Thus, plaintiffs proceeding under the materiality provision must allege that the defendant went beyond state law. Here, Plaintiffs failed to do so.

### A.    Plaintiffs' preemption theory finds no support in the text.

State law requires original signatures, so original signatures are material "under State law." *Id.* Florida requires citizens who don't have a digital signature on file with the DMV to provide an "original signature" on their paper voter registration application. Fla. Stat. §97.053(5)(a)(8). If an applicant "fails to complete" the application by not providing an original signature, the applicant "shall not be eligible to vote." *Id.* §97.053(2); *see also id.* §98.045(1)(a) (the "failure to complete a voter registration application as specified in s. 97.053" means that the applicant "is ineligible" to vote). That state law requires original signatures on registration applications ends the inquiry under the materiality provision. *See Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by Missouri statute without offending 52 U.S.C. §10101(a)(2)(B)").

Plaintiffs overlook those requirements. They list a handful of qualifications under section 97.041 of the Florida Statutes: 18 years old, U.S. citizen, resident of Florida, not mentally incapacitated, and not a felon whose voting rights have not been restored. *See*

Blue Br. 10 (citing Fla. Stat. §97.041). But they omit another requirement named in that same section: "A person may become a registered voter only if that person … [r]egisters pursuant to the Florida Election Code." Fla. Stat. §97.041(1)(a). "[V]oting necessarily requires some effort and compliance with some rules." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). And a voter who fails to follow the registration rules established by the Legislature has not fulfilled the "[q]ualifications to register or vote" under state law. Fla. Stat. §97.041(1)(a).

Other features of the text confirm that the materiality provision does not preempt state law. The statute reaches only state action denying applications for "errors or omissions," not for wholesale failures to comply with state law. *Id.* As the Third Circuit noted, "facially non-compliant mistakes that render a ballot defective under state law might be 'defects'" but not an "an error or omission" under the statute. *Penn. State Conf. of NAACP*, 97 F.4th at 131 n.6 (citation omitted). When "the *statute* imposes a duty on the voter" and "the requirement is mandatory," the failure to follow those rules renders an application noncompliant. *Id.* (emphasis added). In contrast, "errors or omissions" result in "imperfectly compliant" applications "where electors have facially met statutory requirements but have done so imperfectly." *Id.* An original signature signed in pencil and smudged in transit might be "imperfectly compliant." *Id.* Or an original signature using an applicant's maiden name might be an "error" in complying with the original-signature requirement. But even if officials were rejecting applications for those errors—and Plaintiffs don't allege that they are—that would not permit a facial challenge to a "mandatory" requirement that "the statute imposes … on the voter." *Id.*

24

"If Congress had intended to displace state authority as significantly as plaintiffs suggest, surely there would be clearer indication of that in the text or history of the statute." *Liebert*, 2024 WL 2078216, at *16.

**B.    Plaintiffs' preemption theory finds no support in caselaw.**

This Court's precedents also indicate that the materiality provision doesn't preempt state law. While this Court has considered facial challenges to state law under the materiality provision, it has not confronted the argument that state law is the measure of materiality. *See Browning*, 522 F.3d at 1172-75. In *Browning*, the Court held that information *must be* material if federal law requires it. In *Schwier v. Cox*, the Court addressed the "mirror image," holding that information *cannot be* material if federal law prohibits it. *Id.* at 1174 n.22. At most, this Court assumed in *Browning* and *Schwier* that the materiality provision subjects state statutes to facial attack. But "assumptions are not holdings." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016). And the Court has not yet addressed whether a requirement is material "under State law" because it is required by state law.

In *Schwier*, the district court addressed whether Georgia's voter registration forms could require social security numbers consistent with the federal Privacy Act and the materiality provision. 412 F. Supp. 2d at 1276. The social security numbers were not required "under State law." 52 U.S.C. §10101(a)(2)(B). They were made "mandatory" on "Georgia's voter registration forms" by the Secretary of State, *Schwier*, 412 F. Supp. 2d at 1275-76, but state law required only that the registration form contain "a space for the applicant to write in his SSN, 'if known at the time of the application,'" *id.* at 1268 (quoting Ga. Code §34-609). This led to inconsistent enforcement among

registrars—some of whom "refused registration if the applicant knew his SSN but did not provide it," while others "registered individuals without their SSN" but made no "attempts to later obtain the information," and still others "did not require SSNs at all." *Id.* This is exactly the kind of ad hoc executive action that the materiality provision covers.

In any event, the district court concluded that social security numbers could not be "material" because the Privacy Act prohibited Georgia from collecting them. The court ruled that under the Privacy Act, "Georgia's voter registration forms cannot instruct applicants that disclosure of their SSNs is mandatory." *Id.* at 1275-76 (citing 5 U.S.C. §552a (note)). And because "Georgia [was] not permitted to require this disclosure" under the Privacy Act, it followed that "disclosing one's SSN cannot be material in determining whether that person is qualified to vote under Georgia law." *Id.* at 1276. This Court "affirm[ed] the district court's judgment for the reasons stated in the district court's memorandum opinion." *Schwier*, 439 F.3d at 1286.

Other courts have likewise concluded that whether a registration requirement was material depended upon whether it was required "under State law." *See Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (ruling that the county-established practice of rejecting absentee ballots for deficient birth information violated the materiality provision because that county practice was not required "under Georgia law"); *Jones v. Jessup*, 615 S.E.2d 529, 531 n.5 (Ga. 2005) (noting that under the law at issue in *Martin*, a deficient birthdate on an absentee ballot was "a ground for rejection," but no state law mandated "the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth."); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634,

636 (W.D. Wis. 2021) (noting that "the court [in *Martin*] held that the county's decision was *inconsistent* with state law").

In short, neither *Browning* nor *Schwier* addressed the issue here: whether a requirement is material because state law imposes it. But both cases indicate that *the law* is the measure of materiality. They used federal law as a proxy to measure materiality, but the materiality provision itself permits—indeed, requires—a more direct measure: "State law." 52 U.S.C. §10101(a)(2)(B). What state law requires, the materiality provision doesn't prohibit. And because original signatures are required by "the laws, customs, or usages" of Florida, they are material "under State law." *Id.*

### C.    Plaintiffs' preemption theory finds no support in historical practice.

History, too, shows that the materiality provision applied only to ad hoc requirements by state officials that were not mandated "under State law." *Id.* In 1961, the U.S. Commission on Civil Rights published a report on national civil rights issues. *See* Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961), perma.cc/WA4A-QEYK. The Commission discussed "discriminatory practices on the part of registrars" that were "aimed at reducing Negro registration." *Id.* at 43.

In Louisiana, for example, some registrars would arbitrarily refuse witnesses or valid government documents as identification. *Id.* at 50-53. Others would force applicants to calculate their age in exact number of days, *id.* at 54, 57, even though the Louisiana Constitution required only that the applicant provide "the essential facts necessary to show that he" is "not less than twenty-one years of age," La. Const. of 1921, art. VIII, §1. The Louisiana Constitution also contained a sample application with

27

blanks for the years, months, and days the applicant had been born, *id.*, but the Commission was especially concerned with the fact that "some [registrars] would exclude, others include, the day on which the application is filed," *Comm'n on Civil Rights Report*, *supra* at 56. They would quiz applicants on "a reasonable interpretation of [a] specific clause of the constitution," and the registrars would use their "own discretion in determining whether or not the applicant meets the constitutional test." *Id.* at 58. "In most cases," the "arbitrary practices [were] largely, or even exclusively, directed against Negroes," *id.* at 66, which led the Commission to conclude that "substantial numbers" of black citizens had been "denied the right to vote on grounds of race or color," *id.* at 135.

Relying on the Commission's findings, Congress passed the Civil Rights Act of 1964. *See* An Act to Enforce the Constitutional Right to Vote, Pub. L. 88-352, §101, 78 Stat. 241, 241-42 (July 2, 1964). The House Report found that the "crux of the problem" addressed by the materiality provision was that "registrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting a Negro application for the same or more trivial reasons." H.R. Rep. No. 88-914 (Nov. 20, 1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2491. Relying on the Commission's findings about "the arbitrary or discriminatory application of various registration procedures," one of the bill's sponsors explained that it was "quite clear that this statute would not infringe on the rights of the States to establish voter qualifications." Misc. Proposals Regarding the C.R. of Persons Within the Jurisdiction of the U.S.: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88

Cong. 915 (May 8, 1963) (statement of Rep. Peter W. Rodino, Jr.). Congress enacted the materiality provision "for these reasons." 1964 U.S.C.C.A.N. at 2491.

Courts also understood that the materiality provision applied to arbitrary action by state officials. The paradigmatic violation was "disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). After reviewing decades of cases, one court concluded that "the jurisprudence appears to demonstrate that [§10101] is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay v. Altobello*, No. 1:96-cv-3458, 1996 WL 635987, at *1 (E.D. La. 1996); *see also Condon*, 913 F. Supp. at 950. This Court has likewise observed that the materiality provision was enacted to "sweep away such tactics as disqualifying an applicant" by "inducing voter-generated errors that could be used to justify rejecting applicants." *Browning*, 522 F.3d at 1173; *see also Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

Plaintiffs argue that unless the Court adopts their novel preemption argument, the materiality provision will be meaningless. Not so. If federal election regulations "were intended to preempt all state laws" that govern voter registration, then courts "would expect to see a more comprehensive regulation of voter registration and identification." *Browning*, 522 F.3d at 1172 (holding that the Help America Vote Act did not preempt Florida's identity verification process for voter registration). Neither HAVA nor the materiality provision, however, enacted "comprehensive regulation of voter registration and identification." *Id.* The materiality provision instead targeted— and solved—a narrow problem: discriminatory application of voter registration

requirements. It was never intended to forgive non-compliance with neutral laws that ensure security and confidence in the State's elections. That is why, "[u]ntil recently, the Materiality Provision received little attention from federal appellate courts." *Penn. State Conf. of NAACP*, 97 F.4th at 127. "The fact that no such argument was even made" until very recently "illuminates the profession's understanding of the scope of" its reach. *United States v. Ross*, 456 U.S. 798, 819 (1982).

Plaintiffs' novel interpretation would also lead to absurd results. If, as Plaintiffs argue, the materiality provision hamstrings States' ability to set a particular "method" of registration, *see* Blue Br. 10, then States would be forced to accept all sorts of deviations from standard registration procedures. An applicant could fill out the form in Latin—or any other language—instead of English. He could write his birthdate in binary code. He could supply his address in the form of a hand-scrawled map. Under Plaintiffs' theory, the materiality provision would force States to accept all of those applications because the errors go to mere "technical instructions" that *themselves* don't show whether the voter is a citizen, over the age of 18, or meets the other high-level qualifications. Blue Br. 10. In fact, States wouldn't be able to require a written application at all—they would be forced to accept a short list of the voter's qualifications scrawled on a Post-it note or orally communicated to a clerk. Yet there is no indication that Congress intended to put States at the mercy of their most eccentric applicants by preempting basic registration rules. "In the absence of a clear textual mandate," the court should "not infer that Congress intended to impose [such] arbitrary restrictions on states." *Liebert*, 2024 WL 2078216, at *16.

*     *     *

30

Plaintiffs' preemption argument finds no support in text, caselaw, and history. State law requires original signatures, so original signatures are necessarily "material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). Plaintiffs might, for example, have a case against a "person acting under color of law," *id.*, who decided on his own to reject signatures because they were signed in red ink. Such an ad hoc requirement would not imposed "under State law." *Id.* But original signatures are, so Plaintiffs' claim fails.

## III.  The original-signature requirement does not deny anyone the right to vote.

The materiality provision doesn't apply to Florida's original-signature requirement for a third independent reason: it doesn't "deny the right of any individual to vote." 52 U.S.C. §10101(a)(2)(B). Florida law provides applicants the opportunity to cure any defects in their voter registration applications. *See* Fla. Stat. §§97.073(1), 97.052(6) (election officials "shall notify the applicant of the failure," and "[t]he applicant shall have an opportunity to complete the application form"). Registration, like voting, "requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. An applicant who fails to timely register, fails to follow the registration rules, or fails to timely cure has not been denied the right to vote: she has simply failed in "following the directions" for registration. *Id.*; *see also Penn. State Conf. of NAACP*, 97 F.4th at 133 ("[A] voter who fails to abide by state rules prescribing how to make a vote effective is not denied the right to vote when his ballot is not counted." (cleaned up)).

Plaintiffs err by reading the word "deny" in the materiality provision to mean "burden." Other courts have made the same mistake. The Fifth Circuit initially (and

correctly) held that when applicants can cure defects and there are alternative ways to register, "it is hard to conceive how the wet signature rule deprives anyone of the right to vote." *Vote.Org I*, 39 F.4th at 306. The court later "set aside that holding" but left the issue "open for a later case," noting that "the *need* to cure an immaterial requirement creates a hurdle for—even if it is not itself a final denial of—the right to vote." *Vote.Org II*, 89 F.4th at 487. But the statute is clear: it prohibits enforcing arbitrary requirements that "deny the right" to vote, 52 U.S.C. §10101(a)(2)(B), not those that merely impose burdens or "hurdle[s]," *Vote.Org II*, 89 F.4th at 487. A cure opportunity "has the practical effect of moving back the date before each election by which voters must register," but it does not *deny* anyone the right to register or vote. *Browning*, 522 F.3d at 1158 n.4.

In short, "deny" means what it says. The United States argues that this would mean the materiality provision wouldn't apply to the "practices that Congress passed the Provision to eliminate—such as registrars' refusals to register Black voters for incorrectly calculating their age in months and days or putting information in the wrong spot on their forms." U.S. Br. 15. Not true. For one, mandatory cure provisions are relatively new. Florida enacted its mandatory cure provision in just 2005. *See* Act of June 20, 2005, 2005 Fla. Sess. Law Serv. Ch. 2005-278, §5. The United States cites no cure provisions on the books in the Jim Crow South, let alone cure opportunities that were actually afforded to those voters. And the report of the Civil Rights Commission contains no mention of cure provisions. *See generally Comm'n on Civil Rights Report, supra.*

Moreover, Florida law requires election officials to "notify the applicant of the failure," Fla. Stat. §97.052(6), which is the *opposite* of what was going on in the Jim Crow

South. When forcing applicants to calculate their age, for example, "some [registrars] would exclude, others include, the day on which the application is filed." *Comm'n on Civil Rights Report*, *supra* at 56. States have abandoned this hide-the-ball method of registration discrimination, thanks in part to the Civil Rights Act. That Congress solved the problem it sought to address does not give courts license to invent problems the statute doesn't reach.

Plaintiffs' facial challenge is the source of their confusion. Even assuming that original signatures were not "material in determining" voter qualifications "under State law," *contra* Sections I & II, *supra*, Plaintiffs could at most bring an as-applied challenge on behalf of an individual voter who would likely be "den[ied]" the right to vote after the cure process. 52 U.S.C. §10101(a)(2)(B). But their facial challenge points to no such applicant. Plaintiffs don't even allege that *anyone* has been unable to comply with the law. They say that some voters "have difficulty" signing registration applications, App. 43, 45, but the materiality provision "does not establish a least-restrictive-alternative test" for voting. *Browning*, 522 F.3d at 1175. It prohibits denials of the right to vote, not de minimis burdens that are part and parcel of the voting process. None of the cases Plaintiffs rely on addressed the facial versus as-applied distinction.

Plaintiffs' no-undue-burden reading would transform the materiality provision into an interest-balancing test. This Court has already rejected that reading. In this case, as in *Browning*, "the thrust of plaintiffs' argument" is not that the registration requirement is "immaterial," but that the requirement is "unjustifiably burdensome on the applicant." *Browning*, 522 F.3d at 1175; *see also* App. 45 (alleging that "[s]ome" of Plaintiffs' members "lack easy access to a printer or may otherwise have difficulty

obtaining, printing, signing, or returning a voter registration application"). But the materiality provision "does not establish a least-restrictive-alternative test for voter registration applications in the plain text of the statute." *Browning*, 522 F.3d at 1175. A separate constitutional test known as the *Anderson-Burdick* standard governs claims alleging undue burdens on the right to vote. But Plaintiffs did not plead an *Anderson-Burdick* claim in this case. The Court should take the United States' advice and refrain from "borrow[ing] these concepts from constitutional law and graft[ing] them onto the Materiality Provision." U.S. Br. 25. A claim under the materiality provision requires more than a hypothetical "burden" or "hurdle" in voting—the plain text applies only to actions that "deny" the right of an "individual" to vote. 52 U.S.C. §10101(a)(2)(B).

Plaintiffs argue that dismissing their facial challenge would "evade[]" the materiality provision's "intended" purpose. Blue Br. 9; *accord* U.S. Br. 15. But the text of the materiality provision has always operated on an as-applied basis. Before courts extended enforcement of the materiality provision to private parties, *Schwier*, 340 F.3d at 1296, every §10101 suit was brought by "the Attorney General" under subsection (c), *see* 52 U.S.C. §10101(c). That provision permits the Attorney General to obtain relief against "any person" who "is about to engage in any act or practice which would deprive any other person" of the right to vote. *Id.* The statute provides a specific mechanism to extend those as-applied judgments to other voters. *See id.* §10101(e). Under subsection (e), "in the event the court finds that any person has been deprived [of the right to vote] on account of race or color," the Attorney General can request a finding that "such deprivation was or is pursuant to a pattern or practice." *Id.* "If the court finds such pattern or practice," any person affected by the practice can apply for "an order

34

declaring him qualified to vote," upon proof that he is "qualified under State law to vote" and "has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law." *Id.*

That is, the statute contemplates as-applied challenges, and it provides an expedited process to apply judgments to other voters. But that remedy "comes into play only upon a finding by the Court that persons have been deprived on account of race or subsection (a) rights, and that such deprivation was or is pursuant to a pattern or practice." *Alabama v. United States*, 304 F.2d 583, 592 (5th Cir.), *aff'd*, 371 U.S. 37 (1962). That this Court extended the materiality provision to private parties does not transform the provision into a vast preemption statute. *See Schwier*, 340 F.3d at 1296. Congress's precise judicial remedies ensure that courts can apply individualized determinations to other voters. That scheme is rendered meaningless if plaintiffs could merely bring facial challenges to state statutes. Until an "individual" is "den[ied]" the right to vote, he does not have a claim under 52 U.S.C. §10101(a)(2)(B).

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

*/s/ Tyler R. Green*

Daniel E. Nordby
Benjamin J. Gibson
Denise M. Harle
SHUTTS & BOWEN, LLP
215 S Monroe St., Ste. 804
Tallahassee, FL 32301
850-241-1717
dnordby@shutts.com
bgibson@shutts.com
dharle@shutts.com

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S Main St., Fl. 5
Salt Lake City, UT 84101
703-243-9423
tyler@consovoymccarthy.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Intervenor-Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7) because it contains 10,026 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: May 15, 2024                    _/s/ Tyler R. Green_

**CERTIFICATE OF SERVICE**

I e-filed this document on ECF, which will email everyone requiring notice.

Dated: May 15, 2024                    _/s/ Tyler R. Green_