No. 23-13727

# United States Court of Appeals
### for the
# Eleventh Circuit

DISABILITY RIGHTS FLORIDA, ET AL.,

*Plaintiffs-Appellants*,

v.

SECRETARY, STATE OF FLORIDA, ET AL.,

*Defendants-Appellees*.

and

REPUBLICAN NATIONAL COMMITTEE, ET AL.,

*Intervenor-Defendants-Appellees*

_____

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:23-cv-111 (Winsor, J.)

## BRIEF OF CENTER FOR ELECTION CONFIDENCE, INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

Robert A. O'Donnell
Florida Bar No. 1011567
**O'Donnell Christopher LLP**
P.O. Box 172538
Miami, FL 33017-2538
(305) 640-8958
rodonnell@odonnellchristopher.com
*Counsel for* Amicus Curiae

No. 23-13727 *Disability Rights Florida, et al. v. Secretary, State of Florida, et al.*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. Proc. 26.1 and 29 and 11th Cir. Local R. 26.1-1, Counsel for Amicus Curiae Center for Election Confidence, Inc. (CEC) certifies that, in addition to those persons identified by Plaintiffs-Appellants, Defendants-Appellees, Intervenor-Defendants-Appellees, and the United States as amicus curiae, the following person may have an interest in the outcome of this appeal:

1.    Center for Election Confidence, Inc. (Amicus Curiae)

2.    Robert A. O'Donnell (counsel for Amicus Curiae)

3.    O'Donnell Christopher LLP (counsel for Amicus Curiae)

Amicus further certifies that CEC is a non-profit, 501(c)(4) organization. It is not a publicly held corporation, has no parent companies or subsidiaries, and it neither owns, nor is owned by, any of the parties in this case.

/s/ *Robert A. O'Donnell*
Robert A. O'Donnell

*Counsel for* Amicus Curiae

C-1 of 1

## TABLE OF CONTENTS

Table of Authorities ................................................................................ ii

Statement of Issues ................................................................................. 1

Interest of Amicus Curiae ...................................................................... 2

Summary of Argument ........................................................................... 3

Argument ................................................................................................ 5

A.    The Congress That Enacted The Materiality Provision Assumed Voters Would Physically Sign Registration Forms. ............................ 5

B.    The Materiality Provision Did Not Displace Registration Signature Requirements Because Congress Required Signatures In The National Voter Registration Act. ................................................ 11

C.    The Plaintiffs-Appellants' Logic Would Threaten Many Other State Election Integrity Laws. ............................................................. 17

Conclusion ............................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcia v. Florida Secretary of State*,
    772 F.3d 1335 (11th Cir. 2014) ...................................................................6

*Ball v. Chapman*,
    289 A.3d 1 (Pa. 2023).................................................................................3

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020).....................................................................................6

*Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021)...........................................................................3, 12, 20

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)................................................................................12, 20

*Migliori v. Cohen*,
    36 F.4th 153 (3d Cir.), *judgment vacated sub nom.*
    *Ritter v. Migliori*, 143 S. Ct. 297 (2022) ............................................3, 7

*New Prime Inc. v. Oliveira*,
    586 U.S. 105 (2019)....................................................................................6, 8

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*,
    97 F.4th 120 (3rd Cir. 2024)....................................................................6, 7, 9

*Perrin v. United States*,
    444 U.S. 37 (1979).........................................................................................6

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)...........................................................................................12

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) .....................................................................7

*United States v. Cornell*,
    2 Mason 60, 25 F. Cas. 646 (D.R.I. 1819).....................................................16

*Principal authorities are marked with an asterisk.

ii

*Vote.org v. Byrd*,
    ___ F. Supp.3d ___, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023).........8, 13, 16

*\*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ...............................................................8, 9, 13, 16

**Statutes**

Civil Rights Act of 1964, Pub. Law No. 88-352, 78 Stat. 241

    52 U.S.C. § 10101(a)(1) ....................................................................................12

    52 U.S.C. § 10101(a)(2) ....................................................................................12

    52 U.S.C. § 10101(a)(2)(B) ............................................................................6, 7

    52 U.S.C. § 10101(a)(3) ......................................................................................6

National Voter Registration Act of 1993, Pub. Law No. 103-31, 107 Stat. 77

    § 5(c)(2)(C)(ii)-(iii)..............................................................................................4

    52 U.S.C. § 20501(b)........................................................................................13

    52 U.S.C. § 20504(a)(1) ...................................................................................13

    52 U.S.C. § 20504(c)(2)(B)(ii) .........................................................................12

    52 U.S.C. § 20504(c)(2)(C)(ii)-(iii)...............................................................4, 14

    52 U.S.C. § 20504(c)(2)(D)(i) ..........................................................................14

    52 U.S.C. § 20506(a)(6)(A)(i) ..........................................................................14

    52 U.S.C. § 20507(a)(5)(A)-(B) ........................................................................14

    52 U.S.C. § 20508(b)........................................................................................12

Voting Rights Act of 1965, Pub. Law No. 89-110, § 7(b) .......................................12

Ala. Const. art. VIII, § 177 ...................................................................................18

Ala. Code §§ 17-3-30 to -30.1 ...............................................................................18

Ala. Code § 17-3-50................................................................................................19

Ala. Code § 17-3-52 ..................................................................................8, 19

Ala. Code § 17-17-14 .....................................................................................13

Fla. Const. art. VI, § 2 ...................................................................................18

Fla. Const. art. VI, § 3 ...................................................................................18

Fla. Const. art. VI, § 4 ...................................................................................18

Fla. Stat. § 97.041 ..........................................................................................18

Fla. Stat. § 97.051 .....................................................................................18, 19

Fla. Stat. § 97.052 ..........................................................................................20

Fla. Stat. § 104.011 ........................................................................................13

Ga. Const. art. II, § I, paras. II – III .............................................................19

Ga. Code Ann. § 21-2-216 .............................................................................19

Ga. Code Ann. §§ 21-2-220 to -221.2 ..........................................................20

Ga. Code Ann. § 21-2-220.1 ............................................................................8

Ga. Code Ann. § 21-2-221 ...............................................................................8

Ga. Code Ann. § 21-2-221-1 ............................................................................8

Ga. Code Ann. § 21-2-221.2 ............................................................................8

Ga. Code Ann. § 21-2-224 .............................................................................19

Ga. Code Ann. § 21-2-561 .............................................................................13

**Other Authorities**

Thomas Alsop, *Percentage of Households in the United States with a Computer at Home from 1984 to 2016*, Statista (May 12, 2020), https://www.statista.com/statistics/214641/household-adoption-rate-of-computer-in-the-us-since-1997/ ........................................................................15

iv

Mark Doms, *The Diffusion of Personal Computers Across the U.S.*, Federal
    Reserve Bank of San Francisco (Dec. 23, 2005),
    https://www.frbsf.org/research-and-insights/publications/economic-
    letter/2005/12/the-diffusion-of-personal-computers-across-the-us/...................14

Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*,
    11 Harv. J. Law & Pub. Policy 59 (1988). .........................................................9

H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391 ...........................9

Derek T. Muller, *What's Old is New Again: The Nineteenth Century Voter
    Registration Debates and Lessons About Voter Identification Disputes*,
    56 Washburn L.J. 109 (2017), https://ssrn.com/abstract=3107326...................10

Nat'l Conf. of State Legislatures, *Online Voter Registration* (Dec. 31, 2023),
    https://www.ncsl.org/elections-and-campaigns/online-voter-registration .........11

Vanessa M. Perez, *America's First Voter Identification Laws: The Effects of
    Personal Registration and Declining Political Party Competition on
    Presidential Election Turnout, 1880-1916*, Vol. 69 Electoral Studies
    (Feb. 2021),
    https://www.sciencedirect.com/science/article/pii/S0261379420301426..........10

 Pew Charitable Trusts, *Online Voter Registration* (May 2015),
    https://www.pewtrusts.org/-/media/assets/2015/05/ovr_2015_brief.pdf. ..........11

Viswanath Venkatesh & Susan A. Brown, *A Longitudinal Investigation of
    Personal Computers in Homes: Adoption Determinants and Emerging
    Challenges*, Indiana Univ. Ctr. for Soc. Informatics Working Paper,
    Paper No. 98-01 (1998),
    https://scholarworks.iu.edu/iuswrrest/api/core/bitstreams/157463cd-bccd-
    4c17-a699-5600afb2dc96/content ....................................................................14

## STATEMENT OF ISSUES

Whether the District Court correctly determined that Plaintiffs failed to state a claim under the Materiality Provision of the Civil Rights Act because a wet signature requirement is a material requirement of a state's voter registration and election administration processes.

**INTEREST OF AMICUS CURIAE**[1]

Center for Election Confidence, Inc. (CEC) is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. CEC works to ensure that all citizens can vote freely within an election system of reasonable procedures that promote election integrity, prevent vote dilution and disenfranchisement, and instill public confidence in election systems and outcomes. To accomplish this, CEC conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. CEC is a resource for lawyers, journalists, policymakers, courts, and others interested in the electoral process. CEC also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration.

With respect to the intersection of election integrity laws and the Materiality Clause of the Civil Rights Act, CEC (when previously known as Lawyers Democracy Fund) submitted an amicus brief to the U.S. Supreme Court in *Ritter v.*

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.
Pursuant to Fed. R. App. Proc. 29, the parties have consented to the filing of this brief.

2

*Migliori*, advocating for vacatur of the Third Circuit's unprecedented opinion in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *judgment vacated sub nom Ritter v. Migliori*, 143 S. Ct. 297 (2022). CEC also submitted an amicus brief to the Supreme Court of Pennsylvania in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), advocating that the state high court respect the policy judgments of the state's General Assembly and enforce the signature and date requirement for absentee ballots. Both courts ruled in favor of the positions advocated by CEC.

As CEC argued in the U.S. Supreme Court, the position advocated by the Plaintiffs-Appellants would effectively replace the well-established *Anderson-Burdick* test with an unprecedented and erroneous legal theory so broad in its import that it would invalidate an array of quotidian ballot-casting rules and open a Pandora's Box of novel legal challenges to reasonable election administration methods around the country. It also would countermand the Supreme Court's ruling in *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021). For these reasons, CEC's interest in preserving sound jurisprudence and reasonable regulation of election administration is directly implicated.

## SUMMARY OF ARGUMENT

A wet signature requirement to complete voter registration forms is nothing new. All states within the 11th Circuit have some form of signature requirement for voter registration or requesting absentee ballots. Congress, too, required physical

3

signatures on voter registration applications when it enacted the National Voter Registration Act (NVRA), requiring applications submitted through state departments of motor vehicles (DMVs) to include "an attestation that the applicant meets each [state eligibility] requirement; and *requires the signature of the applicant under penalty of perjury*." National Voter Registration Act of 1993, Pub. Law No. 103-31, § 5(c)(2)(C)(ii)-(iii), 107 Stat. 77, 52 U.S.C. § 20504(c)(2)(C)(ii)-(iii) (emphasis added).

It is highly likely that the authors of the Civil Rights Act knew and understood signatures would be a material part of the voter registration process. Signatures serve as acknowledgements that voters understand the gravity of participating in the democratic process and as certifications to officials that they know and meet the qualifications. Further, those who authored the Materiality Provision understood that signatures were widely required to serve an important role safeguarding election integrity. States needed signatures to protect the election against those who, history showed, would make misrepresentations or other significant omissions to subvert the electoral process.

Arguments to strike wet signature requirements under the Materiality Provision of the Civil Rights Act of 1964 go further than just attestations. If this Court accepts Appellants' arguments, any state provision governing registration and not related to qualifications, such as deadlines, oaths, and identification requirements

4

may be suspect under the Materiality Provision.  The ultimate logical conclusion of Appellants' arguments would force states to accept and process voter registration forms without much regard to whether the applicants are eligible electors.

This amicus brief will first look at the meaning behind the Materiality Provision, briefly look at the context and application, including signature requirements in at least one other federal voting law added by a later Congress, and conclude by looking at the voter registration standards from other states within this Circuit that would be impacted by a decision favoring Appellants.

**ARGUMENT**

**A.    The Congress That Enacted The Materiality Provision Assumed Voters Would Physically Sign Registration Forms.**

Requiring prospective voters to sign application forms, including with wet signatures, is consistent with the Materiality Provision.  The members of Congress who drafted the Materiality Provision of the Civil Rights Act were well acquainted with requirements that prospective voters sign their registration forms.  Signatures were widely required for voter registration at the time.  Because this was long before the adoption of personal computers and the digitization of the registration process, voter registration forms were paper that required hand signatures, known as "wet signatures."  Signature requirements have continued to be used even through present time.  Given the roles signatures play, whether to create a sense of seriousness or to provide authorities avenues to prosecute those who would manipulate elections, the

5

authors of the Materiality Provision would consider wet signatures on voter registration forms to be an important, and thus material, part of the registration process.

When seeking to interpret a statute, courts normally do so "in accord within the ordinary public meaning of its terms at the time of enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1343-44 (11th Cir. 2014). This means, unless Congress specifically defines a term, "words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citations omitted). Within the relevant provisions of the Civil Rights Act of 1964, Congress saw fit to define only two specific words: "vote" and "literacy test." 52 U.S.C. § 10101(a)(3).

Aside from the two specific definitions, the text of the Materiality Provision states

> No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

The Materiality Provision "targets laws that restrict who may vote." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 131

(3rd Cir. 2024). Congress wanted to eliminate "the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). The Provision, therefore "forbids a person acting under color of law to disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application." *Id.* at 1297.

Courts must ascertain the stage of the election process to which the plaintiffs seek to apply the Provision, whether the decision not to register a voter is the result of an error or omission on a "record or paper," whether that record or paper is "related to" the registration process, and finally, whether the error or omission is material to determining whether a voter is "qualified *under State law* to vote." *See, e.g.*, 52 U.S.C. § 10101(a)(2)(B) (emphasis added) and *Penn. State Conf. of NAACP Branches*, 97 F.4th at 130 (citing *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of application for stay)).

Congress delegated to states authority to determine qualifications and the voter registration process. As will be discussed below, most states, like Florida, have basic requirements, from citizenship and residency, to age, and ensuring that convicted felons cannot vote until they have paid their debts to society. Many states, including those within the 11th Circuit, require prospective voters to sign their registration forms, with a failure to sign resulting in rejection of the application.

*Vote.org v. Byrd*, ___ F. Supp.3d ___, 2023 WL 7169095, at *4 (N.D. Fla. Oct. 30, 2023) (citing Fla. Stat. § 97.053(5)(a)).[2]

Congress never defined what it meant by "material" in the text of the statute. Because Congress decided not to attach special meaning, courts must seek to interpret the text of the statute using the "ordinary meaning at the time Congress enacted the statute." *New Prime Inc*, 586 U.S. at 113. The definition of "material" has not significantly changed since 1965. Modern definitions indicate that the term means "[o]f such a nature that knowledge of the item would affect a person's decision-making: significant; essential" and "[o]f serious or substantial import; significant, important, of consequence." *Vote.org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023) (citations omitted).

To understand what the authors of the statute may have considered to be material, or immaterial, it may be necessary to look at the "sort of problem [Congress] was trying to address," along with examining the brief history of voter

---

[2] *See also, e.g.*, Ala. Code § 17-3-52 (requiring applicants to sign registration forms and oaths to defend the Constitution); Ga. Code Ann. § 21-2-220.1 (requiring all applicants to affirm that they understand the eligibility requirements under state law and meet them), § 21-2-221 (requiring a "second signature" and attestation for all applications submitted through the State's DMV), § 21-2-221-1 (requiring signatures and attestation for registration forms submitted by voters through the Department of Natural Resources), § 21-2-221.2 (requiring voters submitting applications through Secretary of State's website to affirm they meet the state's eligibility requirements).

registration and the state registration practices Congress wanted to eliminate.[3]  While this type of examination can never supplant a textual analysis of the Materiality Provision, it can help elucidate why Congress used certain terms.

During the early to mid-1960s, Congress knew that registrars rejected applicants "for failing to calculate their age to the day, misspelling Louisiana, underlining Mr. when it should have been circled, or the Catch-22 of identifying their skin color as Negro instead of brown, or brown instead of Negro." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 126 (citing the Report of the U.S. Commission on Civil Rights 1963) (cleaned up).  Other registrars required applicants to "analyze long sections of the Constitution" in addition to rejecting registrations for "simple misspellings." *Callanen*, 89 F.4th at 487 (citing H.R. Rep. No. 88-914).  Because of the differing standards, or variances in how individual registrars applied state standards, Congress wanted both to protect minorities' right to vote and for state and local election officials to

> (1) apply standards, practices, and procedures equally among individuals seeking to register to vote; (2) disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote; (3) administer literacy tests in writing.

H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491.

---

[3] Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J. Law & Pub. Policy 59, 61 (1988).

Voter registration laws arose in the late 19th Century as a response to allegations of mass voter fraud.[4] Early versions of voter registration required voters to register in person with the relevant board, mandated publication of registration details in newspapers, and set preliminary deadlines by which voters had to be registered to participate in an election.[5] The registration processes included, as ways to reduce fraud, general descriptions of the voter and signature requirements.[6] Over the course of time, registration processes moved from in-person to registration through affidavit and, eventually, to the mail-in process popular through the mid-1990s.[7]

Members of Congress in 1964 could not have predicted the digitization of the registration process, which did not enter the Information Age until 2002 when Arizona pioneered online voter registration. It took six years for the next state,

---

[4] Vanessa M. Perez, *America's First Voter Identification Laws: The Effects of Personal Registration and Declining Political Party Competition on Presidential Election Turnout, 1880-1916*, Vol. 69 Electoral Studies (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0261379420301426.

[5] *Id*.

[6] *Id*.

[7] Derek T. Muller, *What's Old is New Again: The Nineteenth Century Voter Registration Debates and Lessons About Voter Identification Disputes*, 56 Washburn L.J. 109, 109-15 (2017), https://ssrn.com/abstract=3107326.

Washington, to digitize the process.[8]  In the 16 years since Arizona and Washington innovated voter registration, 42 other jurisdictions followed suit.[9]

Notwithstanding technological improvements in registration processes, however, states still require signatures, wet or digital, depending on the medium of registration.  As will be discussed below, even Congress viewed signatures as essential in the voter registration process, including the expansion of the process to driver's license applications.  Since the 88th Congress in 1964 understood the gravity of signatures, expected that applicants would sign registrations, and wet signatures were the norm for decades before digital signatures came into existence, Congress intended wet signatures to play an important, and thus material, role in the registration process.  Thus, Florida's signature requirement is wholly consistent with the Civil Rights Act.

**B.    The Materiality Provision Did Not Displace Registration Signature Requirements Because Congress Required Signatures In The National Voter Registration Act.**

The Materiality Provision cannot, and does not, displace state registration laws or other federal voting laws.  In fact, within specific exceptions, federal law,

---

[8] Pew Charitable Trusts, *Online Voter Registration*, May 2015, p. 2, https://www.pewtrusts.org/-/media/assets/2015/05/ovr_2015_brief.pdf.

[9] Nat'l Conf. of State Legislatures, *Online Voter Registration* (Dec. 31, 2023), https://www.ncsl.org/elections-and-campaigns/online-voter-registration.

11

whether the Civil Rights Act, Voting Rights Act, or National Voter Registration Act, leaves determination of voter eligibility requirements to the states.[10]  Nor can the Materiality Provision preempt state efforts to ensure the integrity of the registration process, since states "indisputably [have] a compelling interest in preserving the integrity of [their] election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*).  Importantly, laws designed to protect the integrity of the election, at any stage in the process, fulfill a critical policy goal: instilling public confidence in the electoral process "because it encourages citizen participation in the democratic process." *Crawford v. Marion County Election Board*, 553 U.S. 181, 197 (2008).[11]

Physical signatures can play a significant role for states seeking to safeguard the registration process.  They emphasize the "solemn weight" participating in elections represents along with providing states a way to enforce abuse of the

---

[10] *E.g.*, Civil Rights Act of 1964, Pub. Law 88-352, 78 Stat. 241, 52 U.S.C. § 10101(a)(1) and (2) (providing that all citizens of the United States "who are otherwise qualified by law at any election by the people in any State" and referencing qualifications under state law); Voting Rights Act of 1965, Pub. Law 89-110, § 7(b) (barring voter qualification laws "imposed or applied … on account of race or color" while referencing qualifications prescribed by State law not "inconsistent with the Constitution and laws of the United States"); National Voter Registration Act, 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20508(b) (both requiring sufficient "identifying information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant" including citizenship).

[11] *See also Brnovich*, 594 U.S. at 686 (recognizing, in the context of absentee ballots, that a "State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders").

registration process.  *Byrd*, 2023 WL 7169095, at \*6, citing *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (staying a district court's order preliminarily enjoining Texas's wet signature requirement).[12]

Recognizing how important signatures are within the voter registration process, Congress included signatures as part of the effort to streamline and modernize the registration process in the NVRA. According to the law's prefatory statement, Congress viewed voters' signatures as helping states implement the registration process, part of election integrity, or both.  *See* 52 U.S.C. § 20501(b).

The NVRA, importantly, ensures that eligible voters may register when obtaining, or renewing, a driver's license at a state's department of motor vehicles (DMV).  Critically, the law *requires* states to collect voter signatures.  It also requires state DMV offices to inform each voter of eligibility requirements and have a place to attest – by signature – that she is eligible.  For example, Congress in the law stated that applications for driver's licenses shall serve as an application for voter registration "unless the applicant fails to *sign the voter registration application*." 52 U.S.C. § 20504(a)(1) (emphasis added).  As part of the process at the DMV, Congress required applications submitted to "include a statement that … contains an

---

[12] *E.g.*, Ala. Code § 17-17-14 (voting without registration and oath); Fla. Stat. § 104.011 (false swearing, submission of false voter registration information); Ga. Code Ann. § 21-2-561 (false registration).

attestation that the application meets each [state eligibility] requirement; and requires the *signature of the applicant*, under penalty of perjury." 52 U.S.C. § 20504(c)(2)(C)(ii)-(iii) (emphasis added).[13]  And in the next paragraph, Congress stated that the DMV form "shall include, in print that is identical to that used in the attestation portion of the application, the information required in section 20507(a)(5)(A) and (B)."  52 U.S.C. § 20504(c)(2)(D)(i).[14]

The process for obtaining a driver's license in the early to mid-1990s, when Congress enacted the NVRA, served as its analogue.  Drivers had to fill out paper forms and the process was not digitized as it is today.  While computers and the internet are ubiquitous today, far fewer households adopted personal computer usage in 1993.[15]  The transition from paper driver license applications forms to digital

---

[13] 52 U.S.C. § 20506(a)(6)(A)(i) includes a nearly identical requirement for registration forms submitted through voter registration agencies.

[14] These provisions require state election officials to "inform applicants under sections 20504, 20505, and 20506 of this title of voter eligibility requirements; and penalties provided by law for submission of a false voter registration application." 52 U.S.C. § 20507(a)(5)(A)-(B).

[15] *E.g.*, Viswanath Venkatesh & Susan A. Brown, *A Longitudinal Investigation of Personal Computers in Homes: Adoption Determinants and Emerging Challenges*, Indiana Univ. Ctr. for Soc. Informatics Working Paper, Paper No. 98-01 (1998), https://scholarworks.iu.edu/iuswrrest/api/core/bitstreams/_157463cd-bccd-4c17-a699-5600afb2dc96/content (estimating that only 33% of households in the United States in the mid- to late 1990s had personal computers); Mark Doms, *The Diffusion of Personal Computers Across the U.S.*, Federal Reserve Bank of San Francisco (Dec. 23, 2005), https://www.frbsf.org/research-and-insights/publications/economic-letter/2005/12/the-diffusion-of-personal-

processes has occurred gradually, with some states still retaining the option for applicants to complete the process on paper, while nearly every state has at least an option to renew driver licenses online.[16] As discussed above, it wasn't until after 2008 that most states digitized voter registration. When the process was updated through the NVRA in 1993, the signatures Congress required as part of the registration process were wet signatures on paper forms.

Returning to the dictionary definition of "material" as "of serious or substantial import; significant, important, of consequence,"[17] because Congress included a wet signature requirement in the NVRA along clearly stated voter eligibility standards and consequences for false submissions, it is reasonable to conclude that Congress viewed the signatures as essential to the registration process. And if Congress viewed wet signatures as important in the NVRA, they would necessarily be material for purposes of the Civil Rights Act.

---

computers-across-the-us/ (estimating computer adoption in businesses and geographic regions per 100 workers, between 1990 and 2002); and Thomas Alsop, *Percentage of Households in the United States with a Computer at Home from 1984 to 2016*, Statista (May 12, 2020), https://www.statista.com/statistics/214641/ household-adoption-rate-of-computer-in-the-us-since-1997/.

[16] For example, Nevada Form DMV 002, https://dmv.nv.gov/pdfforms/ dmv002en.pdf and Texas Form DL-14A, https://www.dps.texas.gov/internetforms/ forms/dl-14a.pdf.

[17] *Callenen*, 89 F.4th at 478.

15

The danger in accepting Appellants' arguments, advanced at trial court and in other similar proceedings, is that the NVRA's disclosure, attestation, and signature requirements, along with many other state laws regulating the registration process, would be displaced by the Materiality Provision. Essentially, as exemplified in *Callanen*, any law enhancing the integrity of the voter registration processes, would be suspect. *Callanen*, 89 F.4th at 489, *see also Byrd*, 2023 WL 7169095, at *6.[18]

The effect of Appellants' arguments would, in effect, nullify many of the NVRA's provisions just discussed. Such an effect is untenable and undermines Congressional authority. Where such an illogical point is advanced, courts should make every effort to construe the two statutes – the Materiality Provision of the Civil Rights Act and the NVRA – as consistent with each other. *E.g.*, *United States v. Cornell*, 2 Mason 60, 25 F. Cas. 646 (D.R.I. 1819).[19] With the text and historical context of both the Civil Rights Act and NVRA explained above, courts can apply both provisions consistently by determining that Congress intended for voters to

---

[18] Where the court recounts plaintiffs' arguments that aspects of voter registration integrity laws either telling "election officials nothing about whether the applicant is qualified" or which bear "no relation to the statutory qualifications" would be suspect under the Materiality Provision.

[19] In an opinion by Joseph Story, the court ensured that a Rhode Island state law ceding land to the United States was harmonized with the U.S. Constitution's grant of sole legislative authority to Congress. In doing so, Story adopted the canon of *ut res magis valeat quam pereat*.

physically sign registration forms or, at the least, that wet signatures are of great import (and thus material) in the registration process.

### C. The Plaintiffs-Appellants' Logic Would Threaten Many Other State Election Integrity Laws.

States registration laws are comprised of complex schemes designed with many provisions that buttress the integrity of each state's entire electoral system. Not every provision in isolation determines completely whether an applicant is qualified, though several requirements contribute to that objective. Some state laws are aimed at protecting the integrity of the entire electoral process and, thus, naturally have a small impact, denying a very small number of people the right to cast a ballot due to concerns over eligibility. If, for example, a prospective voter cannot provide his accurate address or birthdate, officials may rightfully deny the application.

Under Appellants' logic, however, any procedure that does not directly ascertain the qualifications of a voter would be immaterial, and thus not permitted, under the Civil Rights Act. This logic goes too far and ignores that many provisions buttress the ascertainment of identity and qualifications. To help determine what type of laws might be immaterial applying Appellants' theories, it is first necessary to look at state provisions defining qualified voters.

<u>Alabama</u>

- Alabama requires voters to be citizens of the United States, aged eighteen and older, and who have resided in the state and county of registration for a length

17

of time.  Individuals convicted of felonies "involving moral turpitude" or who are mentally incompetent may not vote until "restoration of civil and political rights or removal of disability."  Ala. Const. art. VIII, § 177; *see also* Ala. Code §§ 17-3-30 to -30.1.

Florida

- The Florida Constitution requires electors to be citizens of the United States, at least eighteen years of age, and a permanent resident of the state.  Fla. Const. art. VI, § 2.  It disqualifies any person convicted of a felony or adjudicated mentally incompetent until restoration of "all terms of sentence including parole or probation."  *Id*. § 4.  Finally, the state constitution requires voters to swear an oath to defend and protect the federal and state constitutions and that they are qualified as an elector under the state constitution and laws.  *Id*. § 3.  *See also* Fla. Stat. §§ 97.041, 97.051.

Georgia

- The Georgia Constitution requires electors to be citizens of the United States, residents of Georgia, at least eighteen years of age, not disenfranchised by other provisions of the constitution, which disqualify those convicted of felonies involving moral turpitude or who are judicially deemed mentally

18

incompetent, and who meet minimum residency requirements established by law.  Ga. Const. art. II, § I, paras. II – III; *see also* Ga. Code Ann. § 21-2-216. With the qualifications established, any information required beyond that necessary for officials to determine citizenship, age, residency, and any potential disqualifications would be immaterial and unlawful under Plaintiffs-Appellants' theory. Surveying other registration laws in the relevant states for the 11th Circuit, the following provisions may not directly determine qualifications:

- Alabama and Florida's requirements that registrations be received at least 14 and 29 days prior to the election, respectively, along with Georgia's requirement that the registration process be closed "by the close of business on the fifth Monday… prior to the date of [the election]."  Ala. Code. § 17-3-50, Fla. Stat. 97.051, Ga. Code Ann. § 21-2-224.

- Alabama and Florida's requirements that voters sign an oath vowing to support and defend both the federal and state constitutions, along with Alabama's extra requirement that prospective voters disavow any "group or party" which advocates for the overthrow of the federal or state governments. Ala. Code § 17-3-52; Fla. Stat. § 97.051.

- Florida and Georgia's requirements that voters submit some form of identification, usually driver's license or state-issued identification numbers,

19

as part of the registration process.  Fla. Stat. § 97.052; Ga. Code Ann. §§ 21-2-220 to -221.2.

All these requirements, though, have been a part of the registration process for decades.  All of them serve important functions, such as providing officials the time necessary to verify registrants are indeed qualified, helping ascertain in which counties or precincts voters should be assigned, and expediting the process while minimizing mistakes by requiring identification.  They also advance the goals of election integrity and efficient and accurate election administration.  And these purposes abide notwithstanding the evolution of new digital signature technologies.

The District Court correctly determined that wet signatures are material to Florida's registration process.  Statutes providing deadlines for registration, or requiring identification or oaths serve similar, important functions and are certainly permitted under both *Crawford* and *Brnovich* if states apply them uniformly.  A decision to reverse the District Court, though, would threaten all laws designed to protect the registration process from abuse.

## CONCLUSION

The Congresses that enacted the Civil Rights Act and National Voter Registration Act would have expected voters to physically sign paper forms.  And the Congress that enacted the NVRA itself determined physical signatures were an integral part of the registration process.  Because of that, and the responsibility of

20

states to protect the integrity of the registration process, CEC respectfully requests that this Court affirm the decision of the District Court, holding that wet signatures are material for voter registrations.

Dated: May 22, 2024

Respectfully submitted,

*/s/ Robert A. O'Donnell*
Robert A. O'Donnell
Florida Bar No. 1011567
**O'Donnell Christopher LLP**
P.O. Box 172538
Miami, FL 33017-2538
(305) 640-8958
rodonnell@odonnellchristopher.com
*Counsel for* Amicus Curiae

21

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because the brief contains 4,447 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  May 22, 2024                          */s/ Robert A. O'Donnell*
                                             Robert A. O'Donnell

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 22, 2024, the Brief of *Amicus Curiae* Center for Election Confidence, Inc. was filed electronically through the appellate CM/ECF system with the Clerk of the Court, which will automatically send e-mail notification of such filing to all attorneys of record.


Dated:  May 22, 2024                          */s/ Robert A. O'Donnell*
                                              Robert A. O'Donnell